**CT** Corporation

**Service of Process Transmittal**
07/31/2020
CT Log Number 538027172

TO:  AMANDA FERGUSON
The Gap, Inc.
2 FOLSOM ST DEPT LAW
SAN FRANCISCO, CA 94105-1205

RE:  **Process Served in District of Columbia**

FOR:  THE GAP, INC.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Jack I. Bender & Sons, Pltf. vs. The Gap, Inc., etc., Dft. |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # 2020CA003261B |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Washington, DC |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/31/2020 at 15:58 |
| **JURISDICTION SERVED :** | District of Columbia |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 07/31/2020, Expected Purge Date: 08/05/2020<br><br>Image SOP<br><br>Email Notification,  Octavia Cruz  Octavia_Cruz@gap.com<br><br>Email Notification,  AMANDA FERGUSON  Amanda_Ferguson@gap.com<br><br>Email Notification,  GABRIELLE LINDSEY  gabrielle_lindsey@gap.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>1999 Bryan Street<br>Suite 900<br>Dallas, TX 75201 |
| **For Questions:** | 866-665-5799<br>SouthTeam2@wolterskluwer.com |

Page 1 of  1 / GP

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**Filed**
**D.C. Superior Court**
**07/28/2020 18:00PM**
**Clerk of the Court**

## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION – CIVIL ACTION BRANCH

JACK I. BENDER & SONS
C/O MICHAEL R. COGAN, ESQ.
MICHAEL R. COGAN, P.C.
12 SOUTH SUMMIT AVENUE
SUITE 250
GAITHERSBURG, MD 20877

     *PLAINTIFF,*

v.

THE GAP, INC., a/k/a Gap, Inc.
SERVE:  C T CORPORATION SYSTEM
REGISTERED AGENT
1015 15TH ST. NW
SUITE 1000
WASHINGTON, DC 20005

     *DEFENDANT.*

CASE NO.    **2020 CA 003261 B**

## COMPLAINT

COMES NOW, Plaintiff, Jack I. Bender & Sons, a Washington, D.C. general partnership ("**Plaintiff**") by and through counsel, Michael R. Cogan, Esquire, Eric Yarvin, Esq., and the law firm of Michael R. Cogan, P.C. and sues the Defendant, The Gap, Inc., a/k/a Gap, Inc., a Delaware corporation (the "**Defendant**") and in furtherance thereof states:

1.    Upon information and belief, Defendant is a Delaware corporation authorized to conduct business in the District of Columbia.

2.    Plaintiff is a Washington, D.C. general partnership authorized to conduct business in the District of Columbia.

3.    Jurisdiction of this Court is founded on DC Code Annotated, 1973 Edition, as amended, Section 11-921.

4.    Plaintiff and Defendant did enter into that certain "Multi-Occupancy Building Lease" dated June 9, 1992 (the "**Original Lease**"), as amended by that certain "Supplement to Lease" dated July 7, 2004 (the "**First Amendment**"), as further amended by that certain "Second Supplement to Lease" dated June 21, 2007 (the "**Second Amendment**"), as further amended by that certain "Third Supplement to Lease" dated July 27, 2015 (the "**Third Amendment**") (the "Original Lease", the "First Amendment", the "Second

1

Amendment" and the "Third Amendment", along with any and all addenda, riders, exhibits and attachments thereto are referred to herein, collectively, as the **"Lease"**), pursuant to which Plaintiff leased to Defendant, and Defendant leased from Plaintiff, the **"Premises"** (as defined in the Lease), consisting of certain commercial retail space located on the first (1st) floor and mezzanine level of the **"Building"** (as defined in the Lease) having an address of 1120 Connecticut Avenue, N.W., Washington, D.C. 20036 , in accordance with and as set forth more fully in the Lease.  A copy of the Lease is attached hereto and incorporated herein by reference as **Exhibit A**.

5.    In accordance with the terms of the Lease generally and Section 1 of the Third Amendment specifically, the **"Extension Term"** (as defined in the Third Amendment) of the Lease commenced on November 1, 2016 and shall expire naturally on January 31, 2022, as set forth more fully therein.

6.    In accordance with the terms of the Lease generally and Section 2 of the Third Amendment specifically, Defendant is obligated to pay to Plaintiff **"Minimum Rent"** (as defined in the Lease) for the Premises in the amount of $55,253.25 per month, as set forth more fully therein.

7.    As of July 1, 2020, Defendant has failed to pay to Plaintiff Minimum Rent and **"Other Charges"** (as defined in the Lease) in the amount of $228,603.68, exclusive of interest and attorney's fees (the **"Arrearage"**) as set forth more fully on the statement of account attached hereto and incorporated herein by reference as **Exhibit B**.

8.    Section 18.01 of the Original Lease provides, in pertinent part, that Defendant shall have committed an **"Event of Default"** (as defined in the Lease) in the event of "the failure by Defendant to pay any Rent due under this Lease which failure continues for a period of ten (10) days after receipt of written notice from Plaintiff sent pursuant to Section 27.01 that the same is overdue[.]"

9.    On May 22, 2020, Plaintiff did send to Defendant written notice (the **"Default Notice"**) of Defendant's failure to pay Minimum Rent and Other Charges due under the Lease in accordance with the terms of the Lease generally and Section 18.01 of the Original Lease specifically.  A copy of Plaintiff's Default Notice is attached hereto and incorporated herein by reference as **Exhibit C**.

10.    As a result of Defendant's failure to pay to Plaintiff all Minimum Rent and Other Charges due under the Lease timely and otherwise in accordance with its terms and after the giving by Plaintiff of the Default Notice and the running of the applicable ten (10) day cure period in accordance with the Lease, Defendant has committed an Event of Default under the Lease and Plaintiff is entitled to exercise all rights, claims and remedies that Plaintiff has or may have under the Lease, at law and in equity as a result of such Event of Default by Defendant.

11.    Plaintiff has made demand against Defendant under the Lease for payment of all sums due and Defendant has failed and refused and continues to fail and refuse to pay to Plaintiff all sums due under the Lease.

12.    Pursuant to the terms of the Lease generally and Section 20.01 of the Original Lease

specifically, if either party shall bring an action against the other to enforce or interpret the terms of this Lease, or otherwise arising out of this Lease, the prevailing party in such action shall be entitled to its costs of suit and reasonable attorneys' fees.

13.     Pursuant to the terms of the Lease generally and Section 18.04 of the Original Lease specifically, any payment of Minimum Rent or Other Charges which is not made when due shall bear interest at the rate equal to the prime rate of Wells Fargo Bank of San Francisco for short term commercial loans, plus 2%. Upon information and belief, the current interest rate for Wells Fargo unsecured business loans is 6.25%. Therefore, the current contract rate of interest under the Lease is 8.25%.

14.     Through July 1, 2020, there is due and owing to Plaintiff from Defendant under the Lease the principal sum of $228,603.68, exclusive of and in addtion to, attorneys' fees, interest and court costs. Plaintiff's Application and Affdiavit in Support of Judgment is attached hereto and incorporated herein by reference as **Exhibit D**.

15.     In accordance with the terms of the Lease generally and Section 18.02 of the Original Lease specifically, Plaintiff does hereby expressly reserve the right to amend this Complaint and/or file successive actions against Defendant for sums which come due under the Lease after July 1, 2020.

WHEREFORE, Plaintiff, Jack I. Bender & Sons, demands judgment against the Defendant, The Gap, Inc., a/k/a Gap, Inc., in the prineipal amount of $288,603.68, representing Minimum Rent and Other Charges due under the Lease through July 1, 2020, plus interest from December 1, 2019, until paid in full at contract rate of 8.25% per annum, plus reasonable attorney's fees in the amount of $45,720.74, the costs of this action, and any such further relief as this Honorable Court deems just and proper.

DATED:                                      Respectfully submitted,

_____
Michael R. Cogan, Esquire #450916
Michael R. Cogan, P.C.
12 S. Summit Avenue, Suite 250
Gaithersburg, Maryland 20877
P (240) 912-0400
F (240) 386-0555
Email: mcogan@randclegal.com
Attorney for Plaintiff

THIRD SUPPLEMENT TO LEASE

**EXHIBIT**

**A**

THIS THIRD SUPPLEMENT TO LEASE, made this ___27___ day of _July_, 2015, in the District of Columbia, by and between JACK I. BENDER & SONS, a Washington, D.C. general partnership (hereinafter referred to as "Landlord") and THE GAP, INC., a Delaware corporation (hereinafter referred to as "Tenant").

### WITNESSETH:

WHEREAS, on the 9th day of June, 1992, a written Agreement of Lease (the "Lease") was entered into wherein Landlord let to Tenant certain retail space on the first floor, mezzanine level and basement level (the "Initial Premises") of the Bender Building located at 1120 Connecticut Avenue, N.W. (the "Building"), in the city of Washington, District of Columbia, as more specifically described in said Lease, on the terms and conditions therein provided;

WHEREAS, on the 7th day of July, 2004, said Lease was supplemented to provide for an extension of the Lease Term and a reduction in size of the Initial Premises;

WHEREAS, on the 21st day of June, 2007, said Lease was supplemented to provide for an extension of the Lease Term; and,

WHEREAS, the parties hereto are desirous of supplementing the terms of said Lease to provide for an extension of the Lease Term upon the terms and conditions set forth in this Third Supplement to Lease.

NOW THEREFORE, for and in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the parties mutually covenant and agree that the above described Lease shall be supplemented as follows:

1. The Lease is hereby extended for a period of five (5) years and three (3) months, commencing November 1, 2016, and continuing through January 31, 2022, (the "Extension Term"), under the terms and conditions set forth in the Lease, except as set forth herein.

2. During the Extension Term, Tenant shall continue to lease from Landlord and Landlord shall continue to Lease to Tenant space on the first floor and mezzanine level of the Building consisting of approximately Eleven Thousand Three Hundred Thirty-Four

(11,334) square feet of rentable area (the "Premises") as outlined in red on Exhibit "A" to the July 7, 2004, Supplement to Lease. The monthly Minimum Rent for the Premises during the Extension Term shall be FIFTY-FIVE THOUSAND TWO HUNDRED FIFTY-THREE DOLLARS AND TWENTY-FIVE CENTS ($55,253.25), based on FIFTY-EIGHT DOLLARS AND FIFTY CENTS ($58.50) per square foot of the Premises.

3. Tenant shall lease the Premises in its current "as-is" condition, subject to Landlord's maintenance and repair obligations set forth in Section 9.01 of the Lease. Any improvements performed in the Premises shall be performed at Tenant's sole cost and expense in accordance with the Lease, as supplemented.

4. The parties acknowledge that Tenant's renewal option in accordance with Section 4 of the Second Supplement to Lease dated June 21st, 2007, has not been exercised and upon the effective date hereof, such Section shall be deleted in its entirety and be of no further force or effect.

5. The parties agree that the terms and conditions set forth in this Third Supplement to Lease shall not alter, waive or modify any rights, remedies or claims that Landlord or Tenant now has or may hereafter have under or arising out of the Lease whether known or unknown and whether relating to periods of time before or after the date of this Third Supplement to Lease, including, without limitation, any rights, remedies or claims of Landlord or Tenant based in whole or in part on a default by the other party of its obligations under the Lease, or the non-satisfaction or failure of any requirement or condition under the Lease.

6. This Third Supplement to Lease and all prior addendums and supplements shall hereinafter be referred to as the Lease.

7. This Third Supplement to Lease shall be executed under seal and the law of sealed instruments shall apply.

8. This Third Supplement to Lease shall not be binding until such time as it shall have been executed by and on behalf of the Landlord and Tenant and the fully executed documents have been returned to Tenant.

9. Landlord represents and warrants that (a) there is no mortgage or deed of trust encumbering the Building, (b) no party other than Landlord has an ownership interest in

the Premises or a lessor's interest in the Lease, and (c) no consents of third parties are necessary for the execution and performance of this Third Supplement to Lease (or that Landlord has obtained all consents of third parties necessary for the execution and performance of this Third Supplement to Lease). Each party hereto represents that this Third Supplement to Lease has been duly authorized and that the person executing the Third Supplement to Lease on behalf of the respective parties are authorized to do so and that such action is binding upon the respective parties. Each party shall defend, indemnify and save harmless the other party from and against all losses, claims, demands, damages, liabilities, costs and attorneys' fees resulting from a breach of, or inaccuracy in, any of the representations and warranties set forth in this section.

IN WITNESS WHEREOF, Landlord has caused this Third Supplement to Lease to be signed in its name by its agent, under seal, and Tenant has caused this Third Supplement to Lease to be signed in its corporate name by an authorized representative all on the day and year first hereinabove written.

WITNESS:                          LANDLORD:  JACK I BENDER & SONS

By: _____            By: _____ [SEAL]
    V.a. President                   Exec. v.a. President

WITNESS:                          TENANT:  THE GAP, INC.

By: _____            By: _____ [SEAL]
                                     Paul R. Mohun
                                     Associate General Counsel
                                     Assistant Secretary

# Gap Inc.

GPS Services
2 Folsom Street
San Francisco, CA 94105

December 22, 2008

**VIA FEDEX**

JACK I BENDER & SONS
C/O BLAKE REAL ESTATE, INC.
1150 CONNECTICUT AVE, NW, STE 801
ATTN: EXECUTIVE VICE PRES
WASHINGTON, DC, US - 20036

        **RE:  CHANGE OF NOTICE ADDRESS**
            **GAP #1009 - CONNECTICUT AVE-DC**
            **1120 CONNECTICUT AVE NW,**
            **WASHINGTON, DC**
            **LID# 651**

Dear Sir or Madam:

Please be advised Gap Inc has a new mailing address.  Effectively immediately, the notice must be addressed as follows:
:

For all notices,
including notices
of default, other
than invoices:      c/o The Gap, Inc.
               2 Folsom Street
               San Francisco, CA  94105
               Attn:  Real Estate Law, Store #1009, LID #651
               Fax:  415/427-0188
               Telephone:  415/427-0225

*received 3/25/09*

164598.2

Change of Notice Address
December 22, 2008
Page 2 of 2

For all invoices,
including copies of
notices of default
relating to
nonpayment of
amounts due to
Landlord:

c/o The Gap, Inc.
40 First Plaza NW
Albuquerque, NM 87102
Attn: Real Estate Payables, Store #1009, LID #651
Fax: 505/462-0256
Telephone: 505/462-0008

For all maintenance-
related issues,
including copies of
notices of default
relating to
maintenance:

c/o The Gap, Inc.
850 Cherry Avenue
San Bruno, CA 94066
Attn: Facilities Services, Store #1009, LID #651
Fax: 650/874-7797
Telephone: 800/241-2626 (Option 2)

In the event the above-referenced property is subject to a Non-Disturbance and Attornment
Agreement, kindly deliver a copy of this notice to any required mortgagee.

If you have any questions, please contact Betty Koo at 415-427-0130 or Betty_Koo@gap.com.
Thank you for your cooperation.

Very truly yours,

Paul R. Mohun
Senior Director
Associate General Counsel

164598.2

May - FYI

# Gap Inc.

Gap
Banana Republic
Old Navy

40 First Plaza NW
Albuquerque, NM 87102

January 29, 2008

JACK I BENDER & SONS
C/O BLAKE REAL ESTATE, INC.
1150 CONNECTICUT AVE, NW, STE 801,ATTN:  EXECUTIVE VICE PRES
WASHINGTON, DC  20036

**RE: Gap Inc. location CONNECTICUT AVE - DC---Gap, Store # 1009, Lease ID 651**

Dear Landlord/Developer;

It has been some time since we've dispersed any information to you and thought you might find the information below useful. Note, the lease id (lid) is what appears on your check remittance under Invoice #, and on your sales letters; this is how we identify each store's current rental obligations.

**For lease related invoices (i.e. Rent, CAM, RE Tax, etc.) & YE invoice reconciliations only mail to:**

Gap Inc.
40 First Plaza NW
Attn: Real Estate Payables, store #1009 / lid #651
Albuquerque, NM 87102

Failure to use the address above may delay or prevent your payment from reaching us.  Please continue to send all formal correspondence to the address outlined in your lease In addition, we ask that you refrain from addressing mail to any specific contact person.  Unfortunately, personnel changes often cause mail to be mis-directed to other departments and subsequently delay our receipt.  Please include your telephone # and/or email address on statements and invoices so that we can quickly resolve any questions that may otherwise delay payment.

**Sales Letters.**  Our sales follow a Fiscal Calendar, so sales may be delayed from month to month. Therefore, with reasonable certainty the monthly sales letter should arrive between the 15th and 20th.  You may call (505) 462-0729 or 1-866-411-2772 x20729 and select option #3 if you are in need of a Sales Report.  *If applicable, your sales letter references the Gap Inc. lease id (lid), not the store #.*

Most importantly, so that you have a first point of contact for either of the two departments. listed below, please phone or email:

Your Real Estate Payables contact is, Micaela Martinez, phone # 505-462-0292, and email micaela_martinez@gap.com. This would be for current year monthly or recurring rental charges, lost checks, or non specific invoicing.

Your Occupancy Accounting (YE reconciliations) contact is Dennis Strause, phone # 505-462-0285, and email dennis_strause@gap.com.

Yours truly,
Gap Inc.
**Lease Administration, CSSC, Albuquerque, NM**

B  L  A  K  E      R  E  A  L      E  S  T  A  T  E      I  N  C

## SECOND SUPPLEMENT TO LEASE

THIS SECOND SUPPLEMENT TO LEASE, made this 21ST day of June, 2007, in the District of Columbia, by and between JACK I. BENDER & SONS, a Washington, D.C. general partnership (hereinafter referred to as "Landlord") and THE GAP, INC., a Delaware corporation (hereinafter referred to as "Tenant").

### WITNESSETH:

WHEREAS, on the 9th day of June, 1992, a written Agreement of Lease ("the Lease") was entered into wherein Landlord let to Tenant certain retail space on the first floor, mezzanine level and basement level of the Bender Building located at 1120 Connecticut Avenue, N.W., in the city of Washington, District of Columbia, as more specifically described in said Lease, on the terms and conditions therein provided;

WHEREAS, on the 7th day of July, 2004, said Lease was supplemented to provide for an extension of the Lease Term and a reduction in the size of the Premises;

1

B   L   A   K   E      R   E   A   L      E   S   T   A   T   E      I   N   C

WHEREAS, the parties hereto are desirous of supplementing the terms of said Lease to provide for an extension of the Lease Term and for an option to further extend the Lease Term;

NOW THEREFORE, for and in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the parties mutually covenant and agree that the above described Lease shall be supplemented as follows:

1.      The Lease is hereby extended for the period of five (5) years, commencing November 1, 2011, and continuing to October 31, 2016 (the "Extension Term").

2.      During the Extension Term, Tenant shall continue to lease from Landlord and Landlord shall continue to Lease to Tenant space on the first floor and mezzanine level of the Building consisting of approximately Eleven Thousand Three Hundred Thirty-Four (11,334) square feet of rentable area (the "Premises"). as outlined in red on Exhibit "A" to the July 7, 2004, Supplement to Lease.  The monthly Minimum Rent for the Premises during the Extension Term shall be FIFTY-ONE THOUSAND NINE HUNDRED FORTY-SEVEN DOLLARS AND FIFTY CENTS ($51,947.50) or SIX HUNDRED TWENTY-THREE

2

B L A K E      R E A L      E S T A T E      I N C

THOUSAND THREE HUNDRED SEVENTY DOLLARS AND ZERO

CENTS ($623,370.00) per annum.

3.      Tenant shall lease the Premises in its current "as is"

condition. Landlord is under no obligation to make any improvements to

the Premises whatsoever. Any improvements performed in the Premises

shall be performed at Tenant's sole cost and expense in accordance with

the terms and conditions of the June 9, 1992, Lease, as supplemented. In

the event Tenant elects to perform a remodeling or reconfiguration of the

Premises, Landlord hereby agrees to allow Tenant to close all or a

portion of the Premises for a period not to exceed one hundred twenty

(120) days to perform such remodeling work, provided Tenant continues

to pay Minimum Rent and Other Charges due under the Lease during the

period of such closure.

4.      Landlord hereby grants to Tenant the conditional right,

exercisable at Tenant's option, to renew the term of this Lease for one (1)

five (5) year term commencing November 1, 2016, and continuing

through October 31, 2021 (the "Renewal Term"). Tenant shall exercise

its right of renewal by giving Landlord written notice of such election not

earlier than eighteen (18) months (i.e. not earlier than May 1, 2015), nor

later than twelve (12) months (i.e. not later than October 31, 2015) prior

3

B  L  A  K  E     R  E  A  L     E  S  T  A  T  E     I  N  C

to the expiration of the Extension Term.  If exercised, and if the conditions applicable thereto have been satisfied, the Renewal Term shall commence immediately following the end of the Extension Term.  The right of renewal herein granted to Tenant shall otherwise be subject to, and shall be exercised in accordance with, the following terms and conditions:

(a)  Upon receipt of written request by Tenant, sent to Landlord on or before February 28, 2015, within thirty (30) days of receipt of such request, Landlord shall provide Tenant with written notification of the proposed Minimum Rent, escalation factor and Other Charges for the Renewal Term for Tenant's consideration.  The parties shall have forty-five (45) days after Tenant's receipt of such terms from Landlord in which to agree on the Minimum Rent, escalation factor and Other Charges which shall be payable during the Renewal Term.  Among the factors to be considered by the parties during such negotiations shall be first floor retail rental market in the Connecticut Avenue, NW corridor between K Street, NW and M Street, NW; the rental rates then being quoted by Landlord to comparable renewal tenants for comparable retail space in the Building; and, the rents being charged similar renewal tenants for similar first floor retail space.  If during such forty-five (45) day period the parties agree on such Minimum Rent, escalation factor and

4

B   L   A   K   E      R   E   A   L      E   S   T   A   T   E      I   N   C

Other Charges payable during each year of the Renewal Term, and Tenant

elects to exercise the option for the Renewal Term then the parties shall

promptly execute an amendment to the Lease stating the rent so agreed upon.

If during such forty-five (45) day period the parties are unable, for any

reason whatsoever, to agree on such Minimum Rent, escalation factor and

Other Charges payable, and provided Tenant properly exercises the option

for the Renewal Term, then within ten (10) days thereafter the parties shall

each appoint a disinterested real estate broker who shall be licensed in the

District of Columbia and who specializes in the field of commercial retail

space leasing in the downtown Washington, D.C. market, has at least ten

(10) years of experience and is recognized within the field as being reputable

and ethical. Such two individuals shall each determine within ten (10) days

after their appointment such Minimum Rent, escalation factor and Other

Charges (to be not less than the minimums specified in this Section 4). If

such individuals do not agree on such items, then the two individuals shall,

within five (5) days, render separate written reports of their determinations

and together appoint a third similarly qualified individual. The third

individual shall within ten (10) days after his or her appointment make a

determination of such Minimum Rent, escalation factor and Other Charges

(to be not less than the minimums specified in this Section 4). The

Minimum Rent, escalation factor and Other Charges applicable during the

first      Lease      Year      of      the      Renewal      Term      shall      equal

B  L  A  K  E    R  E  A  L    E  S  T  A  T  E    I  N  C

the median of the three determinations and shall be final and conclusive. Landlord and Tenant shall each bear the cost of its broker and shall share equally the cost of the third broker. Upon such final determination of the Minimum Rent, escalation factor and Other Charges payable pursuant to this Section, the parties shall promptly execute an amendment to the Lease memorializing the rental terms so determined for the option period.

(b) If Tenant's renewal notice is not given timely, then Tenant's right of renewal shall lapse and be of no further force or effect.

(c) If Tenant is in default beyond any applicable cure periods under the Lease on the date Tenant sends a renewal notice or any time thereafter until the Renewal Term is to commence, then, at Landlord's election, the Renewal Term shall not commence and the term of this Lease shall expire at the expiration of the Extension Term.

(d) If at the time of exercise of the option, the Tenant is not The Gap, Inc. or an Affiliate (as defined in Section 17.02 of the June 9, 1992, Lease) then Tenant shall not be permitted to exercise this renewal option.

(e) Notwithstanding any other term or provision of this Section, Tenant's Minimum Rent, escalation factor and Other Charges during the

6

B   L   A   K   E        R   E   A   L        E   S   T   A   T   E        I   N   C

Renewal Term shall not be less than that which is in effect under this

Lease during the last month of the Extension Term.

5.      Notices shall now be sent to Landlord as follows:

>           Jack I. Bender & Sons
>           c/o Blake Real Estate, Inc.
>           1150 Connecticut Avenue, NW
>           Suite 801
>           Washington, D.C. 20036
>           Attn:  Executive Vice President

>           Notices shall now be sent to Tenant as follows:

>           The Gap, Inc.
>           Attn: Real Estate Department
>           Store #1009
>           901 Cherry Avenue
>           San Bruno, CA 94066
>           (650) 874-4101 (Telephone)
>           (650) 874-7818 (Fax)

>           Invoices shall be sent to:

>           The Gap, Inc.
>           Attn: Real Estate Payables Store #1009
>           40 First Plaza NW
>           Albuquerque, NM 87102
>           (505) 462-0004 (Telephone)
>           (505) 462-0347 (Fax)

>           For all maintenance related issues,
>           including copies of notices of default
>           related to maintenance:
>           The Gap, Inc.
>           Attn:  Facilities Store #1009
>           901 Cherry Avenue
>           San Bruno, CA 94066
>           (650) 874-7797 (Telephone)
>           (800) 241-2626 (Fax)

7

B   L   A   K   E       R   E   A   L       E   S   T   A   T   E       I   N   C

6.    This Second Supplement to Lease shall be executed under seal and the law of sealed instruments shall apply.

7.    Subject to Landlord's reasonable approval, Tenant shall have the exclusive right to place Gap signage or Gap marketing graphics on any scaffolding or barricades within or directly in front of the Premises.  Without limiting the restrictions set forth anywhere in the Lease, if the scaffolding or barricades located directly in front of the Premises affects the visibility of Tenant's storefront or signage or access to the Premises, then Tenant shall have the non-exclusive right to place such approved signage or marketing graphics on such scaffolding or barricades at Tenant's sole cost and expense.

8.    This Second Supplement to Lease shall not be binding until such time as it shall have been executed by and on behalf of the Landlord and Tenant and the fully executed documents have been returned to Tenant.

9.    Each party hereto represents that this Second Supplement to Lease has been duly authorized and that the person executing the Second Supplement to Lease on behalf of the respective parties are authorized to do so and that such action is binding upon the respective parties.

8

B L A K E   R E A L   E S T A T E   I N C

IN WITNESS WHEREOF, Landlord has caused this Second Supplement to Lease to be signed in its name by one of its General Partners, under seal, and Tenant has caused this Second Supplement to Lease to be signed in its corporate name by an authorized representative all on the day and year first hereinabove written.

WITNESS:

By: _____

ATTEST: Witness:

By: _____

LANDLORD: **JACK I. BENDER & SONS**

By: _____ [Seal]

TENANT: **THE GAP, INC.**

By: _____ [Seal]
Smita Butala
Senior Director
Associate General Counsel

9

B  L  A  K  E     R  E  A  L     E  S  T  A  T  E     I  N  C

### SUPPLEMENT TO LEASE

THIS SUPPLEMENT TO LEASE, made this _____ 7ᵗʰ day of July, 2004, in the District of Columbia, by and between JACK I. BENDER & SONS, a Washington, D.C. general partnership (hereinafter referred to as "Landlord") and THE GAP, INC., a Delaware corporation (hereinafter referred to as "Tenant").

### WITNESSETH:

WHEREAS, on the 9ᵗʰ day of June, 1992, a written Agreement of Lease ("the Lease") was entered into wherein Landlord let to Tenant certain retail space on the first floor, mezzanine level and basement level of the Bender Building located at 1120 Connecticut Avenue, N.W., in the city of Washington, District of Columbia, as more specifically described in said Lease, on the terms and conditions therein provided;

WHEREAS, the parties hereto are desirous of supplementing the terms of said Lease to provide for an extension of the Lease Term and reduction in the size of the Premises;

1.

B   L   A   K   E       R   E   A   L       E   S   T   A   T   E       I   N   C

NOW THEREFORE, for and in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the parties mutually covenant and agree that the above described Lease shall be supplemented as follows:

1.      The Lease shall be extended to now expire October 31, 2011.

2.      Effective November 1, 2004, and continuing until October 31, 2011, Tenant shall lease and be responsible for space on the first floor and mezzanine level of the Building consisting of approximately Eleven Thousand Three Hundred Thirty-Four (11,334) square feet of rentable area (the "Reduced Premises"). as outlined in red on Exhibit "A" attached hereto and made a part hereof.  The Base Monthly Rent for the Reduced Premises shall be THIRTY-NINE THOUSAND ONE HUNDRED SIXTY-SIX DOLLARS AND SIXTY-SEVEN CENTS ($39,166.67) for the period November 1, 2004, through October 31, 2009, and FORTY-THREE THOUSAND EIGHTY-THREE DOLLARS AND THIRTY-THREE ($43,083.33) for the period November 1, 2009 to October 31, 2011.

2

B   L   A   K   E       R   E   A   L       E   S   T   A   T   E       I   N   C

3.      Effective November 1, 2004, Tenant's Proportionate Share of the Building for the Reduced Premises shall be three and seventy-three hundredths percent (3.73%).

4.      Tenant shall lease the Reduced Premises in its current "as is" condition.  Landlord is under no obligation to make any improvements to the Reduced Premises whatsoever.  Any improvements performed in the Reduced Premises shall be performed at Tenant's sole cost and expense in accordance with the terms and conditions of the June 29, 1992, Lease.  However, as consideration for the Landlord agreeing to reduce the size of the Premises, Tenant shall:  1) return the basement and a portion of the mezzanine space that Tenant is relinquishing to Landlord in a broom clean condition; 2) assure that all rents and additional rents due to Landlord are made current through October 31, 2004; 3) remit to Landlord upon Tenant's execution of this Supplement to Lease a check in the amount of  FOURTEEN THOUSAND SEVEN HUNDRED FIFTY FOUR DOLLARS AND FIFTY CENTS ($14,754.50) which represents the first half of Tenant's obligation for the work required in the basement and mezzanine areas; and, 4) remit to Landlord, by the earlier to occur of November 1, 2004 or within thirty (30) days of completion of the work required in the basement and mezzanine areas, a check

3

B  L  A  K  E      R  E  A  L      E  S  T  A  T  E      I  N  C

for FOURTEEN THOUSAND SEVEN HUNDRED FIFTY FOUR

DOLLARS AND FIFTY CENTS ($14,754.50) which represents the second

half of Tenant's obligation for the work required in the basement and

mezzanine areas.

5.      On or before October 31, 2004, Tenant shall vacate the

relinquished basement and a portion of the mezzanine area, remove all of its

furniture, fixtures and equipment and leave such areas in broom clean

condition.

6.      (a) It is further mutually covenanted and agreed that with the

exception of: Sections; 2.01-4; 2.03; 4.01; and, Exhibit "B" to the June 9,

1992, Lease, all of the terms and conditions of the June 9, 1992, Lease, except

as modified herein, shall remain in full force and effect.

(b) The following new Section 4.01 shall be substituted for the

former Section 4.01 deleted per 6(a) above:

> Tenant shall pay to Landlord at such place designated in
> the Notice Section below or at such other place designated
> by Landlord without prior demand therefor, and except as
> expressly provided otherwise in this Lease the rent as
> described in Section 2 of this Supplement to Lease.  The
> rent shall be payable in equal monthly installments in

4

B  L  A  K  E       R  E  A  L       E  S  T  A  T  E       I  N  C

advance on the first day of each calendar month during the term hereof.

7.    Notices shall now be sent to Landlord as follows:

Jack I. Bender & Sons
c/o Blake Real Estate, Inc.
1150 Connecticut Avenue, NW
Suite 801
Washington, D.C. 20036
Attn:  Executive Vice President

Notices shall now be sent to Tenant as follows:

The Gap, Inc.
Attn: Real Estate Department
Store #1009
901 Cherry Avenue
San Bruno, CA 94066
(650) 874-4101 (Telephone)
(650) 874-7818 (Fax)

Invoices shall be sent to:

The Gap, Inc.
Attn: Real Estate Payables Store #1009
40 First Plaza NW
Albuquerque, NM 87102
(505) 462-0004 (Telephone)
(505) 462-0347 (Fax)

8.    The three (3) indented paragraphs in Section 1.1 of the

percentage rent rider are deleted and the following paragraph is inserted in

place.

B   L   A   K   E        R   E   A   L        E   S   T   A   T   E        I   N   C

"The annual breakpoint for the period November 1, 2004,
through October 31, 2009 shall be NINE MILLION FOUR HUNDRED
THOUSAND DOLLARS AND ZERO CENTS ($9,400,000.00).  The annual
breakpoint for the period November 1, 2009, through October 31, 2011, shall
be TEN MILLION THREE HUNDRED FORTY THOUSAND DOLLARS
AND ZERO CENTS ($10,340,000.00)."

9.    This Lease shall be executed under seal and the law of sealed
instruments shall apply.

10.    Tenant upon receipt of written request of Landlord, shall provide
Landlord with its most recent annual report.

11.    This Supplement to Lease shall not be binding until such time as
it shall have been executed by and on behalf of the Landlord and Tenant and
the fully executed documents have been returned to both parties.

B   L   A   K   E      R   E   A   L      E   S   T   A   T   E      I   N   C

IN WITNESS WHEREOF, Landlord has caused this Supplement to Lease to be signed in its name by one of its General Partners, under seal, and Tenant has caused the Supplement to Lease to be signed in its corporate name by an authorized representative all on the day and year first hereinabove written.

WITNESS:                                    LANDLORD: **JACK I. BENDER**
                                            **& SONS**

By: _____                   By: _____ [Seal]

WITNESS:                                    TENANT: **THE GAP, INC.**
                                            a Delaware corporation

By: _Melanie White_                          By: _____ [Seal]



Exhibit "A" Supplement to Lease Agreement dated
_____ 2004, by and between JACK I. BENDER & SONS
("Landlord") and THE GAP, INC. ("Tenant") for retail space
located on the FIRST (1st) FLOOR and MEZZANINE LEVEL
of the Building located at 1120 Connecticut Avenue, N.W.,
Washington, D.C.

APPROVED BY:

LANDLORD:
DATE: 7-7-04
TENANT:
DATE: 6/29/04

☑003

Design Services Group

04 11:08 FAX 3018277739



MEZZANINE FLOOR LEVEL B-2
1/16"=1'-0"          1.12.04



Design
Services
Group, LLC

Architecture    &    Interior    Architecture

Tel: 301-527-7735

## WORK REQUIRED IN MEZZANINE AND BASEMENT AREAS

REMOVE THREE (3) DOORS AND FRAMES

REMOVE EXISTING 5' X 6' 8" DOOR FRAME
FROM EXISTING BLOCK WALL

REMOVE 26' OF DRYWALL PARTITION

FURNISH & INSTALL 19' OF SLAB TO SLAB
DRYWALL PARTITION

FURNISH & INSTALL 2 NEW 6' 8" HOLLOW
METAL DOORS AND WITH
NEW EXIT HARDWARE

FURNISH & INSTALL 1 NEW 6' 8" HOLLOW
METAL DOOR AND FRAME WITH
NEW EXIT HARDWARE

MODIFY EXISTING BLOCK TO ACCOMMODATE
NEW DOOR AND FRAME

RELOCATE EXISTING EXIT DOOR

FURNISH & INSTALL NEW LIGHT SWITCH AND
BX CABLE

RESWITCH 8 LIGHT FIXTURES

FURNISH & INSTALL NEW FIRE ALARM MANUAL
STATIONS AT 2 STAIRWELL EGRESS LOCATIONS

FURNISH & INSTALL NEW FIRE ALARM "FIREMAN'S
PHONES AT 2 STAIRWELL EGRESS LOCATIONS

FURNISH & INSTALL 12 FIRE ALARM STROBE
LIGHTS ON PERIMETER WALLS

FURNISH & INSTALL 1 POWER EXTENDER PANEL

FURNISH & INSTALL 4 WALL MOUNTED EMERGENCY
LIGHTS

REMOVE EXISTING FIRE ALARM CONTROL PANEL
AND ASSOCIATED FIRE ALARM DEVICES



January 30, 2004

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

JACK I BENDER & SONS
THE REAL ESTATE DIVISION
1150 CONNECTICUT AVE., NW
WASHINGTON, DC 20036
ATTN: STEPHEN F. LUSTGARTEN

                    RE:  GAP #1009-CONNECTICUT AVE - DC
                         WASHINGTON, DC
                         PID# 651

Dear Sir or Madam:

Effective January 31, 2004, The Fisher Gap Stores Inc. will be merged with and into The Gap, Inc.  Pursuant to the terms of the lease between us, this is an intra-corporate transfer permitted without Landlord's consent.  This change is technical in nature and has no practical effect on our relationship with you as our Landlord since, by operation of law, The Gap, Inc. will assume and perform all obligations of the tenant under the lease and will be bound by all of the terms and conditions thereof.

In addition, please update Tenant's notice address in your files, as necessary.  All notices pursuant to the Lease should be sent to the following address:

                    The Gap, Inc.,
                    901 Cherry Avenue
                    San Bruno, CA  94066
                    Attn:  Real Estate Law Dept. - Store # 1009

                    Fax: 650/874-6134
                    Telephone: 650/874-4101

91277.1

Page 2

Please remit any invoices to:

> The Gap, Inc.,
> 40 First Plaza NW
> Albuquerque, NM 87102
> Attn: Real Estate Payables - Store # 1009
>
> Fax: 505/462-0347
> Telephone: 505/462-0004

Sincerely,

Kenneth C. Wan
Senior Director
Associate General Counsel
On behalf of The Fisher Gap Stores Inc.

CC:

JACK I BENDER & SONS, 1120 CONNECTICUT AVENUE, N.W., WASHINGTON, DC 20036; ATTN: STEVEN SCHWARTZ, ESQ.

91277.1

# G A P

Real Estate Law Department                                    December 30, 1993
Fax Number (415) 873-5731                                     VIA FEDERAL EXPRESS

Stephen F. Lustgarten
Blake Construction Co., Inc.
Real Estate Division
1150 Connecticut Ave., N.W.
Washington, D.C., 20036

THE GAP, INC.
900 CHERRY AV
SAN BRUNO
CA 94066
TELEPHONE
415 952 4400

                Re:    The Gap @ 1120 Connecticut Ave., N.W.

Dear Mr. Lustgarten,

        Reference is made to that certain lease dated June 6, 1992 (the "Lease"),
by and between Jack I. Bender & Sons as Landlord, and The Gap, Inc. as Tenant,
covering the above-captioned premises.  As we believe it is the intention of the
parties that, should The Gap elect to exercise either of the options to extend the
term, that any such extension shall become effective as of the day following the
"Natural Expiration Date" as defined in Section 2.01-4 of the Lease.  Accordingly,
the reference to the "Original Term Expiration Date" in Section 2.01-4(b)(i)
should be deleted and replaced with "Natural Expiration Date."

        If you concur, please sign and return the enclosed duplicate of this letter at
your earliest convenience.

                                        Sincerely,

                                        J. Michael Whisman
                                        Associate General Counsel
                                        and Managing Attorney

Acknowledged and agreed this
11th of January , 1994,

By

cc:    Jack I. Bender & Sons

**Blake Real Estate**
A Division of Blake Construction Co., Inc.
1150 Connecticut Avenue, N.W.
Washington, D.C. 20036-4104
Telephone 202/776-0400
Telecopier 202/223-9836

Representing
B. G. W. Limited Partnership
Bell Associates
Blake Development Company
Brookville Realty, Inc.
Capitol Broadcasting Company
J. I. B. Associates
Jack I. Bender & Sons
Northwestern Development Company
Northwestern Development Company "B"
Paramount Development Company Limited Partnership
Professional Associates
Rednob Parking
Rhode Island & M Associates
12th & L Streets Limited Partnership
Langley Park Associates Joint Venture
Azalea Forest Associates Joint Venture
2900 Wilson Boulevard Associates Joint Venture

VIA CERTIFIED RETURN RECEIPT AND FEDERAL EXPRESS

CRR# P 002 919 541

June 5, 1992

The Gap, Inc.
900 Cherry Avenue
San Bruno, CA 94066
Attn: General Counsel

Re: 1120 Connecticut Avenue, N.W.
Washington, D.C.

Gentlemen:

This letter will confirm our agreement regarding the condition of the premises that are the subject of that certain Multi-Occupancy Building Lease dated June 9, 1992 (the "Lease") between Jack I. Bender & Sons ("Landlord") and The Gap, Inc. ("Tenant"). ~~Notwithstanding the fact that actual possession of the premises has not been delivered to Tenant as of June 5, 1992,~~ Landlord and Tenant agree that for all purposes under the Lease the premises shall be deemed "ready for occupancy" as defined in Section 2.01-1 of the Lease as of June 5, 1992, and the 120 day construction period shall run from such date. JBK b

Please confirm your agreement with the foregoing by executing the enclosed copy of this letter and returning it to the undersigned.

Sincerely,

JACK I. BENDER & SONS

By: Stewart A Horowitz

ACCEPTED AND AGREED BY:
THE GAP, INC.

By: Steven B. Kaplan
Steven B. Kaplan
Senior Vice President

6/9/92
DATE

SAG/at

cc: Stephen F. Lustgarten
Chester White
Jay Epstien
Diane Estrin

JIBS

JIBS - 01758

# MULTI-OCCUPANCY BUILDING LEASE

THIS LEASE is made and entered into this ___9th___ day of ___June___, 1992, by and between Jack I. Bender & Sons, a District of Columbia general partnership, hereinafter called "Landlord" and The Gap, Inc., a Delaware corporation, hereinafter called "Tenant".

In consideration of the mutual agreements hereinafter set forth, Landlord and Tenant agree as follows:

## ARTICLE 1:   PREMISES

**1.01 Premises.** Landlord leases to Tenant and Tenant hires from Landlord that certain store premises containing approximately 19,468 square feet of area, including first floor, mezzanine and basement space area (said store premises and basement space being collectively referred to as the "Premises"), which Premises is located on the first floor, mezzanine and basement of that certain multi-story building (the "Building") known as 1120 Connecticut Avenue, N.W., in the District of Columbia. The height of the Premises shall extend from the floor beneath the floor slab (of the first floor, of the mezzanine, and of the basement, as the case may be) to the underside of the floor above. The Building is located on that certain parcel of land (the "Land"), which Land is known for purposes of assessment and taxation as Lot 0037, Square 0161, and the Premises located thereon are outlined in red on Exhibit A attached hereto and made a part hereof.

**1.02 Appurtenances.** Said Premises is hereby leased to Tenant with all appurtenances thereto. In addition to said Premises and appurtenances Landlord hereby grants to Tenant a license or right of way at the rear of the Premises over other portions of the Land and/or over other property of Landlord as may be required by applicable law as a rear means of egress therefrom which license shall be appurtenant to the Premises during the term of this Lease, as the same may be extended. Landlord shall have the right to relocate the licensed right of way on a permanent or temporary basis, provided that Landlord provides Tenant with a reasonably acceptable alternative right of way.

**1.03 Common Easement.** In addition to said Premises, Tenant, its employees, agents, licensees, customers, invitees, successors and assigns, shall have all rights appurtenant thereto and Landlord hereby grants and conveys to the Tenant, for itself, and for the benefit of its employees, agents, customers, licensees, invitees, successors and assigns for the term of this Lease a non-exclusive, irrevocable easement and right, in common with the other occupants of the Building and with the public for the purpose of ingress to, egress from, access over and across any corridor or right of way at the rear of the Premises as may be required by applicable law as a rear means of egress from the Premises. The aforementioned easement shall be appurtenant to the Premises, and shall run with the Land during the term of this Lease, as the same may be extended.

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
igldspi\dgn\connect.lse



## ARTICLE 2:   TERM

2.01-1  <u>Original Term/Commencement Date</u>.  (a)  The term of this Lease shall be for a period of twelve (12) Lease Years (as defined herein).  The term of this Lease and Tenant's obligation to pay Rent shall commence (the "Commencement Date") upon one of the following dates, whichever is earlier:

(i)  the date next following the expiration of one hundred twenty (120) days (the "Construction Period") after the Premises are ready for occupancy (as hereinafter defined) by Tenant, or

(ii)  the date Tenant opens the Premises for business.

(b)  <u>Ready for Occupancy</u>.  The Premises shall be deemed "ready for occupancy" and the Construction Period shall commence to run when all of the following have occurred:

(i)  actual possession of the Premises has been delivered to Tenant in the condition called for in Article 5 and Exhibit B hereof, and

(ii)  Tenant has obtained the Approvals referred to in Article 31, and

(iii)  Landlord shall have obtained the non-disturbance agreement referred to in Article 22 of this Lease but this requirement shall apply only if there is any existing ground lease, deed of trust, mortgage or other security agreement or arrangement covering the Premises at the time possession thereof is delivered to Tenant.

Notwithstanding the foregoing, if Landlord delivers possession of the Premises "ready for occupancy" on a date which will result in the expiration of the one hundred twenty (120) day Construction Period occurring during a Dead Period (as hereinafter defined), then unless Tenant opens for business sooner, Tenant shall not be required to open, nor shall the Commencement Date occur before the end of the current Dead Period.  The term "Dead Period" as used herein shall mean any of the following periods:  (a) June 13, 1992 through July 30, 1992, (b) October 3, 1992 through November 12, 1992, (c) December 5, 1992 through January 28, 1993.  Notwithstanding the foregoing, if Landlord delivers possession of the premises "ready for occupancy" at any time after June 5, 1992, then with respect to the Dead Period defined in clause (b) of the immediately preceding sentence, Tenant shall be obligated to pay minimum rent in the amount equal to Five Hundred Thirty-four Dollars and Eight-four Cents ($534.84) per day for each day during the period commencing on the date which is 120 days after the date on which the Premises are delivered "ready for occupancy" and ending on the earlier to occur of the date Tenant opens for business or the end of such Dead Period.

Promptly following the Commencement Date, the parties hereto agree to execute an agreement establishing said Commencement Date.

2.01-2  THIS SECTION INTENTIONALLY DELETED.

2.01-3  THIS SECTION INTENTIONALLY DELETED.

-2-





**2.01-4  Automatic Extension of Original Term For Fall/Holiday Season.** Further, if by virtue of the provisions of this Lease the original term would expire by natural lapse of time (the "Natural Expiration Date") during the period between August 1 and December 31 of a given year, and in the further event:

(a)  Tenant does not elect to exercise its options to extend the original term as provided in Section 2.03, then the original term shall be deemed automatically extended and shall expire on the January 31st ("Original Term Expiration Date") next succeeding the Natural Expiration Date and during such extension Tenant shall pay as monthly Minimum Rent the monthly amount paid by Tenant during the last month immediately prior to the Natural Expiration Date;

(b)  Tenant does elect to exercise its option(s) to extend the original term as provided in Section 2.03, then:

(i)  such option term(s) shall run from the day following the Original Term Expiration Date of the lease, and

(ii)  Lease Years during said extension period(s)  shall continue to run in the manner defined in Section 2.02; and

(iii)  the term shall be deemed further extended automatically from the end of the last option exercised by Tenant to the next succeeding January 31st ("Option Expiration Date") and during such extension  Tenant shall pay as monthly Minimum Rent the monthly amount paid by Tenant during the last month of the preceding option period.

**Provisions Not Applicable.** If the Natural Expiration Date of the original term or any option period would occur during the period between January 1 through July 31 of a given year or if the Lease is terminated by reason of a default then the foregoing provisions will not apply.

**2.02  Lease Year Defined.** The "first Lease Year" shall begin on the Commencement Date and shall expire on the last day of the month, twelve (12) full calendar months next following said Commencement Date. If the Commencement Date shall occur on the first day of the calendar month, then the first Lease Year shall end on the day immediately preceding the first anniversary of the Commencement Date. Subsequent Lease Years shall be each consecutive twelve (12) calendar month period thereafter.

In the event the term of this Lease is extended to a January 31st as provided in Section 2.01-4 hereof (or is terminated prior to the expiration of the last full Lease Year), then the period from the end of the last full Lease Year to the next succeeding January 31st (or to the termination of the term, if earlier) shall be deemed a "Partial Lease Year."

**2.03  Options to Extend Term.** Subject to the following conditions precedent, Tenant shall have the option to extend the term of this Lease for two (2) additional periods of five (5) years each upon the same terms and conditions as are provided for the original term except that the Minimum Rent shall be as set forth in Article 4. In the event Tenant elects to exercise any option(s) to extend as provided herein, Tenant shall give Landlord written notice thereof at least one (1) year prior to the expiration of the Original Term Expiration Date or the next preceding Option Expiration Date, as the case may be. Subject to

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgldspf\dge\connect.lse

JIBS - 01760



the provisions of Section 5.03 and Articles 9, 12 and 13, Tenant shall accept the Premises in their "as-is" condition.

The conditions precedent for Tenant's right to exercise its options to extend the term of the Lease are as follows:

(i)   No uncured Event of Default exists at either the time that the option notice is delivered to Landlord or the first day of the applicable option term; and

(ii)   If at the time of exercise of the option the Tenant is not The Gap, Inc. or an Affiliate (as hereinafter defined in Section 17.02), then Tenant shall not be permitted to exercise the applicable renewal option if there has occurred within the three (3) year period immediately preceding the date on which Tenant notifies Landlord of its election to exercise such option three (3) or more Events of Default, whether or not such Events of Default have been subsequently cured.

2.04   THIS SECTION INTENTIONALLY DELETED.

ARTICLE 3:   USE/OPERATION

3.01   Use.   The Premises may be used for any retail purpose or purposes except for the prohibited uses set forth on Exhibit A-1 attached hereto and by reference made a part hereof.  Tenant shall have no obligation to operate any business nor conduct any use in the Premises either initially or at any time during the term of this Lease provided that the Minimum Rent and Other Charges (as defined in Article 4) nevertheless continue to be paid to Landlord and provided further that Tenant performs all other terms and conditions of this Lease so far as applicable to a vacant premises.

3.02   Landlord's Right to Recapture.   Although Tenant shall have no obligation to operate any business at the Premises, Tenant shall be obligated to continue to pay to Landlord the Minimum Rent and additional rent and charges due hereunder and shall continue to perform all other obligations of Tenant hereunder to the extent applicable to vacant premises. Notwithstanding the foregoing, in the event Tenant ceases operation of its business at the Premises for a period in excess of one hundred eighty (180) continuous days for any reason (other than force majeure), Landlord shall have the right to terminate the Lease by written notice to Tenant at any time thereafter, which termination shall be effective sixty (60) days after the date of such notice.  If Landlord elects to terminate the lease in accordance with the foregoing, then Tenant shall have the right (but not more often than one time within any three (3) year period) to avoid such termination by reopening the Premises for business with the public, fully stocked and staffed, no later than sixty (60) days after Landlord's termination notice.

ARTICLE 4:   RENT

4.01   Minimum Rent.   Tenant shall pay to Landlord at the place designated in the Article entitled "Notices" or at such other place designated by Landlord, without prior demand therefor, and, except as expressly provided otherwise in this Lease, without setoff or deduction, rent (the "Minimum Rent") in the amounts set forth in the following schedule.  The Minimum Rent shall be payable in equal monthly installments in advance on the first day of each calendar month during the term hereof. Minimum Rent shall be prorated on a per diem basis with respect

JIBS - 01761



to any fractional calendar month.

## Minimum Rent

For and during the period from the Commencement Date through the end of the fourth (4th) full Lease Year of the term at the rate of Three Hundred Eighty-nine Thousand, Three Hundred Sixty Dollars ($389,360.00) per annum, payable in equal monthly installments of Thirty-two Thousand, Four Hundred Forty-six Dollars and Sixty-seven Cents ($32,446.67) each.

For and during the period from the beginning of the fifth (5th) Lease Year through the expiration of the eighth (8th) Lease Year, at the rate of Four Hundred Twenty-eight Thousand, Two Hundred Ninety-six Dollars ($428,296.00) per annum, payable in equal monthly installments of Thirty-five Thousand, Six Hundred Ninety-one Dollars and Thirty-three Cents ($35,691.33) each.

For and during the period from the beginning of the ninth (9th) Lease Year through the Original Term Expiration Date, at the rate of Four Hundred Eighty-six Thousand, Seven Hundred Dollars ($486,700.00) per annum, payable in equal monthly installments of Forty Thousand, Five Hundred Fifty-eight Dollars and Thirty-three Cents ($40,558.33) each.

## Option Periods

For and during the period from the beginning of the thirteenth (13th) Lease Year through the expiration of the seventeenth (17th) Lease Year, at the greater of (i) ninety percent (90%) of the fair rental value (computed in the manner set forth below) or (ii) the rate of Four Hundred Eighty-six Thousand, Seven Hundred Dollars ($486,700.00) per annum.

For and during the period from the beginning of the eighteenth (18th) Lease Year through the Option Expiration Date of the second option, at the greater of (i) ninety percent (90%) of the fair rental value (computed in the manner set forth below) or (ii) the annual rate payable during the first option period.

## Determination of Fair Rental Value

The "fair rental value of the Premises", as used in this Section 4.01, shall mean the monthly rental which a willing lessee would pay a willing lessor for a lease of the Premises upon the terms set forth in this Lease, neither party being under any compulsion to act, determined as of the commencement of the thirteenth and eighteenth full Lease Years of the Term or as close thereto as practicable. For purposes of determining fair rental value of the Premises, the Premises shall be deemed to be in "move-in" condition with no remodeling being necessary (whether or not such is the case) and no improvements or other allowance being requested or appropriate.

Fair rental value of the Premises shall be determined in accordance with the following procedures:

-5-

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
[illegible]



A.    Within thirty (30) days after the commencement of the
twelfth (12th) full Lease Year of the Term or the seventeenth
(17th) full Lease Year of the Term, as the case may be, Landlord
shall send a written notice to Tenant (the "Fair Rental Value
Notice") setting forth Landlord's determination of the fair
rental value of the Premises.  If Tenant disagrees with
Landlord's determination of the fair rental value of the Premises
as set forth in the Fair Rental Value Notice, Tenant shall,
within thirty (30) days after the giving of the Fair Rental Value
Notice, give written notice (the "Conference Notice") to Landlord
of such disagreement and stating Tenant's determination of the
fair rental value of the Premises.  If the Conference Notice is
not fully and timely given, then the amount set forth in the Fair
Rental Value Notice shall be the fair rental value of the
Premises.

B.    Upon the giving of the Conference Notice, the parties
shall promptly meet and confer in good faith and agree in writing
as to the fair rental value of the Premises.

C.    If the Conference Notice is duly given and Landlord and
Tenant are unable to agree upon the fair rental value of the
Premises by thirty (30) days after the giving of the Conference
Notice then the fair rental value of the Premises shall be
determined in the following manner:

Landlord and Tenant shall each, by written notice to the
other, promptly appoint a licensed real estate broker who shall
have been actively engaged in commercial leasing in that portion
of downtown Washington, D.C. which is bounded on the north by
Dupont Circle, on the south by Pennsylvania Avenue, on the west
by 21st Street and on the east by 17th Street, for a period of
not less than five (5) years immediately preceding his or her
appointment.  If the brokers thus appointed cannot agree on the
fair rental value then they shall appoint a third licensed real
estate broker with the same qualifications required of the two
(2) brokers thus appointed, and such three (3) brokers shall, as
promptly as practicable, determine the fair rental value of the
Premises.  The determination of a majority of the three (3)
brokers shall be binding upon both parties.  If either Landlord
or Tenant shall not have appointed a broker as aforesaid and
shall have still failed to appoint such broker within ten (10)
days after written notice from the other party of such failure,
the single broker appointed shall proceed to determine the fair
rental value of the Premises, and such determination shall be
conclusive and binding.  If, within ten (10) days after the
appointment of the second broker, the two (2) brokers appointed
by the parties shall be unable to agree upon the appointment of a
third broker, they shall give written notice of such failure to
agree to the parties, and, if the parties fail to agree upon the
selection of such third broker within five (5) days after the
brokers appointed by the parties give notice as aforesaid, then
either Landlord or Tenant, upon written notice to the other, may
apply for such appointment (a) in any court within Washington,
D.C., having jurisdiction thereover and exercising functions for
such appointment or (b) to the American Arbitration Association.
If within fifteen (15) days after the appointment of the third
broker, a majority of the three (3) brokers so appointed shall be
unable to agree upon and determine the fair rental value of the
Premises, each such broker shall give written notice to the
parties setting forth his or her determination of the fair rental
value of the Premises.  The fair rental value shall equal the
average of the three (3) brokers' determinations; provided,
however, that if one or two of the brokers' determinations is

-5-

JI89 - 01769

either more than ten percent (10%) greater or more than ten percent (10%) less then the average of the three determinations, then such determination(s) shall be disregarded, and the fair rental value shall be the average of the determination(s) that are not more than ten (10%) greater or less than the average of the three determinations.  The average, as so determined shall be the fair rental value for the Premises and shall be conclusive and binding on the parties to this lease.

Each party shall pay the fees of the broker appointed by it and the fees of the third broker shall be borne equally by Landlord and Tenant.  The determination of the fair rental value of the Premises as set forth above may be entered as a judgment in any court having jurisdiction thereof.  The broker or brokers, as the case may be, shall give written notice to the parties stating his or her or their determination, and shall furnish to each party a copy of such determination signed by each of them.  In the event of the failure, refusal or inability of any broker to act, a new broker shall be appointed in his or her stead, which appointment shall be made by the same person, and in the same manner, as hereinabove provided for the appointment of that broker so failing, refusing or unable to act.

If the Minimum Rent specified in Section 4.01 hereof has not been determined as of the commencement of the option period (i.e., the thirteenth (13th) or eighteenth (18) full Lease Year, as the case may be), then commencing as of the first day of such Lease Year, Tenant shall pay to Landlord, as temporary Minimum Rent, a sum equal to the monthly Minimum Rent payable during the immediately preceding Lease Year.  If the actual Minimum Rent, when determined, is greater than the temporary Minimum Rent stated above, Tenant shall pay such greater amount as the Minimum Rent commencing with the first day of the calendar month following such determination and, in addition, shall at the same time pay to Landlord the aggregate deficiency in Minimum Rent from the commencement of the thirteenth (13th) or eighteenth (18th) full Lease Year (as the case may be) to the date on which such determination occurred.

4.02  Other Charges.  In addition to the Minimum Rent, Tenant agrees to pay to Landlord the Percentage Rent as provided in the Percentage Rent Rider attached hereto.  All other payments and charges, if any, to be made hereunder by Tenant other than Minimum Rent and Percentage Rent shall be deemed to be additional rent and referred to herein as "Other Charges".  Landlord shall have the same rights and remedies hereunder with respect to the collection of said Other Charges as it has with respect to the collection of Minimum Rent and Percentage Rent.  The Minimum Rent, Percentage Rent and Other Charges may sometimes be collectively referred to as "Rent".

ARTICLE 5:  CONDITION OF PREMISES

5.01  Definitions.

(a)  "Code."  Any applicable planning, zoning, building or safety code, regulation or ordinance.

(b).  "Code Violation."  Any deviation from Code which is a violation thereof ipso facto and would require correction whether or not there is (i) a change in use conducted at the Premises, or (ii) any construction work performed at the Premises.

-7-



(c)  "Code Deficiencies."  A deviation from Code in effect on the date the Premises are "ready for occupancy" (as defined above), herein referred to as "current Code", i.e., a deficiency or condition which will require work to bring the Premises to a status of compliance with current Code in a case where the condition in question complied with a former Code no longer in effect.  Code Deficiencies are those deviations from Code which, if there were no change in the status quo with respect to the use conducted at or construction performed at the Premises, there would be no requirement to correct the same.

(d)  "Latent Conditions."  Those Code Violations and/or Code Deficiencies that first come to the parties' attention only after Landlord has delivered possession of the Premises to Tenant or after Tenant has commenced its work in the Premises.

(e)  Intentionally Deleted.

(f)  "Abatement" Work.  The work required to remove Hazardous Materials (as defined in Section 5.03) from the Premises and other property of Landlord as provided in Section 5.03 hereof.

5.02  Code Violations.  Tenant and Landlord each acknowledges that by reason of the work to be performed by Landlord pursuant to Exhibit B hereof, the Premises will be demolished and all utility lines capped and therefore the Premises will not comply with Code applicable to the completed Premises.  Accordingly, Tenant and Landlord agree that Landlord's obligations with respect to Code compliance are to provide that the structure of the Premises is in compliance with Code and that Landlord's work as set forth in Exhibit B and this Article 5 will be performed in accordance with Code and the Premises will be delivered in a safe and structurally sound condition.

5.03  Hazardous Materials: Inspection/Removal.  Except as otherwise provided in the last sentence of this paragraph, Landlord expressly warrants and represents that it has not used any materials containing asbestos or other hazardous materials (hereinafter referred to as "Hazardous Materials") in the construction of the Premises or in connection with the installation of any utility system or other facility which serves the Premises (whether located in the Premises or in other portions of the Building or Landlord's property) including by way of example, but not by limitation, the interior of any partition or demising walls, whether structural or otherwise, columns or beams, and all utility lines, shafts and ducts, HVAC or other equipment.  Such utility systems and other facilities as hereinabove described, whether located in the Premises or other portions of the Building or Landlord's property, shall be collectively referred to as "Support Systems."  Notwithstanding the foregoing, Tenant acknowledges that certain Support Systems located outside the Premises may contain asbestos or other Hazardous Materials, but in such a manner as not to affect the Premises.

Prior to delivery of possession of the Premises to Tenant, Landlord shall cause the Premises to be inspected, at its sole cost and expense, by a licensed inspector who shall issue a report with respect to the asbestos content of the Premises, including all portions thereof as described above and including all Support Systems, as described above, located within the Premises.  Landlord shall furnish to Tenant a copy of the inspector's report together with a certificate of a licensed

JIBS - 01785


The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgl\gap\contract.lse



asbestos removal contractor (a "clearance certificate") certifying that the Premises are free of Hazardous Materials, except as otherwise set forth in the last sentence of the first paragraph of this Section 5.03. If Hazardous Materials are found to be present, except as otherwise set forth in the last sentence of the first paragraph of this Section 5.03 (without regard to whether Landlord caused such Hazardous Materials to be installed therein initially), then Landlord, at its sole cost and expense, shall cause such Hazardous Materials to be removed from the Premises or such other property of Landlord (hereinafter referred to as the "Abatement Work") and shall complete such removal prior to delivery of possession of the Premises to Tenant. Upon completion of the Abatement Work Landlord shall furnish Tenant evidence of removal including copies of the inspection report together with a clearance certificate as aforesaid.

In the event Hazardous Materials which were not installed by Tenant or its contractors, agents, employees or licensees are discovered in the Premises or in Support Systems outside the Premises in a manner which affects the Premises after possession of the Premises is delivered to Tenant, then Tenant shall have the right to cease all work therein and to remove itself from the Premises. In such event Landlord shall, at its sole cost and expense, cause all such Hazardous Materials to be removed from the Premises and Support Systems, wherever located. During such Abatement Work the Construction Period provided for elsewhere in this Lease shall be tolled until such Abatement Work is complete and a clearance certificate issued. In the event Landlord is required to undertake Abatement Work it is understood and agreed that Landlord shall be responsible, at its sole cost and expense, for the replacement of all Tenant Improvements damaged or destroyed as a result of such work.

In the event of a breach of its obligations under this Section, Landlord agrees to indemnify and hold Tenant free and harmless from and against any and all cost, claims, suits, causes of action, losses, injury or damage including without limitation, personal injury damage (including death) as well as damage to property (including disruption of Tenant's quiet and peaceful possession of the Premises) resulting from the presence or removal of Hazardous Materials from the Premises provided that the same was not installed by Tenant or Tenant's contractors, agents, employees or licensees.

Landlord shall be solely responsible for and shall comply with all laws, rules, ordinances or regulations of any governmental authority having jurisdiction over the Premises with respect to the presence or removal of Hazardous Materials not installed by Tenant or Tenant's contractors, agents, employees or licensees.

Tenant shall not cause or permit any Hazardous Materials to be generated, used, released, stored or disposed of in or about the Premises or the Building in an illegal manner or in quantities greater than as required by Tenant's day-to-day operations. Notwithstanding any termination of this Lease, Tenant shall indemnify and hold Landlord, its employees and agents harmless from and against any damage, injury, loss, liability, charge, demand or claim based on or arising out of the illegal presence or illegal removal of, or failure to remove, Hazardous Materials generated, used, released, stored or disposed of by Tenant, its employees or its agents in or about the Premises or the Building, whether before or after Lease Commencement Date.

-9-



For the purpose of this paragraph, Hazardous Materials shall be deemed to be those substances determined to be hazardous at any time during the term of this Lease by any governmental agency having authority or jurisdiction over the area where the Premises is located.

5.04 Sprinklers. Landlord agrees that it shall provide, at its cost and expense an operational sprinkler main or standpipe to a point of entry into the Premises ready for Tenant's hookup.

5.05 Intentionally Deleted.

5.06 Americans With Disabilities Act. The Tenant shall be responsible for complying with the provisions of the Americans With Disabilities Act insofar as such Act applies to the Premises.

5.07 Intentionally Deleted.

5.08 Compliance with Laws/Initial Construction. Tenant's obligation to comply with Code in connection with its initial construction at the Premises shall be governed by the provisions of Sections 5.01, 5.02, 5.04, 5.06 and 5.09 hereof. Work performed by Tenant in the Premises shall be done in accordance with Code. Thereafter, Tenant's obligation to comply with Code shall be governed by the provisions of Section 9.04.

5.09 Broom Clean/Operating Equipment. Landlord agrees that as of the date Landlord delivers possession of the Premises to Tenant, the same shall be in a broom clean condition and free of any personal property left by the previous occupant and that any damage to the Premises occasioned by the removal of the previous occupant shall be repaired at Landlord's cost and expense. Landlord represents and warrants that upon the date of delivery of possession of the Premises, the elevator shall be in good working order and all utilities serving the Premises shall be available (including temporary electricity to the Premises during construction); all corrective work necessary to comply with the foregoing representation shall be performed by Landlord at its cost and expense.

5.10 As Is. Except as otherwise set forth in this Article and subject to Article 9 and Exhibit B, Tenant agrees to accept the Premises in an "As Is" condition.

ARTICLE 6: ALTERATIONS AND FIXTURES

6.01 Alterations and Fixtures. Except for structural work and exterior alterations (including exterior signage) with respect to which Landlord's consent shall be required, Tenant may at any time during the term of this Lease (and including its initial construction prior to the term pursuant to Article 5 and Exhibit B), at its own expense, make such improvements, alterations and additions and may install such non-trade fixtures and equipment ("Tenant's Improvements", which term includes all Basic Tenant Improvements and all Additional Tenant Improvements, as defined below) upon or to the Premises as Tenant deems desirable without the Landlord's consent provided that all such work shall be done in a workmanlike manner, in conformity with applicable building codes and without adversely affecting the structural integrity of the Premises or utility systems serving other portions of the Building. Landlord agrees that its consent to exterior alterations, including changes in exterior signage, shall not be unreasonably withheld or delayed, provided, however,

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgldcp\dse\connect.lse

SS

Landlord may withhold consent to a "blade" sign in its absolute discretion.  Subject to the provisions hereinafter set forth with respect to the Basic Improvements (as hereinbelow defined), the ownership interest in all of such Tenant's Improvements and signs shall remain in Tenant whether or not affixed to or attached to the Premises and Tenant shall have the right, but shall not be required, to remove from the Premises at any time and from time to time, all or any part of such Tenant's Improvements and signs made or installed by Tenant, provided such removal will not cause structural injury to the Premises and provided further that Tenant repairs any damage to the Premises caused by reason of such removal.  Tenant, at its own expense, may also erect, install and remove at any time during the Lease term such signs in, on, about, or outside the Premises as well as its trade fixtures, furniture and personal property as it deems desirable for the purpose of conducting its business.  Nothing contained herein shall be deemed to limit Landlord's right to reskin the area above the first floor windows in connection with a reskinning of the entire Building or an expansion of the Building, provided that Tenant first approves the nature and quality of such reskinning performed on the Connecticut Avenue side of the Building below the third floor, which approval will not be unreasonably withheld, conditioned or delayed.

6.02  **Surrender**.  Tenant shall peacefully surrender possession of the Premises upon the expiration or termination of the term of this Lease, or any renewals or extensions hereof with at least the Basic Improvements (as hereinbelow defined) remaining therein in a used condition, broom clean, and free from Tenant's movable personal property and any damage caused by Tenant's negligence and subject to damage caused by fire or other casualty, acts of God and acts of governmental authorities, reasonable wear and tear or any other damage or condition that Tenant is not required to repair or remedy by any other provision of this Lease.

6.03  **Definition of Basic/Additional Improvements**.  The term "Basic Improvements" as may sometimes be used in this Lease shall mean the Basic Tenant Improvements (as hereinafter defined) and that portion of the Basic Landlord Improvements (as hereinafter defined) that constitutes the Premises.  The term "Basic Landlord Improvements" shall mean a building, consistent with zoning laws and building codes then in existence, of substantially the same dimensions, height, structural features and external materials as the Building that contained the Premises when the same was delivered to Tenant prior to the commencement of the Construction Period.  The term "Basic Tenant Improvements" shall mean the following improvements and fixtures at the minimum standards set forth below:

1.   Demising walls sheetrocked as required by Code, taped and painted;

2.   An electrical panel in the Premises plus a sufficient number of convenience outlets suitable for general retail purposes plus conduit and wiring for signs and for ceiling light fixtures.  Light fixtures may be fluorescent light fixtures;

3.   A heating, ventilating and air-conditioning system sized at one ton per 350 square feet plus duct work and distribution system;

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
[gildep1\gap\connect.lse

JISS - 01768



4.   Toilet rooms with standard toilet fixtures and ventilation at least equal in number to those required by Code for a general retail use;

5.   A sprinkler system if required by Code, based upon an open and undivided store;

6.   A floor covering of good commercial quality;

7.   A finished ceiling consisting at a minimum of 2' by 4' lay-in acoustical tiles.  In the event Tenant is restoring the Premises for the purpose of continued occupancy under this Lease following damage or destruction pursuant to Article 12 or eminent domain pursuant to Article 13, then construction of such ceiling is optional on Tenant's part.  However, if this Lease is canceled pursuant to Article 12 or Article 13, then the cost attributable to such a ceiling as described herein shall be paid to Landlord out of Tenant's insurance proceeds;

8.   A storefront including entry doors and display windows.

All materials and equipment used and installed shall be of good commercial quality.

Those Tenant Improvements other than those that are a part of Basic Tenant Improvements are referred to as "Additional Tenant Improvements".

### ARTICLE 7:   UTILITIES

7.01  **Utilities.**  Tenant shall pay all charges for electricity, gas, water, sewer, refuse, telephone and other utility services used by Tenant on the Premises during the term of this Lease or any renewals or extensions hereof.  Tenant shall supply and install at Tenant's expense submeters for any such utility services which Tenant does not obtain directly from the applicable utility company.

7.02  **Premises HVAC.**  The utility meters to be installed by Tenant shall include BTU meters to measure Tenant's consumption from the chilled water, steam, supply and condensate return lines.  Landlord reserves the right to retain a qualified mechanical engineer to verify the accuracy of all submeter readings.

Tenant shall pay to Landlord the expenses associated with Tenant's use of the heating, ventilating and air conditioning ("HVAC") system serving the Premises including but not limited to:

(a)  Landlord's utility and fuel cost in furnishing the same to the Premises, and

(b)  Landlord's expenses for maintenance, insurance and depreciation of capital equipment cost (as defined below) related to the operation of the said system.

The foregoing costs of (a) and (b) above are collectively referred to the "HVAC Charge".

With respect to the utility component of such HVAC Charge referred to in (a) above, Tenant's share of the same shall be allocated to Tenant on the basis of sound engineering principles,

-12-

taking into account Tenant's connected electrical load, occupancy factors, Tenant's hours of operation and supply flow rates of steam or chilled water furnished to the Premises through said HVAC system.

With respect to the maintenance, insurance and depreciation components of such HVAC charge referred to in (b) above, Tenant's proportionate share shall be calculated by multiplying such costs by a fraction, the numerator of which shall be the gross leasable area of the Premises and the denominator of which shall be the gross leasable area of the Building or portions thereof (including the Premises) available for leasing to tenants in the Building and which receive central heating, ventilating and air conditioning services from Landlord.

The phrase "capital replacement cost" shall be defined as any replacement costs of the HVAC system in excess of One Thousand Dollars ($1,000.00) in the aggregate, during any calendar year. Landlord shall depreciate such costs on a straight line basis over the useful life of such replacement system.

Landlord shall furnish to Tenant at least once per year a statement, showing in reasonable detail the manner in which Tenant's HVAC Charge is computed, including a reasonable breakdown and explanation of the utility, maintenance and insurance components of said HVAC Charge, any capital equipment costs during the period covered by the statement, as well as the computation of Tenant's share thereof.

Tenant shall have the right at any time during the term hereof to request an adjustment of the HVAC Charge based on engineering data or other evidence furnished by Tenant. If Landlord and Tenant shall be unable to agree upon the computation of the HVAC Charge, then the matter will be decided by an independent third party (the "Umpire") mutually acceptable to Landlord and Tenant, who shall be duly qualified in terms of professional education and experience to determine the HVAC Charge. The decision of the Umpire shall be binding on both parties; the fee of the Umpire shall be shared equally by Landlord and Tenant. If Landlord or Tenant are unable to agree on the Umpire, the matter will be decided in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The determination of the HVAC Charge shall be retroactive to the date that the circumstances supporting the determination were first found to exist.

### ARTICLE 8:  MECHANICS' LIENS

8.01  <u>Tenant to Remove Liens</u>.  Tenant shall keep the Premises free from any liens arising out of any work performed, materials furnished or obligations incurred by Tenant, but Tenant shall have the right, in good faith and at its own expense, to contest or protest any claim and if a lien is filed against the Premises Tenant shall, within twenty (20) days after notice of the filing of such lien, obtain the release thereof as a lien against the Premises by bond, title insurance insuring over the lien or otherwise. If Tenant fails to do so, Landlord may post a bond to release the lien and Tenant shall pay the cost thereof upon demand as additional rent. In the event of any contest or protest of such lien by Tenant, Landlord agrees that it will not pay the claimant or discharge the lien on Tenant's account; and Tenant shall be under no obligation to Landlord for any sums expended by Landlord in violation of this sentence.

-13-

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgldopi\doc\connect.lse



## ARTICLE 9: REPAIRS

**9.01  Landlord's Repairs.**  Except for repairs specifically required herein to be made by Tenant, Landlord shall at all times, at its sole cost and expense, keep, replace and maintain in good condition, order and repair: (i) all portions of the Building which may not be a part of the Premises described in Article 1 of this Lease; (ii) all portions of the roof, roof structures and supports (and including Tenant's interior ceiling damaged from leaking, but excluding damage due to Tenant's improvements), and all structural portions of the Premises, including but not limited to, the foundation and structural supports, exterior and load bearing walls, floors (but not floor coverings), and roof drains; (iii) all utilities to the point of entry to the Premises; (iv) all driveways, sidewalks, parking areas and all other common areas and facilities thereof including the removal of snow and ice therefrom; (v) latent defects in the structure of the Premises, the utilities available to the Premises and the Support Systems serving the Premises, as well as any damage to the Premises caused by the willful act or the negligence of the Landlord or its agents.

**9.02  Tenant's Right to Cure.**  Tenant shall give the Landlord notice of any such repairs as may be required under the terms of this Lease and Landlord shall proceed forthwith to effect the same with reasonable diligence, but in no event later than thirty (30) days after having received notice.  In the event of an emergency (*i.e.* an event presenting an imminent threat of injury or damage) the Tenant shall be empowered to undertake immediate repairs of such nature as would be the Landlord's responsibility and notify the Landlord promptly after such repairs have been undertaken.  If the Landlord fails to commence to repair or maintain the Premises within the thirty (30) day period provided herein or fails thereafter diligently to complete such repairs or maintenance, or if the Tenant undertakes emergency repairs as above stated, the Tenant may perform the repairs or maintenance and deduct the reasonable cost thereof from the Rent next coming due, in addition to any other remedies Tenant may have at law or in equity.

**9.03  Tenant's Repairs.**  Subject to the provisions of Section 6.02 hereof relating to surrender of the Premises at the expiration of the term, Tenant shall keep the interior non-structural portions of the Premises, including repairs to the heating, ventilating and air-conditioning system exclusively serving the Premises in good condition, order and repair excepting conditions covered under any warranties of Landlord's contractors, damage by fire and other casualties, acts of governmental authorities, acts of God and the elements, and ordinary wear and tear.  Tenant, at Tenant's sole cost and expense, (i) shall maintain the exterior storefront of the Premises and (ii) shall promptly replace all plate glass windows and other glass forming part of the Premises which may be damaged or broken with glass of the same quality and strength and (iii) shall maintain the elevator and arrange for inspections and licenses therefor as required by Code.

**9.04  Compliance With Code.**  After the issuance of the initial Certificate of Occupancy for the Premises (or if no such certificate is customarily issued in the jurisdiction, then upon the full completion of Landlord's Work and Tenant's Work) Tenant shall only be obligated (and shall be solely responsible) for complying with any statutes, laws, ordinances or requirements of public authorities or any requirements or recommendations of

-14-

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgldcpi\dgc\connect.lse





JIBB - 01771

Landlord's insurance carriers (individually or collectively, "Legal Requirements") which are Tenant Generated (as defined herein) whether such Legal Requirements are structural or nonstructural in nature.  Landlord shall be solely responsible for compliance with Legal Requirements which are (i) Landlord Generated (as defined herein) or (ii) are General Requirements (as defined herein), and in either case whether the same are structural or non-structural in nature.

"Tenant Generated" shall mean that the Legal Requirement was made necessary by, or results from (i) any act or work performed by Tenant or (ii) the particular nature of Tenant's use (i.e. "apparel sales" as distinguished from "general retail") or (iii) the particular manner in which Tenant conducts its permitted use. "Landlord Generated" shall mean that the Legal Requirement was made necessary by any act or work performed by Landlord or its agents.  If the Legal Requirements are neither Tenant Generated nor Landlord Generated, then such requirements shall be referred to as "General Requirements."

### ARTICLE 10:   INSURANCE

10.01  **Landlord's Insurance.**  Landlord shall at all times during the term hereof maintain in effect a policy or policies of all risk insurance covering the Building and those portions of the Premises other than Tenant's Improvements in an amount equal to one hundred percent (100%) of full replacement cost (excluding footings and foundation) thereof and so as to prevent the application of co-insurance provisions.

10.02  **Tenant's Insurance.**  Tenant shall maintain, at its expense, from and after the date Tenant accepts possession of the Premises, all risk insurance insuring Tenant's Improvements in amounts equal to one hundred percent (100%) of the full replacement cost thereof and so as to prevent the application of co-insurance provisions.  Such insurance shall name Landlord (and its mortgagee) as additional insureds as their respective interests may appear provided however that Landlord (and its mortgagee) will have an insurable interest in only the Basic Improvements as defined in Section 6.03 (and a right to only the insurance proceeds applicable to the Basic Improvements, the "Basic Proceeds") and Landlord and its mortgagee shall have no interest whatsoever in any Additional Tenant Improvements (as defined in Section 6.03) nor in any proceeds payable under Tenant's insurance policies and applicable to Additional Tenant Improvements (the "Excess Proceeds") whether or not such Excess Proceeds are paid for loss or damage to Additional Tenant Improvements previously installed by Tenant but not replaced by Tenant following a damage or destruction.

10.03  **Liability Insurance.**  Each party shall also maintain Comprehensive General Liability Insurance on an occurrence basis with a minimum limit of liability in the amount of Three Million Dollars ($3,000,000.00) and which insurance shall contain a contractual liability endorsement covering the matters set forth in Article 15 hereof.

10.04  **Waiver of Subrogation.**  Each party, on behalf of itself and on behalf of anyone claiming under or through it by way of subrogation or otherwise, waives all rights and causes of action against the other party, and the officers, employees, agents and invitees of the other party, for any liability arising out of any loss or damage in or to the Premises, its contents and other property owned or controlled by Landlord caused by:

-15-

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgldcp1\dge\connect.lse

JIBS – 01772

(i) any peril normally covered under all-risk policies issued in the geographic area in which the Premises is located (whether or not such party actually carries such insurance policies), or

(ii) if the scope of coverage is broader than in (i) above, then any peril actually covered under the insurance maintained by such party.

This release and waiver shall be complete and total even if such loss or damage may have been caused by the negligence of the other party, its officers, employees, agents or invitees and shall not be affected or limited by the amount of insurance proceeds available to the waiving party, regardless of the reason for such deficiency in proceeds.

However, if one party's insurance carrier prohibits waiver of subrogation regardless of premium, then the other party's release and waiver shall become null and void, it being understood that in this instance each waiver is given in consideration for the other.

Each party covenants that from and after the date possession of the Premises is delivered to Tenant its insurance policies will contain waiver of subrogation endorsements, and that if such endorsements, for any reason whatsoever, are about to become unavailable, it will give the other party not less than thirty (30) days prior written notice of such impending unavailability.

10.05  <u>Definition of All Risk Insurance</u>.  The term "all risk insurance" as used in this Lease shall mean insurance against all risk of direct physical loss or damage to the insured property, and resulting business interruption, <u>excluding</u> the following perils, loss or damage:

(i) Loss caused by or resulting from any work upon the property, except for ensuing covered damage.

(ii) Delay, loss of market, loss of use, wear and tear, insect, vermin, gradual deterioration and inherent vice.

(iii) Fraudulent or dishonest acts of owner, partner or employee.

(iv) Electrical disturbance, except for ensuing covered damage.

(v) Mechanical breakdown, structural failures, latent defect, faulty workmanship or materials, except for ensuing covered loss.

(vi) Loss to steam equipment caused by internal condition other than fuel explosion.

(vii) Loss by nuclear or radioactive causes.

(viii) Loss resulting from warlike actions;

(ix) Loss from atomic or radioactive weapon war.

(x) Loss from insurrection, quarantine, confiscation.

<div align="center">-16-</div>



10.06  **General Requirements.**  All policies of insurance required to be maintained by Landlord or Tenant hereunder shall be issued by an insurance company or companies having an adjusted policy holder's surplus of at least Two Hundred Fifty Million Dollars ($250,000,000.00) and authorized to do business in the state in which the Premises are located.  All policies of insurance required to be maintained hereunder shall include a written undertaking from the insurer to notify all insureds and additional insureds thereunder at least thirty (30) days prior to cancellation thereof.  Either party may provide any insurance required hereunder under a so-called blanket policy or policies covering other parties and locations so long as the coverage required hereunder is not thereby diminished.  Upon request, either party shall furnish the other with a certificate of insurance evidencing any such policy.

## ARTICLE 11:  TAXES

11.01  **Tenant's Obligation.**  Subject to other provisions of this Article 11 Tenant shall pay to Landlord its proportionate share of all increases in real estate taxes and assessments ("Taxes") over those payable during Tax Year 1992 (i.e., July 1, 1991 through June 30, 1992) which shall be levied or assessed during the balance of the term of this Lease with respect to the Tax Parcel (such payment by Tenant being referred to as the "Tax Payment").

11.02  **Tax Parcel Defined.**  The term "Tax Parcel" shall mean the single tax or assessment parcel owned or controlled by Landlord which includes the Premises, otherwise known as lot 0037, square 0161, District of Columbia.

11.03  **Taxes Defined.**  The term "Taxes" shall mean the ad valorem real estate taxes and Special Assessments (as defined hereinbelow) levied or assessed upon the Tax Parcel.  "Taxes" shall not include penalties and interest on Taxes, nor any income, profit, business or gross receipts tax or capital levy, nor any inheritance, estate, succession, transfer, gift, franchise or corporation tax levied or imposed upon Landlord, nor any real estate transfer tax, documentary stamp tax, mortgage lien tax, transfer gains tax, recording fees or the like.  "Taxes" shall include assessments ("Special Assessments") which are imposed by a governmental authority for highway improvements directly benefitting the Tax Parcel or utility improvements serving the Tax Parcel, subject to the limitations set forth in Section 11.06 below; however, "Taxes" or "Special Assessments" shall not include any other capital expenditure relating to construction of improvements on any part of the Premises, Building or Tax Parcel, the net effect of which is to fund or finance or perform construction or other projects for or on behalf of Landlord, whether or not the same are paid for or financed by Landlord or others through any assessment, special assessment district or other program authorized by law.

**Other Taxes.**  In addition to real estate taxes and Special Assessments, Tenant agrees to pay to Landlord the following taxes:

(a)  "Substitution Taxes" which are enacted on a Substitution Basis (as defined below) following a change in the method of real property taxation, as described below;

The Gap
1129 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgldept\dge\connect.lse



(b)   "Pure Rent Taxes" (as defined below) whether or not they are enacted on a Substitution Basis.

Any of the provisions contained herein with respect to taxes or fees imposed upon or measured by rent (whether or not on a Substitution Basis, a Pure Rent Tax or otherwise) shall exclude income or profit taxes, whether gross or net. "Income" or "profit" taxes are those which are a tax on profit or on taxable income which remains after the subtraction of certain exclusions, deductions, expense or costs allowed by the tax statute or law. The amount of such taxes are dependent upon whether and to what extent the taxpayer experiences a profit or loss or enjoys remaining taxable income.

Substitution Taxes. A "Substitution Tax" is one which is enacted on a Substitution Basis (as defined herein) following a change in the method of real property taxation as described herein.

A change in the method of real property taxation shall refer to event by which real estate taxes, assessments or valuations shall be "frozen" i.e. no long increased and/or reduced ("rolled back") and/or future increases limited in amount by statute. If following such change and as a result thereof there shall be levied, assessed or imposed (i) a tax on the rents received from the Premises; or (ii) a license fee measured by or based in whole or in part upon the Premises or any portion thereof; and which taxes above are expressly declared by the taxing legislation, legislative history or taxing authority to be imposed as a result of the foregoing limitations on real estate taxes and in substitution thereof, then such resultant enactment based upon such declaration shall be referred to as an enactment on a "Substitution Basis".

Further, the taxes or fees enacted on a Substitution Basis and which are imposed upon or based upon rents, if any, shall only be payable by Tenant if the same is a gross receipt tax in nature. A "gross receipts tax" is one which is imposed upon the gross amount of receipts without any deduction, exclusion or subtraction for any expenses or costs whatsoever and is payable whether or not the taxpayer experiences a profit or a loss and whether or not there remains any taxable income enjoyed by the taxpayer after such deduction, exclusion, expense or cost.

Further, any such gross receipts tax payable by Tenant may not exceed the amount of such tax imposed upon the fixed Minimum Rent and (if taxable) the additional rentals payable by Tenant under this Lease.

Pure Rent Tax. A "Pure Rent Tax" is one in which the application of such tax pursuant to the wording of or interpretation of the tax statute or law (i.e., the taxable event giving rise to the tax) is exclusively limited to rentals receivable from real estate. If such rental taxes may be applicable to activities or taxable events or forms of receipts not limited to rentals receivable from real estate (including, without limitation, business or gross receipts taxes), then Tenant shall have no obligation to pay such taxes whatsoever unless such taxes fall within one of the groups described above as enacted on a Substitution Basis (subject however to other exclusions contained herein).

-18-



Change of Ownership Taxes. In the event that at any time (and from time to time) during the term of the Lease there is enacted, following a change in the method of real property taxation, a real estate tax or increase that is expressly triggered by a change of ownership (as defined by applicable tax law) of real property in the District of Columbia ("Change of Ownership Tax"), and following a change of ownership of the Tax Parcel as contemplated in such Change of Ownership Tax, such Tax in fact results in an increase in the assessed valuation of the Tax Parcel, then Tenant shall not be liable for the portion of Taxes that is specifically attributable to the Change of Ownership Tax; and for purposes of computing Tenant's Tax Payment commencing with the Tax Year in which the Change of Ownership Tax is first reflected in the taxing authorities' notice of assessment (the "Change of Ownership Year") and continuing for all subsequent Tax Years, the Taxes attributable to such Change of Ownership (the "Change of Ownership Taxes") shall be subtracted from Taxes. Landlord and Tenant expressly acknowledge and agree that the statutes, laws and regulations in effect in the District of Columbia as of the date of this Lease do not include a Change of Ownership Tax.

11.04 Tax Year Defined. "Tax Year" shall mean a fiscal or calendar year for which Taxes shall be imposed and falling partly or wholly within the term of this Lease.

11.05 Tenant's Proportionate Share. Tenant's proportionate share shall be that amount, expressed as a percentage ("Tenant's Percentage") which is represented as a fraction, the numerator of which is the gross leasable area of the Premises and the denominator of which is the gross leasable area of all improvements on the Tax Parcel (excluding the parking garage), as such gross leasable area may be changed from time to time. Any change in Tenant's Percentage shall be effective as of the first day of the calendar month next following any change in the gross leasable area of either the numerator or denominator of the aforementioned fraction. As of the date hereof Tenant's Percentage is 6.41%.

11.06 Taxes Payable Over Extended Periods. In the event that any Taxes may, at the option of the taxpayer, be paid in installments over a period longer than one (1) year, then the same shall be deemed paid in installments over the maximum period permitted by the taxing authority and Tenant's obligation for any one (1) tax fiscal year to pay its proportionate share of such real estate taxes or Special Assessments shall only apply to those installments which become actually due and payable (i.e., failing which payment the same would become delinquent), together with the interest charged thereon by the governmental authority, during that same tax fiscal year, except, however, that Tenant shall not be obligated to pay any portion of real estate taxes or Special Assessments or installments thereof which become actually due and payable during any period prior to or subsequent to the term of this Lease. Real estate taxes and Special Assessments for any fraction of a tax year at the commencement or expiration of the term shall be apportioned pro rata between the parties. Tenant's obligation to pay amounts due hereunder shall survive the expiration or other termination of this Lease.

11.07 General Provisions. Landlord shall render to Tenant, promptly after the amount of Taxes applicable to the Tax Parcel for a given Tax Year have been paid by Landlord, a statement showing the amount of Taxes and indicating in reasonable detail the computation of the Tax Payment. Tenant acknowledges that

-19-

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
[gldcp1\dga\connect.lso

JIBS - 01776



Taxes are currently paid on a semi-annual basis.  Accompanying such statement shall be a copy of the tax bill applicable to the Tax Parcel issued by the taxing authority together with receipts issued by such authority evidencing payment of such Taxes by Landlord.  Within thirty (30) days thereafter Tenant shall reimburse Landlord in an amount equal to Tenant's Percentage of such Taxes as billed by Landlord.

At Landlord's option Tenant agrees to make its Tax Payment in equal monthly installments it being understood however that Tenant's obligation for the payment (whether in a lump sum or in installments estimated by Landlord) of any Taxes during each Lease Year shall apply only to Taxes which are allocable to the tax year then in progress (plus any previously accrued Taxes which Tenant has not yet paid or any future Taxes then billed by the appropriate taxing authority), and Tenant shall not be obligated to make any prepayment of Taxes for tax years not yet in progress unless the appropriate taxing authority has billed Landlord for the same.  Accompanying any tax invoice furnished by Landlord shall be a statement, broken down in reasonable detail, showing the items included in "Taxes" and the manner of the computation of Tenant's proportionate share together with a copy of the tax bill from the taxing authority.  If the actual Taxes for the current tax year are not yet known, Landlord may estimate such Taxes based on reasonable anticipated increases provided however that in no event may such estimate exceed 110% of the prior year's actual Taxes (pro-rated for the tax year in which the Commencement Date occurs); when the actual Taxes become known, Tenant's estimated payments may be readjusted as the case may require.

11.08  **Landlord's Right to Contest**.  Landlord shall have the right to contest the amount or validity, in whole or in part, of any Taxes or to seek a reduction in the valuation of the Tax Parcel assessed for tax purposes and to prosecute any action or proceeding to that end by appropriate proceedings diligently conducted in good faith.  From any refund of any Taxes received by Landlord, Landlord shall have the right to deduct the costs of contesting the Taxes, Tenant shall be entitled to receive its proportionate share of such net refund.

### ARTICLE 12:  DAMAGE AND DESTRUCTION

12.01(a)  **Obligations to Rebuild**.  Subject to the provisions hereinafter set forth, if the Building or the Premises is damaged or destroyed by an Insurable Cause (as defined below), Landlord shall with due diligence promptly repair and restore the Building and the Basic Landlord Improvements of the Premises to the condition thereof that existed immediately prior to such damage or destruction consistent with zoning laws and building codes then in existence.  As soon as reasonably possible Tenant shall restore and replace the Basic Tenant Improvements and so much of the Additional Tenant Improvements as are consistent with Tenant's intended use of the Premises, all of which work shall be in accordance with building and zoning codes then in existence.

Such damage or destruction shall in no way annul or void this Lease, except that Tenant shall be entitled to a proportionate reduction of Rent until such repairs and restoration are complete, such proportionate reduction to be based upon the extent to which such damage or destruction and the making of such repairs and restoration shall interfere with the use conducted by Tenant in the Premises.  If from the standpoint of prudent business management the Premises cannot be operated at

JIBS - 01777

The Gap.
1128 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgldcp\\gap\street.lse



A (

all during the restoration process, then Rent shall totally abate during such period of restoration.

12.01(b)  **Delay in Rebuilding.**  In the event Landlord does not complete its repair and restoration work to the Premises within three hundred sixty (360) days after such damage or destruction (herein called the "Restoration Period"), Tenant, at its option, may terminate this Lease by giving written notice thereof to Landlord at any time prior to completion of reconstruction.  The aforesaid Restoration Period shall not be extended by reason of force majeure notwithstanding anything contained in this Lease to the contrary.  In the alternative, Tenant may proceed to undertake and/or complete the restoration of the Premises and to deduct the cost thereof from Rent thereafter becoming due hereunder.

12.02  **Right to Terminate By Reason of Insurable Casualty.**  If during the last three (3) year(s) of the Lease term or during the last three (3) year(s) of any renewals or extensions thereof (i) more than fifty percent (50%) of the replacement cost of the Building is damaged or destroyed by an Insurable Casualty (as defined below), or (ii) more than twenty five percent (25%) of the replacement cost of the Premises is damaged or destroyed by an insurable cause, then Landlord or Tenant may terminate this Lease by giving written notice thereof to the other within sixty (60) days after the date of such damage or destruction, provided however that in the case of subdivision (i) above, no cancellation by Landlord shall be effective unless Landlord similarly and simultaneously cancels the leases of all other tenants with space facing Connecticut Avenue on the first though and including the third floors of the Building.  Further, if Tenant shall have exercised its option to extend the term of this Lease prior to the occurrence of such casualty, neither Landlord nor Tenant, shall have the right to cancel this Lease during the last year of the Lease term or of the first option period, and, the parties shall proceed to repair and restore the Building and/or Premises in accordance with Section 12.01(a).  If, at any time during the term of the Lease, the Building is damaged or destroyed to such an extent that (a) it would take more than three hundred sixty (360) days to restore and (b) all or substantially all tenants of the Building must be evacuated, then Landlord or Tenant may terminate this lease by giving written notice thereof to the other within sixty (60) days after the date of such damage or destruction, provided however, that no cancellation by Landlord shall be effective unless Landlord similarly and simultaneously cancels the leases of all other tenants with space facing Connecticut Avenue on the first through and including the third floors of the Building.  In the case of a cancellation of this Lease, Tenant shall be entitled to retain all Excess Proceeds covering Additional Tenant Improvements and Tenant shall have no obligation to perform any repair or restoration work to the Premises.  In such event Tenant shall pay to Landlord an amount equal to the undepreciated amount of the Construction Allowance (as hereinafter defined) depreciated on a straight-line basis over the original term.  Concurrently with the receipt of such payment, Landlord shall assign to Tenant any insurance proceeds covering the Basic Tenant Improvements.

"Insurable Casualty" - a casualty or peril normally covered or coverable under the insurance carried or required to be carried by the parties pursuant to this Lease.

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgidep\cga\connect.lse



**12.03  Right to Terminate By Reason of Uninsurable Casualty.**  If the Building or Premises is damaged or destroyed by an Uninsurable Casualty (as defined below), both parties shall promptly repair and restore the same in accordance with the provisions of Section 12.01(a), provided however, that if the cost of such repair required to be performed by either party under subparagraph (a) exceeds twenty-five percent (25%) of the replacement cost of the Building or twenty-five percent (25%) of the replacement cost of the Premises, then either party may, within sixty (60) days after such damage or destruction, notify the other that it elects not to repair its portion.  In the event that either party (the "canceling party") has given such notice of intention not to repair, this Lease shall terminate upon the expiration of thirty (30) days after receipt by the other party (the "receiving party") of such notice .

"Uninsurable Casualty" – a casualty not normally coverable under the insurance required to be carried by the parties pursuant to this Lease.

**12.04  Damage or Destruction Prior to Delivery of Possession.**  If the Building or the Premises is damaged or destroyed prior to delivery by Landlord of possession of the Premises to Tenant by any cause normally covered or coverable under "all risk" coverage policies, Landlord shall with due diligence promptly repair and restore the Building and/or Premises to the condition thereof that existed immediately prior to such damage or destruction consistent with zoning laws and buildings codes then in existence; provided however, that if the extent of the damage is such that it could not be repaired within three hundred sixty (360) days and Landlord terminates the leases of substantially all of the tenants of the Building, either party may terminate this Lease by giving notice of its election to do so to the other within sixty (60) days after the date of the casualty loss.  Landlord agrees promptly to notify Tenant of any such casualty which occurs prior to delivery of possession of the Premises.

**12.05  Intentionally Deleted.**

### ARTICLE 13:  EMINENT DOMAIN

**13.01  Definition/General.**  In the event of a taking during the term of this Lease of all or any part of the Premises, Land, the common areas thereof or the driveways serving the same or of any interest therein by reason of any exercise of the power of eminent domain, whether by a condemnation proceeding or otherwise, or in the event of any transfer thereof or of any interest therein made in avoidance of an exercise of the power of eminent domain (all of the foregoing being hereinafter referred to as a "Taking"), the following provisions shall apply.

**13.02  Total Taking.**  In the event of a Taking of all of the Premises, Land, common areas or driveways serving the same, this Lease shall terminate as of the date of such Taking, and all of the Tenant's obligations hereunder, including its obligation to pay Rent accruing from and after the date of the Taking shall terminate as of the date of such Taking.

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 3, 1992
[gldcp\dgs\connect.lse

JTBG - 01779



**13.03  Partial Taking.**  In the event of a Taking of any portion of the Premises or Land or portions of the Building providing access to the same, then Tenant may terminate this Lease by written notice to Landlord within sixty (60) days after possession is taken by the condemning authority.

**13.04  Restoration.**  In the event this Lease is not canceled as herein provided, then:

(a)  Landlord shall (i) restore at its sole cost and expense so much of the remainder of the Premises to a complete architectural unit to the extent that the same existed on the date physical delivery thereof was initially delivered to Tenant prior to the Commencement Date (in any event subject to building codes and zoning laws then in existence at the time of such restoration), and  (ii) turn over to Tenant (for restoration purposes by Tenant) that portion of Landlord's award applicable to Tenant Improvements that was awarded to Landlord (rather than to Tenant) and not otherwise received by Tenant from the condemning authority or pursuant to Section 13.06 below for such element of damage.  Tenant shall commence and complete restoration of the Tenant Improvements following the physical delivery of possession of the Premises to Tenant.  During the period of restoration the Rent shall be equitably abated according to the nature and extent that Tenant's use and enjoyment of the Premises has been interfered with;

(b)  **Intentionally Omitted;**

(c)  **Rent Abatement.**  In the case of Section 13.04(a) above, if, from the standpoint of prudent business management, the Premises cannot be operated at all during the restoration process, then Rent shall totally abate during such period of restoration.  Subsequent to the restoration work Minimum Rent as well as Tenant's share of Other Charges shall be permanently abated in proportion to the amount of square foot floor area of the Premises taken.

**13.05  Notification.**  Landlord shall immediately notify Tenant of any Taking either pending or threatened and of all proceedings in connection therewith including the settling of any award therefor, of which Landlord has knowledge.

**13.06  Award.**  Subject to Section 13.04 hereof, each party shall be entitled to receive from the entire award made with respect to the Taking that portion thereof as is allowed by law representing its respective property interest which was appropriated by the Taking as well as any damages suffered thereby.  Notwithstanding the foregoing, Tenant shall in all events be entitled to receive out of the entire award an amount equal to the undepreciated cost of Tenant Improvements installed at its expense.

### ARTICLE 14:   ENTRY BY LANDLORD

**14.01  Access.**  Tenant shall permit Landlord and the authorized representatives of Landlord to enter the Premises at all reasonable times, after reasonable prior notice to Tenant (except in cases of emergency, which is defined as an event posing an imminent threat of injury to persons or property), for the purpose of inspecting the same and making any necessary repairs to the Premises required to be made by Landlord pursuant to Article 9 hereof, to service the sewer lines through cleanouts, to access Landlord's mechanical room adjacent to

-23-

The Reg.
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgldcpj\dgc\connect.lsa

Tenant's stockroom and the area designated "unoccupied space #1" on Exhibit A attached hereto and to perform work that may be necessary to comply with any laws, ordinances or governmental rules or regulations provided (i) that all rights of Landlord hereunder shall be exercised in a reasonable manner and so as to cause as little interference with Tenant's business as is reasonably possible, (ii) Landlord and its representatives may enter the Premises only if accompanied by an authorized employee of Tenant and (iii) the requirements of Section 14.02 are complied with.

14.02  **Supports, Pipes and Conduits.**  Further, Landlord's right of access to the Premises shall be subject to the following conditions:

(a)  no columns, beams, girders, braces, supports (herein individually or collectively called "Supports") or shafts of any kind may be installed in the Premises except to replace existing Supports or shafts, provided that such replacements be installed in the exact locus of, and be no larger in size or greater in number than, the item replaced;

(b)  no additional pipes, ducts, utility lines, conduits or equipment (herein collectively called "Utility Lines") shall be in the Premises unless all of the following conditions are met:

(i)  such additional Utility Lines are located in Tenant's stockroom areas in locations which will not interfere with Tenant's use and enjoyment of said areas or of the Premises, or (ii) if, from the standpoint of usual and customary architectural and engineering standards such Utility Lines cannot be located in the stockroom area, then the same may be located completely beneath the floor or completely within the walls of non-stockroom areas or completely above the Tenant's hung ceiling provided however that (x) the same may not displace or interfere with the location or placement of Tenant's Utility Lines serving the Premises, it being understood that Tenant's Utility Lines have priority in their location in the Premises, and (y) with respect to the ceiling area, in no event may such Utility Lines extend below Tenant's finished ceiling, and (z) if no finished ceiling is installed by Tenant, such area shall not be available to Landlord for this purpose and Landlord shall be restricted to the sub-floor or interior walls as hereinbefore described;

(c)  such work shall be performed during hours that Tenant is not open for business (except in emergencies) unless Tenant, in the exercise of its sole discretion shall otherwise agree;

(d)  any restoration work or alteration work at the Premises which is necessitated by or results from Landlord's entry, including, without limitation, any work necessary to conceal any element whose presence is permitted hereunder shall, be performed by Landlord at its expense or, at Tenant's election, by Tenant on Landlord's behalf and at Landlord's sole cost and expense (provided, however, Landlord shall be required to perform any alteration or restoration work which affects Utility Lines or Supports which do not exclusively serve the Premises); and

(e)  Landlord shall be liable for all loss, damage, or injury to persons or property resulting therefrom and shall indemnify and hold Tenant harmless from all claims, losses, costs, expenses and liability, including reasonable attorney's

-24-

fees, arising therefrom.

14.03  <u>Other Access</u>.  At any time within the six (6) months immediately preceding the expiration of the term, Landlord may show the Premises to any person wishing to lease them and may during said period affix to any reasonably suited part of the Premises (but not in or upon a display window) a notice for letting or selling the Premises which is reasonable in size and keep the same affixed without hinderance or molestation.

## ARTICLE 15:  INDEMNIFICATION

15.01  <u>Indemnification</u>.  Each party (in the capacity of "Indemnitor") hereby agrees to indemnify and hold the other (in the capacity of "Indemnitee") harmless from all liability, loss and expense resulting from bodily injuries including death, or from injury or destruction of tangible property occurring on the Premises (in the case of Tenant), or, in other portions of the Building, Land or other adjoining property owned or controlled by Landlord (in the case of Landlord), and arising out of such Indemnitor's use thereof except if caused by the negligent or intentional act or omission of the Indemnitee, its contractors, agents, employees, licensees or that of other tenants provided, however, that the Indemnitor shall be notified with reasonable promptness of any suits, proceedings, claims or demands with respect to which the Indemnitee requests indemnification and the Indemnitor shall have the right to assume the entire control of the defense, compromise or settlement thereof and the Indemnitee shall cooperate fully with the Indemnitor in such defense.

## ARTICLE 16:  QUIET ENJOYMENT/WARRANTIES OF LANDLORD

16.01  <u>Landlord's Warranties</u>.  Landlord represents and warrants that it is the fee simple owner of said Premises, that it has full right, power and authority to make, execute and deliver this Lease and that there are no agreements, restrictions, covenants, encumbrances or easements which will increase any of Tenant's obligations under this Lease or diminish any of Tenant's rights hereunder.

16.02  <u>Covenant of Quiet Enjoyment</u>.  Landlord covenants with Tenant that so long as no Event of Default on the part of Tenant has occurred hereunder, Tenant shall and may peaceably and quietly have, hold and enjoy the Premises for the term of this Lease, and any renewals or extensions thereof, and that neither Landlord, nor any party claiming under or through Landlord, shall disturb the use or the occupancy of the Premises by Tenant and Landlord shall defend Tenant's right to such use and occupancy.

## ARTICLE 17:  ASSIGNMENT AND SUBLETTING

17.01  <u>No Consent</u>.  Tenant may assign this Lease or any interest therein or sublet the Premises or any portion thereof without the prior consent of the Landlord.  Any such assignment or subletting shall be expressly subject to the terms and conditions of this Lease.  Tenant shall promptly notify Landlord of the identity of any assignee or subtenant.

17.02  <u>Release of Liability</u>.  In the event of an assignment of this Lease, Tenant and each intermediate successor in interest of Tenant shall remain liable for the performance by the assignee-in-possession of Tenant's obligations hereunder, provided however, that in the event that Tenant's assignee or any subsequent assignee shall have (i) at least three (3) years of

-25-

experience in operating the type of business to be operated at
the Premises with operating profits, (ii) a net worth of at least
Ten Million Dollars ($10,000,000.00), and (iii) current assets of
at least Two Million Dollars ($2,000,000.00) (both (ii) and (iii)
determined in accordance with generally accepted accounting
principles as of the end of the most recent fiscal year of such
assignee immediately preceding such assignment, unless more
current figures are available), then Tenant and all intervening
successors in interest shall be released and discharged from any
further liability under this Lease.  It is understood and agreed
that the assignee must have prior experience in a store of not
less than fifteen thousand (15,000) square feet and the proposed
assignee will submit audited financial statements and such other
information that Landlord may reasonably request to demonstrate
compliance with the requirements of this paragraph.
Notwithstanding anything to the contrary contained herein, Tenant
shall provide Landlord with copies of all assignment and sublease
agreements (excluding financial information) and such other
relevant information which Landlord may reasonably request with
respect to the proposed subletting or assignment.  The release of
liability provisions of this subparagraph shall not apply to an
assignment made by Tenant to its Affiliate which is defined as a
subsidiary, parent or subsidiary of any parent of Tenant.

During any period that Tenant remains liable for the
performance of the assignee-tenant's obligations under this
Lease, the scope of Tenant's liability as assignor-guarantor
shall not extend to any obligation of the assignee-tenant greater
than those specified in this Lease upon the date of Tenant's
assignment unless Tenant shall have specifically consented
thereto in writing.  Landlord agrees that it shall notify all
guarantors of all failures of performance on the assignee-
tenant's part which, with the passage of time could ripen into an
Event of Default, within thirty (30) days after such failure of
performance occurs, whether or not Landlord has given the
assignee-tenant notice of such failure.  Following the assignee-
tenant's failure to cure the default any guarantor shall be
accorded an additional period of five (5) days in the case of
monetary failures and fifteen (15) days in the case of non-
monetary failures (subject to Excused Delays as defined in
Section 18.01 and Force Majeure as defined in Section 24.01) in
which to cure said failures.  In the event Landlord fails to
notify any guarantor of a failure of performance within the time
required herein, such guarantor's liability shall be limited in
the aggregate to an amount equal to the Rent arrearages (or for
an equivalent amount with respect to any other failure of
performance hereunder) dating back to the month which is two
months prior to the date on which any demand for performance was
made upon such guarantor.

## ARTICLE 18:  DEFAULT BY TENANT

18.01  <u>Event of Default Defined</u>:  The following events shall
constitute an "Event of Default":

(1)  the failure by Tenant to pay any Rent due under
this Lease which failure continues for a period of ten (10) days
after receipt of written notice from Landlord sent pursuant to
Section 27.01 that the same is overdue (provided, however, at any
time on or after the date that The Gap, Inc. has been released
from liability under the Lease in accordance with section 17.02,
said ten (10) day cure period shall not be applicable to any
payment of Rent due under this Lease during the remainder of any
Lease Year following the occurrence of three (3) previous Events

-26-

The Gap.
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgldcp\des\correct.lse



Of Default under this subsection 18.01(i) within the past twelve
(12) months, notwithstanding Tenant's curing of such prior Events
of Default, including payment of interest, if any, in connection
therewith); or

(ii)   the failure by Tenant to perform or observe any
other term or condition of this Lease and such failure continues
for a period of thirty (30) days after receipt of written notice
thereof from Landlord sent pursuant to Section 27.01, provided
however, that if the nature of such failure is such that the same
cannot reasonably be cured within said thirty (30) day period
(herein referred to as an "Excused Delay"), then Tenant shall
have such additional time as is reasonably required to cure such
failure provided Tenant commences to cure such failure within
said thirty (30) day period and proceeds to cure such failure
with diligence and continuity; or

(iii)   an "Event of Bankruptcy" as defined below.   An
"Event of Bankruptcy" is:   (a) Tenant's becoming insolvent, as
that term is defined in Title 11 of the United States Code (the
"Bankruptcy Code"), or under the insolvency laws of any state
(the "Insolvency Laws"); (b) appointment of a receiver or
custodian for substantially all of the property of Tenant located
at the Premises, if possession is not restored to Tenant within
sixty (60) days, or the institution of a foreclosure or
attachment action upon substantially all of the property of
Tenant located at the Premises if such action is not dismissed
within ninety (90) days; (c) filing of a voluntary petition by
Tenant under the provisions of the Bankruptcy Code or Insolvency
Laws; (d) filing of a involuntary petition against Tenant as the
subject debtor under the Bankruptcy Code or Insolvency Laws,
which either (1) is not dismissed within sixty (60) days after
filing, or (2) results in the issuance of an order for relief
against the debtor; or (e) Tenant's making or consenting to an
assignment for the benefit of creditors or a composition of
creditors.

Upon occurrence of an Event of Bankruptcy, Landlord shall
have all rights and remedies available pursuant to Section 18.02;
provided, however, that while a case (the "Case") in which Tenant
is the subject debtor under the Bankruptcy Code is pending,
Landlord's right to terminate this Lease shall be subject, to the
extent required by the Bankruptcy Code, to any rights of Tenant
or its trustee in bankruptcy (collectively, "Trustee") to assume
or assign this Lease pursuant to the Bankruptcy Code.   Any person
or entity to which this Lease is assigned pursuant to the
Bankruptcy Code shall be deemed without further act or deed to
have assumed all of the obligations arising under this Lease on
and after the date of assignment, and any such assignee shall
upon request execute and deliver to Landlord an instrument
confirming such assumption.   Trustee shall not have the right to
assume or assign this Lease unless Trustee promptly (a) cures all
defaults under this Lease, (b) compensates Landlord for damages
incurred as a result of such defaults, (c) provides adequate
assurance of future performance on the part of Tenant as debtor
in possession or Tenant's assignee, and (d) complies with all
other requirements of the Bankruptcy Code.   If Trustee fails to
assume or assign this Lease in accordance with the requirements
of the Bankruptcy Code within sixty (60) days after the
initiation of the Case, then Trustee shall be deemed to have
rejected this Lease.   Adequate assurance of future performance
shall require that the following minimum criteria be met:   (1)
Tenant's gross receipts in the ordinary course of business during
the thirty (30) days preceding the Case, must be greater than ten

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
[g\dept\gca\connect.lse



(10) times the next monthly installment of Base Rent and
additional rent due; (2) Both the average and median of Tenant's
monthly gross receipts in the ordinary course of business during
the seven (7) months preceding the Case must be greater than the
next monthly installment of Base Rent and additional rent due;
(3) Trustee must pay its estimated pro-rata share of the cost of
all services performed or provided by Landlord (whether directly
or through agents or contractors and whether or not previously
included as part of Base Rent) in advance of the performance or
provision of such services; (4) Trustee must agree that no
liquidating sale, auction or other similar business operation
shall be conducted in the Premises; (5) Trustee must agree that
the use of the Premises as stated in this Lease shall remain
unchanged and that no prohibited use shall be permitted; (6)
Trustee must pay at the time the next monthly installment of Base
Rent is due, in addition to such installment, an amount equal to
the monthly installments of base rent, and additional rent due
for the next six (6) months thereafter, such amount to be held as
a security deposit; (7) Trustee must agree to pay, at any time
Landlord draws on such security deposit, the amount necessary to
restore such security deposit to its original amount; and (8) All
assurances of future performance specified in the Bankruptcy Code
must be provided.

   18.02  **Remedies of Landlord.**  Upon the occurrence of an
Event of Default Landlord, shall have the right, by written
notice to Tenant: (1) to declare this Lease terminated and the
term ended in which event, this Lease and the term hereof shall
expire, cease and terminate with the same force and effect as
though the date set forth in the notice of termination were the
date originally set forth herein and fixed for the expiration of
the term, and Tenant shall vacate and surrender the Premises but
shall remain liable, subject to the limitations hereinafter set
forth, for all obligations arising during the balance of the
original stated term as provided below; (2) without terminating
this Lease, terminate Tenant's right to possession of the
Premises (subject to the provisions of applicable law; (3)
without terminating Tenant's right to possession of the Premises
continue this Lease in full force and effect (subject to the
provisions of applicable law).

   Notwithstanding the foregoing however, and regardless of
Landlord's election to pursue any of the remedies of (1), (2) or
(3) above or such other remedies as are allowed at law,
Landlord's remedy or recovery for the collection of Rent past due
or to become due under this Lease shall be limited exclusively to
either of the following: (A) without re-entry into the Premises
institute suit from time to time for the recovery of past due
Rent, (B) Landlord shall have the right to re-enter the Premises
pursuant to process of law and to dispossess Tenant and all other
occupants therefrom (subject to Section 22.03) and remove and
store all property therein in a public warehouse or elsewhere at
the cost and for the account of Tenant; and in such event
Landlord may make such alterations and repairs as may be
necessary in order to relet the Premises, and may relet the
Premises or any part thereof for such term or terms (which may be
for a term extending beyond the term of this Lease) and at such
rental or rentals and upon such other terms and conditions as
Landlord may deem advisable.  Upon each such reletting all
rentals and other sums received by Landlord from such reletting
shall be applied in the following order: (i) to the payment of
any indebtedness other than Rent due hereunder from Tenant to
Landlord; (ii) to the payment of any costs and expenses of such
reletting including reasonable brokerage fees and costs of such

-28-

The Bar
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgldept\djs\connect.lse



alterations and repairs (all of the aforementioned items in (i)
and (ii) being collectively referred to as "Other Damages"), and
(iii) to the payment of Rent past due and unpaid hereunder; and
(iv) the residue, if any, shall be held by Landlord and applied
in payment of Future Rent which shall continue to accrue upon the
days that the same would otherwise have become due and payable by
Tenant hereunder if no Event of Default had occurred.  If such
rentals and other sums received from such reletting during any
month are less than the Rent to be paid during that month by
Tenant hereunder.  Tenant shall pay such deficiency to Landlord;
if such rentals and sums shall be more, Tenant shall have no
right to the excess but shall be entitled to a credit in the
amount of such excess against Rent to become due in the future.
Such deficiency shall be calculated and paid monthly.  Landlord
shall use reasonable efforts to mitigate damages and relet the
Premises.  Separate suits may be brought from time to time to
collect any such damages for any month(s) (and any such separate
suit shall not in any manner prejudice the right of Landlord to
collect any damages for any subsequent month(s)), or Landlord may
defer initiating any such suit until after the expiration of the
Lease Term (in which event Tenant hereby agrees that such
deferral should not be construed as a waiver of a Landlord's
rights as set forth herein).  Landlord's statutory or common law
lien or right of distraint, if any, are hereby waived.

        18.03  Acceleration Prohibited.  Whether or not this Lease
shall be terminated by Landlord or deemed to be terminated by any
provision of law or decree of a court of competent jurisdiction
there shall be no liability or obligation on the part of Tenant
to pay any Rent prior to the date the same would otherwise have
become due in the absence of any Event of Default, it being
agreed and understood that Landlord shall have no right to
accelerate (i.e. declare the same immediately due and payable)
any such Rent which would have become due in the future ("Future
Rent").  In the event Landlord terminates this Lease, Tenant's
liability for Future Rent (as well as any damages specifically in
lieu of or representing such Future Rent) shall cease and
terminate, except to the extent and in the manner provided for in
Section 18.02 above (monthly payment of rent or deficiencies
thereof).

        Nothing contained in this Section 18.03 shall affect or
diminish Landlord's rights to recover Other Damages as defined in
Section 18.02 or, only following an Event of Bankruptcy (as
defined above), to accelerate Future Rent to the extent permitted
by the applicable bankruptcy laws.

        18.04  Interest.  Any payment of Rent or Other Charges which
are not made when due shall bear interest from the due date until
paid at the per annum rate equal to the prime rate of Wells Fargo
Bank of San Francisco for short term commercial loans plus two
percent (2%).

                ARTICLE 19:  DEFAULT BY LANDLORD

        19.01  Landlord's Time to Cure.  If Landlord shall fail to
perform any of its obligations under this Lease, which failure
continues for a period of more than thirty (30) days after
receipt of written notice from Tenant specifying such failure
(thereupon constituting an Event of Default), or if by reason of
the intrinsic nature of such failure it will require more than
thirty (30) days to remedy and it continues beyond the time
reasonably necessary to cure the same (provided Landlord had
commenced to cure the failure within such thirty (30) day period

                            -29-                    JHS - 01788

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
1g\dgp\dgp\connect.lse



and proceeds to cure such failure with diligence and continuity), then Tenant may, at its option, in addition to any other remedies available to Tenant at law or equity, upon written notice, incur any expense reasonably necessary to perform the obligations of Landlord specified in such notice and deduct such expense from the Rent becoming due hereunder.

## ARTICLE 20: LITIGATION EXPENSES

20.01  Prevailing Party Recovers.  If either party shall bring an action against the other to enforce or interpret the terms of this Lease or otherwise arising out of this Lease, the prevailing party in such action shall be entitled to its costs of suit and reasonable attorney's fees.  In computing attorney's fees, there will be no allocation of salaries for work performed by in-house counsel.

## ARTICLE 21: HOLDING OVER

21.01  Month to Month.  If Tenant remains in possession of the Premises after the term of this Lease or any extensions or renewals thereof, without Landlord's consent, which consent may be granted or withheld in Landlord's sole discretion, Tenant shall become a tenant from month to month at two hundred percent (200%) of the Minimum Rent payable during the last month of the term of this Lease, or any extensions or renewals thereof and upon the other terms herein specified, and such tenancy shall continue until terminated by Landlord or Tenant giving the other at least thirty (30) days prior notice of its intention to terminate the tenancy.  Tenant shall also be liable for damages to Landlord caused by Tenant's failure to vacate the Premises, provided that Landlord gives Tenant reasonable advance written notice of such damages.

## ARTICLE 22: SUBORDINATION

22.01  Non-Disturbance Protection From Future Encumbrance Holder.  At Landlord's option, this Lease shall become subordinate to any mortgage, deed of trust, ground or master lease, sale-leaseback transaction or other security instrument (any one or more of the foregoing individually or collectively called an "Encumbrance") which shall hereafter be placed on the Premises, provided that Landlord obtains from the holder of the Encumbrance placed against the Premises, a non-disturbance agreement in recordable form which provides that in the event of any foreclosure, sale under a power of sale, ground or master lease termination or transfer in lieu of any of the foregoing or the exercise of any other remedy pursuant to any such Encumbrance (a) Tenant's use, possession and enjoyment of the Premises shall not be disturbed and this Lease shall continue in full force and effect so long as Tenant is not in default hereunder, and (b) this Lease shall automatically become a direct lease between any successor to Landlord's interest, as landlord, and Tenant as if such successor were the Landlord originally named hereunder. Tenant's obligation to execute any documents or instruments as provided in this Section shall be subject to the express limitation that:

(i)  such documents or instruments shall be strictly limited to the matters of (A) the confirmation by Tenant of the subordination of this Lease and (B) the mortgagee's covenant not to disturb Tenant's possession and to recognize this Lease and be bound by the provisions hereunder in accordance with the above provisions, and

JIBS - 01787

-30-



(ii)  no such document or instrument may contain any other matters which materially increase any of Tenant's obligations hereunder or materially decrease any of Tenant's rights under this Lease.

22.02  Non-Disturbance Agreement from Present Encumbrance Holder.  Landlord covenants and represents that as of the date of execution and delivery of this Lease there are no Encumbrances with respect to the Premises or the Building or Land of which the Premises is a part.

22.03  Intentionally Omitted.

### ARTICLE 23:  INTENTIONALLY DELETED

### ARTICLE 24:  FORCE MAJEURE

24.01  Force Majeure.  In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, military or usurped power, sabotage, unusually severe weather, fire or other casualty or other reason (but excluding financial inability or the lack of suitable financing) of a like nature beyond the reasonable control of the party delayed in performing work or doing acts required under the terms of this Lease (herein called "force majeure"), the performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of the delay.  The provisions of the preceding sentence however shall not excuse Tenant from the prompt and timely payment of the Rent as and when the same is due under this Lease except when (i) the Commencement Date of the term is delayed by reason of force majeure, or (ii) such payment is excused pursuant to other provisions of this Lease.

### ARTICLE 25:  RECORDING

25.01  Memorandum of Lease.  This Lease shall not be recorded, but, upon the request of either party, the parties shall execute a short form Memorandum of Lease, which may be recorded by either party.  Such Memorandum of Lease shall include only such provisions as are reasonably necessary to impart notice of Tenant's rights under this Lease but shall specifically include the length of the term (and options to extend the same, if any).  The cost of such recording shall be paid by the party requesting recording.  Tenant agrees to execute a release of the Memorandum of Lease promptly following the expiration or termination of this Lease.

The parties acknowledge that simultaneously with the execution of this Lease they have entered into a Memorandum of Lease in the form of Exhibit D attached hereto incorporating by reference the terms and conditions of this Lease.

### ARTICLE 26:  BROKERS

26.01  Mutual Indemnity.  Landlord and Tenant represent to each other that each has dealt with no broker other than Lord Associates and The Real Estate Division of Blake Construction Co., Inc. for whose commissions and fees Landlord is solely responsible, and each party hereby agrees to indemnify and hold the other harmless from any claims for any other such

JIBS - 01788

-31-

The Bay
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
[gl.dpt\lse\connect.lse]



commissions or fees.

### ARTICLE 27: NOTICES

27.01  Intentionally Deleted.

27.02  Notices.  All notices, consents or waivers required or permitted to be given under this Lease shall be in writing and may be delivered personally or may be forwarded by registered or certified mail, return receipt requested, or may be forwarded by United States Express Mail Service, or by Federal Express or other private overnight delivery service or by telex or telegram (but not facsimile) provided that a receipt or proof of delivery thereof can be produced.

27.03  Notices/Where Sent.  All notices given under this Lease shall be addressed to the respective parties as follows:

```
Notices of Default
To Landlord:              Jack I. Bender & Sons
                          1120 Connecticut Ave., N.W.
                          Washington, D.C. 20036
                          Attn:  Steven Schwartz, Esq.

With a Copy To:           Blake Construction Co., Inc.
                          The Real Estate Division
                          1150 Connecticut Avenue, N.W.
                          Washington, D.C. 20036
                          Attn:  Stephen F. Lustgarten

All Other Notices
To Landlord:              Jack I. Bender & Sons.
                          c/o Blake Construction Co., Inc,
                          The Real Estate Division
                          1150 Connecticut Avenue, N.W.
                          Washington, D.C.  20036
                          Attn:  Stephen F. Lustgarten

To Tenant:                The Gap, Inc.
                          900 Cherry Avenue
                          San Bruno, CA  94066
                          Attn: General Counsel
```

or to such other address as may be contained in a notice from either party to the other given pursuant to this Section.

27.04  Effectiveness of Notice.  Except as hereinafter provided notice shall be deemed given when received, or when receipt is refused.

### ARTICLE 28:  SUCCESSORS AND ASSIGNS

28.01  Successors and Assigns.  Subject to the provisions of Article 17 ("Assignment and Subletting"), the covenants, conditions and agreements contained in this Lease shall be binding upon and shall inure to the benefit of Landlord and Tenant and their respective successors and assigns.

-32-



## ARTICLE 29:  INTERPRETATION

29.01  Interpretation.  Wherever in this Lease provision is made for the approval or consent of any party hereto, then unless expressly provided otherwise, such approval or consent shall not be unreasonably withheld or delayed.  References to the "term of this Lease" or "Lease term" shall, unless the context otherwise requires, be deemed to include any extensions or renewals thereof.  This Lease constitutes the entire agreement between the parties with respect to the subject matter hereof and cannot be modified, supplemented, or amended except by an instrument in writing signed by the party to be charged.  This Lease shall be interpreted and construed in accordance with the laws of the District of Columbia.  The waiver of one Event of Default by either of the parties shall not constitute a waiver of a subsequent Event of Default.  In the event that any provisions of this Lease are, become or shall be declared by any court or tribunal of competent jurisdiction to be illegal, such provisions shall be null and void and shall be deemed deleted from this Lease and all the remaining provisions of this Lease shall remain in full force and effect.

## ARTICLE 30:  CONSTRUCTION ALLOWANCE

30.01  Construction Allowance/When Due.  In consideration for the performance by Tenant of certain work in the Premises Landlord agrees to pay to Tenant an allowance (the "Construction Allowance") in an amount equal to Six Hundred Forty-two Thousand, Four Hundred Forty-four Dollars ($642,444.00) payable in accordance with the following:

A.     Twenty-five percent (25%) of the Construction Allowance and the Letter of Credit (as defined in Section 30.04 below) for the balance of the Construction Allowance upon the fifth (5th) business day immediately prior to the commencement by Tenant of construction at the Premises, which construction date shall be specified in a notice from Tenant to Landlord given at least ten (10) business days prior to said date.  Tenant shall have no obligation to commence construction at the Premises until receipt of this installment of the Construction Allowance and the Letter of Credit, and the Commencement Date and Tenant's obligation to pay Rent shall be postponed by the number of days by which Landlord failed to deliver this installment and the Letter of Credit by the required date aforesaid; provided, however, in no event shall the Commencement Date be delayed beyond the date on which the Tenant opens for business in the Premises.

B.     The balance of the Construction Allowance within ten (10) days after the completion of the conditions set forth in Paragraph C herein below.

C.     The conditions precedent to the obligation of Landlord to pay the Construction Allowance are:

(i)  the opening by Tenant for business in the Premises with the store fully fixtured, stocked and staffed;

(ii)  the submission by Tenant of a copy of the final billing from Tenant's general contractor (the "General Contractor") broken down in reasonable detail and showing the cost of work performed at the Premises;

-33-

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgldgp\vdga\connect.lse



(iii) the submission by Tenant of a lien waiver and release from Tenant's General Contractor; and

(iv) Tenant's affidavit that the Premises has been built in accordance with the plans and specifications approved by Landlord.

30.02  <u>Lien Waivers Not Required.</u>  Except with respect to Tenant's General Contractor from whom a waiver of lien shall be required, the submission by Tenant of lien waivers from any other contractors, subcontractors and materialmen performing Tenant Work at the Premises shall not be a condition precedent to the payment of any portion of the Construction Allowance. Nevertheless, Tenant agrees that it shall submit such waivers as it has in its possession as soon as practicable after receipt of the same and that with respect to any subcontract for which no waiver is submitted Tenant shall protect Landlord's interest from any lien in the manner provided in Article 8 hereof.

30.03  <u>Tenant's Remedies.</u>  In the event Landlord fails to pay the Construction Allowance within the ten (10) day period above provided, then Tenant shall have the right either to draw against the letter of credit, or to deduct the Construction Allowance from the Rent otherwise becoming due hereunder together with interest on the unpaid balance thereof at the prime rate per annum of Wells Fargo Bank of San Francisco for short term commercial loans plus four percent (4%).

30.04  <u>Letter of Credit.</u>  In order to secure the prompt and faithful performance by Landlord of its obligation to pay the Construction Allowance by the date required above, Landlord shall deliver to Tenant an unconditional, clean, irrevocable, standby letter of credit (the "Letter of Credit"), payable on sight with the bearer's draft in the amount of Four Hundred Eighty-one Thousand Eight Hundred Thirty-three Dollars ($481,833.00), issued by and drawn on a major bank (the "Issuing Bank") of Landlord's selection, subject to Tenant's reasonable approval. The Letter of Credit shall state that it shall be payable against a sight draft presented by Tenant, accompanied by Tenant's statement that said drawing is in accordance with the terms and conditions of this Lease; no other document or certification from Tenant shall be required to negotiate the Letter of Credit. Tenant may designate any bank as Tenant's advising bank for collection purposes and any sight draft for the collection of the Letter of Credit may be presented by the advising bank on Tenant's behalf.

The Letter of Credit shall be for a term of one year and shall be in the form of Exhibit E attached hereto. The fee for the maintenance of the Letter of Credit shall be at Landlord's sole cost and expense. Notwithstanding the foregoing, if Landlord pays the Construction Allowance in a timely manner, Tenant shall reimburse Landlord for the usual and customary fee for maintenance of the Letter of Credit.

Upon the failure of Landlord to pay the full amount of the Construction Allowance when the same is due and payable, Tenant shall be entitled to draw against the Letter of Credit in the amount of the unpaid portion thereof. Upon the receipt by Tenant of the full amount of the Construction Allowance, the Letter of Credit, if not theretofore completely drawn, shall be returned to Landlord.

JISS – 01791

-34-



The Tenant shall not be required to exhaust its remedies against the Landlord before having recourse to the Letter of Credit or to any other form of security held by Tenant or to any other remedy available to Tenant at law or in equity.

The Letter of Credit shall be transferable.  Further, in the event of any sale, assignment or transfer by the Tenant of its interest in the Premises or the Lease, the Tenant shall have the right to assign or transfer the Letter of Credit to its grantee, assignee or transferee and in the event of any sale, assignment or transfer, the Tenant so assigning or transferring the Letter of Credit shall have no liability to the Landlord for the return of the Letter of Credit and the Landlord shall look solely to such grantee, assignee or transferee for such return.

Such Letter of Credit shall be delivered to Tenant upon the later of (i) the mutual execution of this Lease and delivery of a fully executed copy of the same to Tenant, or (ii) five (5) business days prior to the date of the date of the commencement of Tenant's construction at the Premises.  Tenant shall give Landlord at least ten (10) business days notice of such construction start date.  Tenant shall have no obligation to commence construction at the Premises until receipt of the Letter of Credit and the Commencement Date and Tenant's Obligation to pay Rent shall be postponed by the number of days by which Landlord failed to deliver the Letter of Credit by the required date aforesaid.

## ARTICLE 31:  APPROVALS

31.01  **Lease Conditioned on Approval.**  Landlord expressly acknowledges that the ability of Tenant to design and construct the Premises (including without limitation the number, design and construction of its signs and storefront) in accordance with its requirements are material inducements to Tenant to enter into this Lease.  Accordingly, it is expressly agreed by the parties hereto that the effectiveness and validity of this Lease shall be expressly conditioned upon the approval by Landlord and all governmental authorities having jurisdiction thereover of Tenant's Sign, Storefront and Design Plans (as described below) as well as its Construction Plans (as described below) for the Premises, including the ability to obtain any required variance from such governmental authority (all of the foregoing approvals and variances being collectively referred to as the "Approvals").  In the event of the failure of Tenant to obtain the Approvals, then Tenant may cancel and terminate the Lease by giving written notice thereof to Landlord.  The term "governmental authority" as used herein includes any quasi-governmental agency or board or any private agency or board, any of which agencies or boards are given authority pursuant to law to review and/or approve Tenant's design or and/or construction to be performed at the Premises.  Notwithstanding anything to the contrary contained herein, the receipt of Landlord's approval and the issuance of all permits (which term does not include a certificate of occupancy) required by any governmental authority for construction of the Premises in accordance with the Development Plans (as defined below) shall satisfy all conditions set forth in this Article 31.  Upon the receipt of Landlord's approval and issuance of such permit(s), Tenant shall no longer have the right to terminate the Lease pursuant to this Article.

JIBB - 01792

-35-

**31.02** **Definition of Plans.** The term "Sign, Storefront and Design Plans" shall mean Tenant's plans for (i) its signs, including, without limitation, the number, size, configuration, location, content, color, and other aesthetic features of said signs, (ii) the external and internal appearance of the Premises or the Building and (iii) the size, dimensions, height, elevation, grade, ground coverage, and landscaping of the Premises or Building. The term "Construction Plans" shall mean all plans relating to the construction or work to be performed at or to the Premises other than that depicted in the Sign, Storefront and Design Plans. Both the Sign, Storefront and Design Plans as well as the Construction Plans may sometimes be collectively referred to as the "Development Plans".

**31.03** **Tenant's Standard of Design.** Tenant's Development Plans may be in accordance with Tenant's own requirements, as Tenant, in its sole discretion, may determine and whether or not its proposal is permitted under the applicable building codes or governmental requirements then in existence.

**31.04** **Governmental Approval Process.** (a) Tenant shall not be required to accept or comply with any condition of approval imposed or requested by such governmental authority which the Tenant does not, in the exercise of its sole discretion, deem acceptable. Tenant's obligation to obtain such Approvals shall not extend beyond the determination of the applicable governmental authority at a formal public hearing for the same and Tenant shall have no obligation to appeal an adverse decision.

(b) Landlord shall cooperate with Tenant in its application for governmental approval of its Development Plans and will execute any required documents in connection therewith and, if necessary, appear in person, or through its duly appointed agent with Tenant (or Tenant's designated agent) at a public hearing on such application.

### ARTICLE 32: ESTOPPEL CERTIFICATES

**32.01** **Estoppel Certificate.** Tenant shall at any time and from time to time, within fifteen (15) days after request by Landlord, deliver a written certificate duly executed by an authorized party on behalf of Tenant certifying to Landlord, or any other person or entity specified by Landlord:

(a) That this Lease is unmodified and in full force and effect, or if there has been any modification, that the same is in full force and effect as so modified, and identifying any such modification;

(b) Whether or not to the knowledge of Tenant there are then existing any offsets or defenses in favor of Tenant against the enforcement of any of the terms, covenants and conditions of this Lease and, if so, specifying the same, and also whether or not to the knowledge of Tenant, Landlord has observed and performed all of the terms, covenants and conditions on its part to be observed and performed, and, if not, specifying the same;

(c) The dates to which Rent has been paid; and

(d) Any other factual matter relating to this Lease, provided however that such factual matters do not increase any of Tenant's obligations under this Lease nor decrease any of

JIBS - 01793

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
tgldcpT\dge\connect.lse

Tenant's rights hereunder nor require Tenant to take any action other than to address or answer the factual matter raised.

The failure of Tenant to deliver such certificate within such fifteen (15) day period shall be conclusive upon Landlord, Tenant and any other person, firm or corporation for whose benefit the certificate was requested with respect to (a), (b) and (c) above but expressly excluding (d) from any such presumption, whether conclusive or prima facie.

## ARTICLE 33:   EXCULPATION CLAUSE

33.01  Landlord's Exculpation.  Except as otherwise expressly provided in this Lease, Tenant shall not have the right to set off or deduct any amount allegedly owed to Tenant pursuant to any claim against Landlord from any rent or other sums payable to Landlord.  If Tenant is awarded a money judgement against Landlord, then recourse for satisfaction of such judgment shall be limited to execution against the estate and interest of Landlord in the Land and Building and the rents, issues, profits and proceeds therefrom.  No other asset of Landlord, any partner, director, trustee, or officer of Landlord (collectively, "officer") or any person or entity shall be available to satisfy or subject to such judgement for monetary damages, nor shall any officer or any other person or entity have personal liability for satisfaction of any claim or judgement for monetary damages against Landlord or any officer.

The limitation of this Section shall not apply to or limit (i) any injunctive or other equitable, declaratory or other forms of relief to which Tenant may be entitled (notwithstanding that such actions are in personam in nature), or (ii) any other remedy or action against Landlord which does not involve the personal liability of Landlord for monetary damages from property other than Landlord's interest in the Building and Land as aforesaid.

## ARTICLE 34: BUILDING DEMOLITION/MAJOR RENOVATION

If, at any time during the second option period, Landlord elects to demolish the Building or substantially remodel the Building (the result herein referred to as the "New Building"); either of which actions require the evacuation of substantially all tenants of the Building, Landlord shall have the right to terminate this Lease at any time during the second option period.  Such termination shall become effective by written notice by the Landlord to the Tenant not less than ninety (90) days prior to the date fixed in the notice for surrender of possession of the Premises to make the same available for Landlord's construction.  Accompanying such notice shall be copies of Landlord's most recent plans and specifications for the New Building Landlord intends to construct on the site currently occupied by the Building.  At least thirty (30) days prior to the date fixed in the notice for surrender of possession of the Premises, Landlord shall pay to Tenant the undepreciated amount of leasehold improvements constructed at Tenant's expense, depreciated on a straight line basis over the lesser of (i) twelve (12) years or (ii) the period of time from the date of their construction to the natural expiration date of the second option period.  Tenant shall provide Landlord with reasonably detailed information to establish the undepreciated amount of such leasehold improvements.  Landlord's plans and specifications shall include detailed specifications of any new ground floor retail premises to be constructed in substantially the same location of the first floor of the New Building as the original Premises (the "New

-37-

The Gap
1520 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
lgldcp1\dgn\connect.tse

Premises"). If Landlord's plans and specifications reflect such New Premises, Tenant shall have the option to reinstate this lease for two successive five year periods (the "New Option Periods"). If the New Premises contain the essential characteristics of the original Premises (the "Essential Characteristics"), Tenant's first five year option (the "First New Option Period") shall be at the same Minimum Rent which applied to the second option period originally contemplated under this Lease. Tenant's second five year option (the "Second New Option Period") shall be at the Minimum Rent equal to the greater of (i) ninety percent (90%) of the fair rental value (computed in the manner set forth in Section 4.01 of the Lease) of the New Premises as of the commencement of the Second New Option Period or (ii) at the annual rate payable during the First New Option Period. The Essential Characteristics are as follows:

(i) the New Premises shall be the same square footage as the existing Premises, plus or minus ten percent (10%), with ceiling heights equal to or higher than those which now exist on the ground floor level;

(ii) the New Premises shall be in substantially the same location on the first floor of the New Building as are the original Premises;

(iii) the New Premises shall contain not substantially less than the existing linear footage of frontage contained in the existing Premises;

(iv) the New Premises shall contain a configuration and dimensions on all three levels substantially the same as the existing Premises;

(v) the New Premises shall have substantially no more or greater physical obstructions than those in the existing Premises;

(vi) the New Premises shall not suffer the loss of any accessibility or visibility (in terms of proximity of Building entrances and freedom from obstructions) than that which existed with respect to the existing Premises.

If landlord's plans and specifications call for New Premises which do not meet the Essential Characteristics, Tenant shall still have the right to reinstate this lease for two (2) successive five year option periods applicable to the New Premises. Such tenancy shall be at a Minimum Rent equal to ninety percent (90%) of the fair rental value of the New Premises established as of the commencement of the First New Option Period for the First New Option Period; and, for the Second New Option Period, Minimum Rent shall be the greater of (i) ninety percent (90%) of the fair rental value of the New Premises (determined as of the commencement of the Second New Option Period) or (ii) the Minimum Rent payable with respect to the First New Option Period. Fair rental value shall be established in the manner set forth in Section 4.01 above as of the commencement of the applicable New Option Period. Tenant's option hereunder is subject to the following terms and conditions:

(a) No later than twelve (12) months prior to the delivery of the New Premises to Tenant, Landlord shall notify Tenant, which notice shall specify the design of the Premises and New Building and the projected delivery of possession date.

-38-



(b)  Tenant shall on or before a date which ninety (90) days after Landlord delivers the notice required under paragraph (a) above, have the right to exercise its option to lease the New Premises.  Tenant shall exercise its option by written notice to Landlord.  Failure of Tenant to exercise said option shall enable Landlord to lease all or part of said space upon any terms to any party and this Lease and Tenant's rights hereunder shall be deemed terminated.

(c)  If Tenant exercises its option hereunder, the New Premises shall be deemed the Premises (as defined in the Lease) and shall be subject to the terms thereof (except as set forth above with respect to Minimum Rent, and the First New Option Period shall commence as of the date which is seventy-five (75) days after Landlord delivers possession of the New Premises to Tenant in accordance with the provisions of Article 5 of the Lease.  Said date is herein referred to as the "New Option Commencement Date".  Notwithstanding the foregoing, it is understood and agreed as follows:

(i)  Landlord's sole obligation with respect to the condition of the New Premises at the time of delivery of such space to Tenant shall be to deliver a raw shell which approximates the condition of the Premises delivered to Tenant in accordance with Article 5 and Exhibit B hereof;

(ii)  The terms and provisions of Article 30 shall not be applicable to the New Premises;

(iii)  Tenant shall be obligated to construct all leasehold improvements in the New Premises pursuant to plans and specifications approved by Landlord; and

(iv)  After exercising the option granted under this Article, Tenant agrees to diligently and timely seek to obtain all necessary permits from governmental authorities (as defined in Article 31 hereof) provided that Landlord has timely approved Tenant's Development Plans (as defined in Article 31 hereof), and Tenant agrees to apply for such permit(s) not later than one hundred twenty days prior to Tenant's anticipated opening date in the New Premises.

(d)  As of the New Option Commencement Date, the New Premises shall become under and subject to this Lease on the same terms, covenants and conditions as contained in this Lease, subject to the foregoing changes in Minimum Rent and the New Option Periods.

(e)  It shall be a condition precedent to the right of Tenant to exercise the option provided under this Article, that at the time of exercising same and at the New Option Commencement Date, there be no existing unremedied Event of Default on the part of the Tenant under any of the terms, covenants or conditions of the Lease on the part of the Tenant to be performed.  Any cancellation or termination of this Lease or of Tenant's right to possession of the Premises shall terminate the option under this Article.  The option granted hereunder shall be conditioned upon Tenant having made due and timely exercise thereof as hereinabove provided.  On the request of either party, the other party shall execute a short form memorandum of lease including the options to extend the term of the lease set forth in this Article.

-39-

(f)  If Landlord does not deliver possession of the New Premises to Tenant by the date specified in the notice set forth in paragraph (a) above, then Tenant shall have the option to terminate this Lease at any time thereafter upon ninety (90) days' prior written notice to Landlord.

### ARTICLE 35: MISCELLANEOUS

35.01   **Waiver of Jury Trial.**  Both parties hereby waive the right to trial by jury in any action arising hereunder.

35.02   **Time of the Essence.**  Time is of the essence of each and every provision of this Lease.

35.03   **Authorization.**  Each party hereto represents that this lease has been duly authorized and that the persons executing the lease on behalf of the respective parties are authorized to do so and that such action is binding upon the respective parties.

35.04   **Miscellaneous.**  If any condition exists which may be the basis of a claim of constructive eviction, then Tenant shall give Landlord written notice thereof and a reasonable opportunity to correct such condition, and in the interim Tenant shall not claim that it has been constructively evicted.  Any property placed by Tenant or any invitee in or about the Premises or the Building or the Land shall be at the sole risk of Tenant, and Landlord shall not in any manner be held responsible therefor.

**ADDITIONAL EXHIBITS AND RIDERS.**  This Lease consists of pages 1 through 40, a Percentage Rent Rider of 3 pages, a plot plan marked Exhibit A, a list of prohibited uses marked Exhibit A-1, a schedule of Landlord's Work marked Exhibit B, an allocation of responsibility for concrete fill and removal marked Exhibit C, a form of Memorandum of Lease marked Exhibit D, a form of Letter of Credit marked Exhibit B and Partial Street Level Plans and Elevations and Sections marked Exhibits RA-1 and RA-2.

IN WITNESS WHEREOF, the parties have caused this Lease to be properly executed as of the date first above written.

LANDLORD

Witness or Attest:

By _____     By _____

Title _____

TENANT

Witness or Attest:

By _____     THE GAP, INC.
Joel R. Kell                     By _____
Title  Assistant Secretary          Steven B. Kapsky
                                  Title  Senior Vice President

-40-

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
\\gldcp\docs\connect.lse

JIBS - 01797

### PERCENTAGE RENT RIDER

Attached to and forming part of Lease dated ~~June 7~~ ,
199 ~~72~~, between Jack I. Bender & Sons, as Landlord, and
The Gap, Inc., as Tenant.

### PERCENTAGE RENT

1.1 **Percentage Rent.** In addition to Minimum Rent, Tenant
agrees to pay to Landlord as percentage rent (hereinafter
referred to as "Percentage Rent") an amount per Lease Year or
Partial Lease Year equal to five percent (5%) of all Gross Sales
(as herein defined) made in the Premises during each full Lease
Year or Partial Lease Year in excess of the annual minimum Gross
Sales figure (the "Breakpoint") applicable to that Lease Year or
Partial Lease Year as set forth in the following schedule:

> For and during the period from the beginning of the
> first (1st) full Lease Year through the end of the
> fourth (4th) full Lease Year, Seven Million Seven
> Hundred Eighty-Seven Thousand Two Hundred Dollars
> ($7,787,200.00) per Lease Year;

> For and during the period from the beginning of the
> fifth (5th) full Lease Year through the end of the
> eighth (8th) full Lease Year Eight Million Five Hundred
> Sixty-five Thousand Nine Hundred Twenty Dollars
> ($8,565,920.00) per Lease Year;

> For and during the period from the beginning of the
> ninth (9th) full Lease Year through the end of the
> twelfth (12th) full Lease Year Nine Million Seven
> Hundred Thirty-four Thousand Dollars ($9,734,800.00)
> per Lease Year.

1.2 **Breakpoint For a Full or Partial Lease Year.** It is
acknowledged by the parties hereto that the Breakpoints
applicable to a given full or partial Lease Year, including Lease
Years during the option periods, are computed by dividing the
Minimum Rent payable by Tenant for that same Lease Year by five
percent (5%). All computation and/or reconciliation of
Percentage Rent payable by Tenant for a full Lease Year or
Partial Lease Year shall be determined in accordance with and
governed by the foregoing sentence.

1.3 **INTENTIONALLY DELETED.**

1.4 **Gross Sales Defined.** The term "Gross Sales" means the
gross amount received by Tenant (including for this purpose only
the amount received from any subtenant, licensee or
concessionaire of Tenant) from all sales, both for cash and on
credit, made or rendered in, upon or from the Premises (and in
cases of sales on credit whether or not payment be actually made
therefor) and including the gross amount received by Tenant for
merchandise sold pursuant to orders received in the Premises
although filled elsewhere. "Gross Sales" shall not include:

> (i) Amounts received with respect to any sale to the
> extent of the net amount of any refund made or credit allowed
> upon any such sale, where the merchandise sold, or some part
> thereof, is returned to and accepted by Tenant;

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
\gldcp1\dga\connect.rdr



(ii)  Exchanges or transfers of merchandise between other stores of Tenant where such exchanges are made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale which has been made at, in, upon, or from the Premises;

(iii)  Returns to suppliers or manufacturers;

(iv)  The amount of any city, county, state or federal sales, use, luxury or excise tax on such sales which is both added to the selling price (or absorbed therein) and paid to the taxing authorities by Tenant;

(v)  Any penalty charged by Tenant for a returned check;

(vi)  Reimbursement of amounts for postage, express or delivery services, including, but not limited to, United Parcel Service, incurred in delivering merchandise to customers, provided that such charges are at all times properly segregated from amounts includable in Gross Sales and so identified on Tenant's records;

(vii)  Any sale at a discount to a bona fide employee of Tenant or of a licensee or concessionaire of Tenant, to the extent that such sales do not exceed three percent (3%) of the total Gross Sales in any Lease Year;

(viii)  Receipts from vending machines or pay telephones;

(ix)  Any charge added by Tenant to its regular cash price as a finance charge for sales on credit, provided that such charge is at all times properly segregated from amounts includable in Gross Sales and so identified on Tenant's records. Each transaction involving the extension of credit shall be treated as a sale for the regular cash price in the month in which such transaction occurred, without regard to the time payment is made or title passes;

(x)  Any charges paid to the issuers of credit cards;

(xi)  Any sale of fixtures or equipment not in the regular course of Tenant's business or after use thereof;

(xii)  Gift certificates, or like vouchers, until such time as the same have been converted into a sale by redemption at the Premises.

(xiii)  Catalog sales, provided that the orders therefor did not originate at the Premises.

1.5  **Lease Year Defined**.  The "first Lease Year" shall begin on the Commencement Date and shall expire on the last day of the month, twelve (12) full calendar months next following said Commencement Date.  If the Commencement Date shall occur on the first day of the calendar month, then the first Lease Year shall end on the day immediately preceding the first anniversary of the Commencement Date.  Subsequent Lease Years shall be each consecutive twelve (12) calendar month period thereafter.

In the event the term of this Lease is extended to a January 31st as provided in Section 2.01 of the Lease (or is terminated prior to the expiration of the last full Lease Year), then the period from the end of the last full Lease Year to the next succeeding January 31st (or to the termination of the term, if

-2-

JIBB - 01799

JIBS - 01800

earlier) shall be deemed a "Partial Lease Year."

**1.6  Reporting.**  Tenant shall submit within thirty (30) days after the end of each tenant fiscal month during the term hereof, a written statement showing the amount of Gross Sales made in the Premises during the preceding fiscal month.  Within sixty (60) days after the end of each Lease Year, and within sixty (60) days after the expiration or earlier termination of the term hereof, Tenant shall furnish Landlord with a statement, certified as correct by Tenant (or if Tenant is a corporation, then by an authorized officer of Tenant), setting forth the Gross Sales made in, upon and from the Premises during the preceding Lease Year.

**1.7  Payment.**  Tenant's obligation to pay Percentage Rent during any one Lease Year (or Partial Lease Year) shall first accrue in the month in which Tenant's Gross Sales for such Lease Year shall first exceed the annual Breakpoint for such Lease Year (or Partial Breakpoint for any Partial Lease Year).  Such Percentage Rent shall be paid monthly thereafter for the balance of such Lease Year (or Partial Lease Year) at the same time as the rendition of Tenant's monthly reports of Gross Sales.

**1.8  Recordkeeping.**  Tenant shall, for a period of three (3) years after the end of each Lease Year, keep safe and intact at Tenant's principal offices all of the records, books, accounts and other data which are regularly kept by Tenant in the ordinary course of its business to establish Tenant's Gross Sales, in upon and from the Premises and shall, upon request, make the same available to Landlord for examination during normal business hours at Tenant's principal accounting offices during said three (3) year period in accordance with Section 1.9 hereinbelow.

**1.9  Landlord's Audit.**  The acceptance by Landlord of payments of Percentage Rent shall be without prejudice to Landlord's right to an examination of Tenant's books and records in order to verify the amount of Gross Sales made by the Tenant in upon and from the Premises.  Landlord may cause once per Lease Year, at any time during normal business hours and upon reasonable prior notice to Tenant, an audit to be made at Tenant's main accounting office of records required to be kept hereunder relating to the Premises for the period covered by any annual statement of Gross Sales furnished by Tenant as above set forth.  If such audit shall disclose a liability for Percentage Rent in excess of three percent (3%) of the Percentage Rent theretofore computed by Tenant for such period, Tenant shall promptly pay to Landlord the reasonable cost of such audit in addition to any deficiency in Percentage Rent, which deficiency shall be payable in any event.  Any information obtained as a result of such audit shall be held in strict confidence, except if relevant in the event of litigation between the parties.

**1.10  Computation Following Re-Entry.**  In the event Landlord re-enters the Premises following an Event of Default of Tenant pursuant to Article 18, then for purposes of computing the Percentage Rent that would have accrued for each month subsequent to Landlord's re-entry, the same shall be deemed to be the average Percentage Rent paid by Tenant for the three (3) year period immediately preceding Landlord's re-entry (or over such shorter period if less than three (3) years have elapsed since the Commencement Date).

-3-









EXHIBIT A
Page 2 of 4

555

## Prohibited Uses

The following uses shall not be permitted at the Premises at any time during the lease term:  bank, savings and loan or other financial institution; drug store, pharmacy or any other store engaged in the sale of cosmetics and health and beauty aids; dry cleaner or any store engaged in the sale of cleaning supplies; copy reproduction and printing facilities; hardware or office supply store; night club, discotheque or any other entertainment use, including but not limited to movie theater, bowling alley, skating rink, or amusement/video game arcade; restaurant (fast food or otherwise), bar, tavern, liquor store, grocery store, convenience store or any other food or beverage use of any kind; sale or rental of records, audio tapes or video tapes; real estate, tax preparation, travel agency, or pawn shop; massage parlor, hot tub or spa or escort service; "adult entertainment" enterprises involving the sale or rental of any paraphernalia related to the use or ingestion of illegal drugs or to the sale or rental of any pornographic items; automobile sales, parts or service; sales of carpets or rugs; sales of beds or bedframes; sales of costume jewelry; off-track batting establishment; repair businesses of any kind; souvenir shop; sales of housewares unless of a quality similar to or better than, by way of example but not limitation, Conran's or William Sonoma; sales of lingerie unless of a quality similar to or better than, by way of example but not limitation, Victoria's Secret; any use intended to be temporary (i.e., for less than one hundred eighty (180) days) and fabric stores.  In addition, no discount store or clearance center of any kind; no manufacturing or wholesale operation; no Goodwill Industries, Salvation Army or other clearinghouse for the collection of donated goods; no social service organization; and no sub-tenant or assignee who can defend a suit or action on the ground of sovereign immunity.

The foregoing limitations on use shall not apply to the incidental sale of cosmetics, beauty aids, costume jewelry, lingerie and children's and infants' items then sold by The Gap, Inc. or an Affiliate (as defined in Section 17.02 of the Lease) in a substantial number of its other stores.

Exhibit A-1

JIBS — 01806

EXHIBIT B
LANDLORD'S WORK

Landlord shall perform the following work at Landlord's
expense in accordance with Tenant's plans and specifications and
with adherence to all pertinent federal, state and local codes
and ordinances.  Responsibility for items of concrete fill and
removal shall be as designated on the attached Exhibit C.

A.   **Demolition**

(1)  Landlord shall remove all kitchen equipment,
exhaust duct work systems within the Premises and
cap at the lease line, other fixtures, and grease
trap from the ground floor, mezzanine and basement
levels.

(2)  Landlord shall remove all electrical wires,
conduit and equipment and all plumbing and gas
lines which exclusively serve the Premises and cap
them flush with the top of the existing concrete
slab or flush with walls.

(3)  Landlord shall remove the restaurant fixtures,
furnishings, personal property, bar area on the
ground floor and luncheonette counter, stools,
curbing, etc. on the ground floor, mezzanine and
basement.

(4)  Landlord shall remove all existing air handling
units which exclusively serve the Premises (except
for the new 15-ton unit located on the mezzanine
floor), all diffusers and duct work which
exclusively serve the Premises from all three
floors of the Premises.  The existing air handler
which serves the main building lobby may remain on
the mezzanine level.

(5)  Landlord shall remove all chilled water and steam
branch lines which exclusively serve the Premises.
Existing chilled water and steam line mains to
remain.

(6)  Landlord shall remove all floor finishes to bare
concrete.

(7)  Landlord shall remove all finishes on columns and
walls to bare concrete or gyp board.

(8)  Landlord shall remove all suspended ceilings and
lights to expose the underside of the floor above.

(9)  Landlord shall remove all walls and/or partitions
which are non load-bearing on all three levels
exposing all columns and perimeter walls to bare
concrete or gyp board only.

(10) Landlord shall demolish the existing storefront
and install, at Tenant's expense, a temporary
barricade in accordance with Tenant's
specifications.

(11) Landlord shall remove all sprinkler laterals and
heads, leaving only the sprinkler mains in the
Premises in place.

(12) Landlord shall remove the dumwaiter and demolish
all existing staircases as noted on Tenant's plans
and specifications and shall close the existing
dumbwaiter opening and all existing stair openings

B-1



as shown on Tenant's plans and specifications.

B. **HVAC**

    (1)  Landlord shall provide chilled water for Tenant's needs from the cooling tower from 8 a.m. until midnight Monday through Saturday and from 9 a.m. until 7 p.m. on Sundays. Tenant shall provide a flow meter for the chilled water and shall pay its proportionate share of the cost of chilled water based upon usage and established engineering principles.

C. **Construction to be Performed by Landlord**

    (1)  Landlord shall remove and/or relocate the fire exit staircase in the Premises (as noted on Tenant's plans) at the sole cost and expense of Landlord (exclusive of finishes, enclosures and railings).

D. **Storefront**

    (1)  Landlord and Tenant shall remodel the existing entry canopy on Connecticut Avenue and reskin the storefront area up to the second floor windows in accordance with plans and specifications attached hereto as Exhibits RA-1 and RA-2.

    (2)  The cost of such work shall be borne by the parties as set forth in the notes on Exhibit RA-1. Following receipt of bids for the installation of the Alucobond on the canopy and the stonewall and pavers for the work described in items 2 and 9 on Exhibit RA-1, Tenant shall provide Landlord with the cost to Tenant of performing such work, broken down in reasonable detail. Within twenty (20) days after receipt of such information, Landlord shall notify Tenant in writing if Landlord elects to perform all or any portion of such work at its sole cost and expense and designating what portion, if any, is to be performed by Tenant's subcontractors. If Landlord notifies Tenant to proceed with all or any portion of such work, then Landlord shall reimburse Tenant the cost to Tenant thereof in an amount not to exceed the cost previously approved by Landlord. Such reimbursement shall be made by Landlord within ten (10) days after (i) the submission by Tenant of a copy of the final billing from Tenant's general contractor (the "General Contractor") broken down in reasonable detail and showing the cost of such work, (ii) the submission by Tenant of a lien waiver and release from Tenant's General Contractor, and (iii) Landlord's architect's certificate that the work has been substantially completed in accordance with the approved plans and specifications. Landlord shall cause its architect to make such periodic inspections of such work as may be necessary in order to provide such certification. If Landlord fails to reimburse Tenant within said ten-day period, Tenant shall have the right to deduct such amount from the Rent otherwise becoming due under the Lease, together with interest at the prime rate per annum of Wells Fargo Bank of San Francisco for short term commercial loans plus four percent (4%), until such amount has been reimbursed in full.



(3) If Landlord elects to perform all or any part of such work, Landlord shall commence promptly to do so and shall diligently prosecute such work to completion in a good and workmanlike manner, in accordance with all applicable codes and the mutually approved plans and specifications. It is understood and agreed that the date on which Landlord completes such portion of said work as it elects to perform itself shall have no effect on the Commencement Date of the Lease.



B-3









JIBS - 01809

EXHIBIT C
Page 1 of 3

RECORDING REQUESTED BY

AND WHEN RECORDED, MAIL TO:

    The Gap, Inc.
    900 Cherry Avenue
    San Bruno, CA  94066
                               JIBS - 01812

    Attn:  Dianne Estrin

---

### MEMORANDUM OF LEASE

    This Memorandum of Lease is made and entered into as of this
_____ day of _____, 199__ by and between
_____, a _____ (hereinafter referred to as
"Landlord") and _____, a
(hereinafter referred to as "Tenant").

    **1.  Demise.**  Landlord hereby leases to Tenant that certain
real property together with all improvements now or hereafter
located thereon and all appurtenances thereto, more particularly
described as set forth on Exhibit "A" attached hereto and by
reference made a part hereof and which real property is commonly
known as
                     , in City of         , County of
        , State of

    **2.  Unrecorded Lease.**  This Lease is made upon all of the
terms, covenants and conditions set forth in that certain
unrecorded lease by and between the parties hereto of even date
herewith, all of the terms and conditions of which are made a
part hereof as though fully set forth herein.  This lease shall
commence in accordance with the terms of the unrecorded lease,
and shall expire terminate on the last day of the month,
( ) years next following the commencement date unless earlier
terminated or extended in accordance with the provisions of the
unrecorded lease.  Alternatively, the original term may expire on
the January 31st following the         ( ) anniversary of
the commencement date upon the occurrence of certain conditions
set forth in the unrecorded lease.  In addition, Tenant is
granted         option(s) to extend the original term for an
additional    ( ) years (each).

    **3.  Interpretation.**  Landlord and Tenant have entered into
this Memorandum of Lease in order that third parties may have

D-1



notice of the existence of the unrecorded lease and some of its specific provisions.  This Memorandum of Lease is not a complete summary of the unrecorded lease.  This Memorandum of Lease is not intended to amend, modify, or otherwise change the terms and conditions of the unrecorded lease between the parties hereto. Provisions in this Memorandum shall not be used in interpreting the provisions of the unrecorded lease.  In the event of a conflict between this Memorandum and the unrecorded lease, the unrecorded lease shall control.

IN WITNESS WHEREOF, ~~the parties hereto have executed this Memorandum of Lease as of the date and year first above written.~~

**LANDLORD**

Witness:

_____          _____

**TENANT**

Attest:

_____          _____

D-2

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
h:\la\dept\dev\connect.d



JIBS — 01814

## Corporation

STATE OF CALIFORNIA)
　　　　　　　　　　) ss
COUNTY OF SAN MATEO)

　　On this _____ day of _____ In the year
19____ , before me, a Notary Public in and for said County and
State, personally appeared _____
　　and_____, personally known to
me (or proved to me on the basis of satisfactory evidence) to be
~~the persons who executed the within instrument as~~ ____
_____and Assistant Secretary on behalf of the corporation
~~therein named,~~ _____ ~~and acknowledged to~~
~~me that the corporation executed the same.~~

_____

D-3

The Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
June 5, 1992
h:\lgldept\dge\connect.d



ₒ

L/C NUMBER:
IRREVOCABLE DOCUMENTARY CREDIT

PLACE AND DATE OF ISSUE:      DATE AND PLACE OF EXPIRY:
[CITY, STATE] [DATE]               [DATE]   [BANK NAME, CITY, STATE]

ACCT PARTY:                   BENEFICIARY OR TRANSFEREE:

[NAME & ADDRESS OF           900 CHERRY AVENUE
LANDLORD]                     SAN BRUNO, CALIFORNIA 94066

ADVISING BANK:       AMOUNT:  USD[INSERT AMOUNT]
**DIRECT TO THE BENEFICIARY

                             CREDIT AVAILABLE WITH: [NAME OF BANK]
                             BY: PAYMENT, AGAINST PRESENTATION OF
                             THE DOCUMENTS DETAILED HEREIN AND OF YOUR
                             DRAFTS AT SIGHT DRAWN ON US,

WE HEREBY ISSUE OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO._____ TO
EXPIRE AT 5:00 P.M., [CITY, STATE] TIME ON [DATE], IN YOUR FAVOR OF THE
ACCOUNT OF    [NAME OF LANDLORD] IN THE AMOUNT OF $.
[_____] AVAILABLE FOR PAYMENT BY YOUR DRAFT AT SIGHT DRAWN ON
[NAME OF BANK], AND ACCOMPANIED BY:

1.   THIS ORIGINAL LETTER OF CREDIT NO._____    AND ALL AMENDMENTS
     THERETO, IF ANY, AND

2.   A SWORN AFFIDAVIT (WHICH FOLLOWS) SIGNED BY AN OFFICER OF    [NAME
     OF TENANT] AFFIRMING UNDER OATH THAT ALL REQUIREMENTS NECESSARY TO
     DRAW UPON THIS LETTER OF CREDIT AS SET FORTH IN LEASE AGREEMENT
     WITH [NAME OF LANDLORD], DATED_____, 19___ HAVE
     BEEN MET,

SPECIAL INSTRUCTIONS:

THIS LETTER OF CREDIT MAY BE TRANSFERRED IN WHOLE BUT NOT IN PART BY
[NAME OF BANK] TO ANOTHER PARTY WITHIN THE UNITED STATES BY THE
BENEFICIARY COMPLETING THE ENCLOSED TRANSFER FORM AND SENDING IT TO
[NAME OF BANK] ATTN:  LETTER OF CREDIT DEPARTMENT.  THE ORIGINAL OF THIS
LETTER OF CREDIT AND ANY AMENDMENTS THERETO MUST ACCOMPANY THE REQUEST
IN ORDER THAT THE TRANSFER WHEN EFFECTED MAY BE ENDORSED THEREON,

PARTIAL DRAWINGS ARE PERMITTED.

A DRAFT PRESENTED FOR DRAWING MUST STATE "DRAWN UNDER [NAME OF BANK]
IRREVOCABLE STANDBY LETTER OF CREDIT NO._____ DATED _____.

WE HEREBY AGREE WITH THE DRAWER THAT A DRAFT(S) UNDER AND IN COMPLIANCE
WITH THE TERMS OF THIS LETTER OF CREDIT WILL BE DULY HONORED IF
PRESENTED AT OUR COUNTERS WITHIN CREDIT VALIDITY.  THE REQUEST FOR
PAYMENT UNDER THIS LETTER OF CREDIT SHALL BE FINAL AND CONCLUSIVE FOR
ALL PURPOSES WITHOUT VERIFICATION BY [NAME OF BANK] AND SHALL NOT BE
SUBJECT TO REPUDIATION, DENIAL, OR CONTEST.

THIS LETTER OF CREDIT IS SUBJECT TO ICE PUBLICATION NO. 400 (1983
REVISION),

Gap
1120 Connecticut Ave., N.W.
Washington, D.C.
lgldopt\dge\connect.e



LC NUMBER:
IRREVOCABLE DOCUMENTARY CREDIT

PLACE AND DATE OF ISSUE:                DATE AND PLACE OF EXPIRY:
[CITY, STATE, DATE]                     [DATE] [BANK NAME, CITY, STATE]

ACCT PARTY:                             BENEFICIARY OR TRANSFEREE:
[LANDLORD]                              900 CHERRY AVENUE
                                        SAN BRUNO, CALIFORNIA 94066

AFFIDAVIT

I ---- (SPECIFY NAME) BEING DULY SWORN ACCORDING TO LAW HEREBY DEPOSE
AND SAY THAT:

1.   I AM THE --- (SPECIFY TITLE WHICH MUST BE ASSISTANT VICE-PRESIDENT
     OR MORE SENIOR OFFICER) OF  ;
     CORPORATION; AND

2.   ALL REQUIREMENTS NECESSARY TO DRAW UPON THE ATTACHED [NAME OF BANK]
     LETTER OF CREDIT NO._____ AS SET FORTH IN THAT CERTAIN LEASE
     DATED _____ BETWEEN [NAME OF LANDLORD], AS ("LANDLORD")
     AND _____ A _____ CORPORATION AS ("TENANT")
     HAVE BEEN MET AND THE AMOUNT OF THIS DRAWING IS IN ACCORDANCE WITH
     SAID LEASE.

     SIGNED BY --- [INDICATE NAME AND TITLE].

     SWORN TO AND SUBSCRIBED BEFORE ME, A NOTARY PUBLIC IN AND FOR SAID
     COUNTY AND STATE. --- [SIGNATURE AND NOTARIZED SEAL].

WE HEREBY ISSUE THIS DOCUMENTARY CREDIT IN YOUR FAVOR.  IT IS SUBJECT TO
THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1983 REVISION,
INTERNATIONAL CHAMBER OF COMMERCE, PARIS, FRANCE PUBLICATION NO. 400)
AND ENGAGES US IN ACCORDANCE WITH THE TERMS THEREOF.  THE NUMBER AND
DATE OF THE CREDIT AND THE NAME OF OUR BANK MUST BE QUOTED ON ALL DRAFTS
REQUIRED.  IF THE CREDIT IS AVAILABLE BY NEGOTIATION, EACH PRESENTATION
MUST BE QUOTED ON THE REVERSE OF THIS ADVICE BY THE BANK WHERE THE
CREDIT IS AVAILABLE.

***********************************************************************

Exhibit B
page 2 of 2

BRO
4120 Connecticut Ave., N.W.
Washington, D.C.
lglckpi\dge\connect.6





JIBS - 01818
1120
GAP
ELEVATION
2
ELEVATION
1
PARTIAL STREET LEVEL PLAN
3
SHEET NOTES
Corporate Design
GAP
1120 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C.
RA-1

ISOMETRIC @ COLUMN 103
SECTION @ COLUMN/BASE
SECTION
EXTERIOR FINISHES
INTERIOR FINISHES
GAP
GAP
1120 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C.
RA-2



| Database: | MRIBRE | | Aged Delinquencies | | | Page: | 1 |
|---|---|---|---|---|---|---|---|
| | | | MRIBRE | | | Date: | 7/16/2020 |
| ENTITY: | 1120 | | JACK I. BENDER & SONS | | | Time: | 11:09 AM |
| | | | Period: 07/20 | | | | |

| Invoice Date | Category | | Source | Amount | Current | 1 Month | 2 Months | 3 Months | 4 Months |
|---|---|---|---|---|---|---|---|---|---|

**1/20/000859  THE GAP, INC.** — Master Occupant Id - GAP-1 — Day Due: — Delq Day:
AMANDA STAUFFER — 0103 - Current — Last Payment: 7/31/2019 — 55,763.25
215-258-3822

| Invoice Date | Category | | Source | Amount | Current | 1 Month | 2 Months | 3 Months | 4 Months |
|---|---|---|---|---|---|---|---|---|---|
| 10/1/2013 | STX | Sales Tax | NC | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 11/25/2014 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 1/27/2015 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 2/25/2015 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 3/24/2015 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 6/2/2015 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 11/24/2015 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 6/28/2016 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 1/27/2017 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 2/24/2017 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 3/29/2017 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 5/23/2017 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 7/24/2017 | PPR | Prepaid Rent | CR | -2.50 | 0.00 | 0.00 | 0.00 | 0.00 | -2.50 |
| 8/22/2017 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 6/25/2018 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 7/30/2018 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 8/27/2018 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 4/1/2020 | STX | Sales Tax | CH | 30.00 | 0.00 | 0.00 | 0.00 | 30.00 | 0.00 |
| 4/1/2020 | TRA | Trash Removal | CH | 500.00 | 0.00 | 0.00 | 0.00 | 500.00 | 0.00 |
| 5/1/2020 | STX | Sales Tax | CH | 30.00 | 0.00 | 0.00 | 30.00 | 0.00 | 0.00 |
| 5/1/2020 | TRA | Trash Removal | CH | 500.00 | 0.00 | 0.00 | 500.00 | 0.00 | 0.00 |
| 6/1/2020 | STX | Sales Tax | CH | 30.00 | 0.00 | 30.00 | 0.00 | 0.00 | 0.00 |
| 6/1/2020 | TRA | Trash Removal | CH | 500.00 | 0.00 | 500.00 | 0.00 | 0.00 | 0.00 |
| 7/1/2020 | STX | Sales Tax | CH | 30.00 | 30.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 7/1/2020 | TRA | Trash Removal | CH | 500.00 | 500.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| | PPR | Prepaid Rent | | -21.25 | 0.00 | 0.00 | 0.00 | 0.00 | -21.25 |
|---|---|---|---|---|---|---|---|---|---|
| | STX | Sales Tax | | 118.75 | 30.00 | 30.00 | 30.00 | 30.00 | -1.25 |
| | TRA | Trash Removal | | 2,000.00 | 500.00 | 500.00 | 500.00 | 500.00 | 0.00 |

| THE GAP, INC. Total: | | | | 2,097.50 | 530.00 | 530.00 | 530.00 | 530.00 | -22.50 |
|---|---|---|---|---|---|---|---|---|---|

**1/20-003323  THE GAP, INC.** — Master Occupant Id - THE GAP-3 — Day Due: — Delq Day:
MICAELA MARTINEZ — 0103 - Current — Last Payment: 3/20/2020 — 1,039.94
505-462-0285

| Invoice Date | Category | | Source | Amount | Current | 1 Month | 2 Months | 3 Months | 4 Months |
|---|---|---|---|---|---|---|---|---|---|
| 10/25/2016 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 11/29/2016 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 12/27/2016 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 4/25/2017 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 8/1/2017 | RET | Real Estate Taxes | NC | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 9/25/2017 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 11/20/2017 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 12/20/2017 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 1/29/2018 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 2/26/2018 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 3/26/2018 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 4/27/2018 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 5/25/2018 | PPR | Prepaid Rent | CR | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| 12/27/2018 | PPR | Prepaid Rent | CR | -30.55 | 0.00 | 0.00 | 0.00 | 0.00 | -30.55 |
| 12/20/2019 | STX | Sales Tax | CH | 155.10 | 0.00 | 0.00 | 0.00 | 0.00 | 155.10 |
| 12/20/2019 | TEN | Tenant Services | CH | 2,585.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,585.00 |
| 4/1/2020 | RNT | Base Rent | CH | 55,253.25 | 0.00 | 0.00 | 0.00 | 55,253.25 | 0.00 |
| 4/10/2020 | ELE | Electric Charge | CH | 1,884.00 | 0.00 | 0.00 | 0.00 | 1,884.00 | 0.00 |
| 5/1/2020 | RNT | Base Rent | CH | 55,253.25 | 0.00 | 0.00 | 55,253.25 | 0.00 | 0.00 |
| 5/8/2020 | ELE | Electric Charge | CH | 915.88 | 0.00 | 0.00 | 915.88 | 0.00 | 0.00 |

| Database: | MRIBRE | | Aged Delinquencies | | | | Page: | 2 |
| ENTITY: | 1120 | | MRIBRE | | | | Date: | 7/18/2020 |
| | | | JACK I. BENDER & SONS | | | | Time: | 11:09 AM |
| | | | Period: 07/20 | | | | | |

| Invoice Date | Category | | Source | Amount | Current | 1 Month | 2 Months | 3 Months | 4 Months |
|---|---|---|---|---|---|---|---|---|---|
| 8/1/2020 | RNT | Base Rent | CH | 55,253.25 | 0.00 | 55,253.25 | 0.00 | 0.00 | 0.00 |
| 7/1/2020 | RNT | Base Rent | CH | 55,253.25 | 55,253.25 | 0.00 | 0.00 | 0.00 | 0.00 |
| | ELE | Electric Charge | | 2,799.88 | 0.00 | 0.00 | 915.88 | 1,884.00 | 0.00 |
| | PPR | Prepaid Rent | | -45.55 | 0.00 | 0.00 | 0.00 | 0.00 | -45.55 |
| | RET | Real Estate Taxes | | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| | RNT | Base Rent | | 221,013.00 | 55,253.25 | 55,253.25 | 55,253.25 | 55,253.25 | 0.00 |
| | STX | Sales Tax | | 155.10 | 0.00 | 0.00 | 0.00 | 0.00 | 155.10 |
| | TEN | Tenant Services | | 2,585.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,585.00 |
| THE GAP, INC. Total: | | | | 226,506.18 | 55,253.25 | 55,253.25 | 56,169.13 | 57,137.25 | 2,693.30 |
| | ELE | Electric Charge | | 2,799.88 | 0.00 | 0.00 | 915.88 | 1,884.00 | 0.00 |
| | PPR | Prepaid Rent | | -86.80 | 0.00 | 0.00 | 0.00 | 0.00 | -86.80 |
| | RET | Real Estate Taxes | | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| | RNT | Base Rent | | 221,013.00 | 55,253.25 | 55,253.25 | 55,253.25 | 55,253.25 | 0.00 |
| | STX | Sales Tax | | 273.85 | 30.00 | 30.00 | 30.00 | 30.00 | 153.85 |
| | TEN | Tenant Services | | 2,585.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,585.00 |
| | TRA | Trash Removal | | 2,000.00 | 500.00 | 500.00 | 500.00 | 500.00 | 0.00 |
| ENTITY 1120 Total: | | | | 228,603.68 | 55,783.25 | 55,783.25 | 56,699.13 | 57,667.25 | 2,670.80 |
| | ELE | Electric Charge | | 2,799.88 | 0.00 | 0.00 | 915.88 | 1,884.00 | 0.00 |
| | PPR | Prepaid Rent | | -86.80 | 0.00 | 0.00 | 0.00 | 0.00 | -86.80 |
| | RET | Real Estate Taxes | | -1.25 | 0.00 | 0.00 | 0.00 | 0.00 | -1.25 |
| | RNT | Base Rent | | 221,013.00 | 55,253.25 | 55,253.25 | 55,253.25 | 55,253.25 | 0.00 |
| | STX | Sales Tax | | 273.85 | 30.00 | 30.00 | 30.00 | 30.00 | 153.85 |
| | TEN | Tenant Services | | 2,585.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,585.00 |
| | TRA | Trash Removal | | 2,000.00 | 500.00 | 500.00 | 500.00 | 500.00 | 0.00 |
| | | Grand Total: | | 228,603.68 | 55,783.25 | 55,783.25 | 56,699.13 | 57,667.25 | 2,670.80 |

# B L A K E   R E A L   E S T A T E   I N C





May 22, 2020

**Representing**
**B.G.W. Limited**
**Partnership**

The Gap, Inc.
2 Folsom Street
San Francisco, CA 94105
Attn: Real Estate Law, Store #1009, LID #651

**Blake**
**Development**
**Company**

RE: Landlord:      Jack I. Bender & Sons
    Tenant:        The Gap, Inc.
    Premises Address: 1120 Connecticut Avenue, Washington, DC 20036

**Jack I. Bender**
**& Sons**

Dear Sir or Madam:

**Northwestern**
**Development**
**Company**

Please be advised that as of the date of this letter, The Gap, Inc. (the "Tenant") is delinquent in the payment of "Base Rent" and "Additional Rent" (as those terms are defined in the Lease) due Jack I. Bender & Sons (the "Landlord") under that certain Lease Agreement dated June 9, 1992, as amended, if applicable, along with any and all addenda, riders, exhibits and attachments thereto (collectively the "Lease"), in the amount of $117,037.18 (the "Arrearage"), as set forth more fully on the attached statement of account.

**Northwestern**
**Development**
**Company "B"**

**Professional**
**Associates**

Tenant's failure to pay any Rent due which failure shall continue for a period of ten (10) days after receipt of written notice from Landlord constitutes an "Event of Default" as defined in the Lease. In the Event of Default by Tenant under the Lease, Landlord may, in Landlord's sole and absolute discretion, avail itself of any and all rights, claims and remedies under the Lease, at law and in equity. Any and all statements contained herein are made under a full reservation of rights by Landlord. Further, Landlord's acceptance of any payment(s) from Tenant of any Base Rent, Additional Rent and/or any other sums due under the Lease which is/are less than the full amount of the Arrearage shall be accepted under a full reservation of rights by Landlord.

**Rodneb Parking**

Should you have any questions or require additional information, please feel free to contact me.

**Rhode Island**
**& M Associates**

Yours truly,

BLAKE REAL ESTATE, INC.
for Jack I. Bender & Sons

**12th & L Streets**
**Limited**
**Partnership**

*Tracie N. Dewey*

**Glade Valley**
**Farms**
**Joint Venture**

Tracie N. Dewey
Lease Administrator

Enclosures
cc: Michael Gordon, V.P./Leasing, Blake Real Estate, Inc.
    The Gap, Inc., 40 First Plaza NW, Albuquerque, NM 87102, Attn: Real Estate Payables,
    Store #1009, LID #651

1150 Connecticut Ave, N.W. • Suite 900 • Washington, DC 20036-4104
Telephone: 202.778.0400 • Facsimile: 202.223.9636
www.blakereal.com

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The Gap, Inc.
40 First Plaza, NW
Albuquerque, NM 87102
Attn: R.E. Payables, Store #1009, LD#651

9590 9402 5450 9189 5729 06

2. Article Number (Transfer from service label)

7019 1120 0001 2448 5810

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature ☐ Agent ☐ Addressee

B. Received by (Printed Name) C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
Mail Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053 Domestic Return Receipt

---

7019 1120 0001 2448 5810

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

**OFFICIAL USE**

Certified Mail Fee
$
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy) $
☐ Return Receipt (electronic) $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required $
☐ Adult Signature Restricted Delivery $
Postage
$
Total Postage and Fees
$
Sent To: The Gap
Street and Apt. No., or PO Box No.
City, State, ZIP+4®: Albuquerque, NM

Postmark Here

PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

---

7019 1120 0001 2448 5827

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

**OFFICIAL USE**

Certified Mail Fee
$
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy) $
☐ Return Receipt (electronic) $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required $
☐ Adult Signature Restricted Delivery $
Postage
$
Total Postage and Fees
$
Sent To: The Gap, Inc
Street and Apt. No., or PO Box No.
City, State, ZIP+4®: San Francisco, CA

Postmark Here

PS Form 3800, April 2015 PSN 7530-02-000-9047 See Reverse for Instructions

SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION – CIVIL ACTION BRANCH



JACK I. BENDER & SONS
C/O MICHAEL R. COGAN, ESQ.
MICHAEL R. COGAN, P.C.
12 SOUTH SUMMIT AVENUE
SUITE 250
GAITHERSBURG, MD 20877

*PLAINTIFF,*

v.

THE GAP, INC., a/k/a Gap, Inc.
SERVE: C T CORPORATION SYSTEM
REGISTERED AGENT
1015 15TH ST. NW
SUITE 1000
WASHINGTON, DC 20005

*DEFENDANT.*

CASE NO.

| State of: | ) | |
| | ) | **ss:** |
| County/City of: | ) | |

## APPLICATION AND AFFIDAVIT IN SUPPORT OF JUDGMENT

Personally appeared on this _____ *22 nd* _____ day of July, 2020, Owen Billman, who is the President and authorized agent of Blake Real Estate, Inc. ("Blake"). Blake is, in turn, the authorized agent of Jack I. Bender & Sons, a Washington, D.C. general partnership (the "Plaintiff"). Therefore, Mr. Billman makes this Application Affidavit in Support of Judgment (the "Affidavit") is his capacity as the authorized agent of Plaintiff. Further, Mr. Billman makes this Affidavit under oath and in due form of law as follows:

1. The undersigned is over the age of 18 years, has personal knowledge of the facts and matters herein, is competent to testify to the matters stated and is duly authorized to make this Affidavit for and on behalf of Plaintiff.

2. Plaintiff and The Gap, Inc., a/k/a Gap, Inc. (the "**Defendant**") did enter into that certain "Multi-Occupancy Building Lease" dated June 9, 1992 (the "**Original Lease**"), as amended by that certain "Supplement to Lease" dated July 7, 2004 (the "**First Amendment**"), as further amended by that certain "Second Supplement to Lease" dated June 21, 2007 (the "**Second Amendment**"), as further amended by that certain "Third Supplement to Lease" dated July 27, 2015 (the "**Third Amendment**") (the "Original Lease", the "First Amendment", the "Second Amendment" and the "Third Amendment", along with any and all addenda, riders, exhibits and attachments thereto are referred to herein, collectively, as the "**Lease**"), pursuant to which Plaintiff leased to Defendant, and Defendant leased from Plaintiff, the "**Premises**" (as defined in the Lease), consisting of certain commercial retail space located on the first (1st) floor and mezzanine level of the "**Building**" (as defined in the Lease) having an address of 1120

Connecticut Avenue, N.W., Washington, D.C. 20036 , in accordance with and as set forth more fully in the Lease.

3.  Defendant has committed an "**Event of Default**" (as defined in the Lease) as a result of Defendant's failure to pay to Plaintiff timely and in full (and after notice and cure as required by the Lease) all sums due under the Lease, as set forth more fully in the attached Complaint and the exhibi8ts thereto, which is/are incorporated herein by reference.

4.  The Complaint and all exhibits attached thereto contain sufficient detail as to liability and damages to apprise Defendant clearly of Plaintiff's claims against the Defendant, including the contract rate of interest in accordance with the Lease.

5.  There is justly due and owing by Defendant to Plaintiff, without deduction or setoff, rent and other sums due under the Lease through July 1, 2020, in the amount of $228,603.68, plus interest at the rate of 8.25% from December 20, 2019 until paid in full, plus attorney fees as provided for in accordance with the Lease.

6.  Plaintiff does reserve all rights to amend the Complaint or file successive suits for rent and other sums which come due under the Lease after July 1, 2020.

7.  Plaintiff has not, directly or indirectly, received any part of the amount charged herein as due, or received any security or satisfaction for which credit has not already been given.

8.  The statements contained herein and in the Complaint are true and the documents attached hereto are genuine and accurate copies of the originals.

**I DECLARE AND AFFIRM** under the penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief

Sign: _____

Print:  Owen Billman

Title:  Authorized Agent of Plaintiff

**SWORN TO AND SUBSCRIBED** before me this 22nd day of July , 2020.

_____ Notary Public

My commission expires:  10/14/2020



Form CA 114

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**

CIVIL DIVISION

Case Number: **2020 CA 003261 B**

Jack I Bender & Sons                    vs.        The Gap, Inc., a/k/a Gap, Inc.
_____                                 _____
Plaintiff/Landlord                                              Defendant

## AFFIDAVIT IN COMPLIANCE WITH THE SERVICEMEMBERS CIVIL RELIEF ACT (2003) (50 U.S.C. App. § 501 et seq.)

Michael R. Cogan, Esquire _____, certifies and declares as follows:
(Type or print name clearly)

1. I am: ☐ the plaintiff or ☑ the plaintiff's agent in the above-entitled case. My relationship to the plaintiff is (*if the person completing the form is the plaintiff, leave this line blank*) __Attorney for Plaintiff__.

2. This affidavit is made pursuant to Section 201 of the Servicemembers Civil Relief Act (50 U.S.C. App. § 521).

3. I have caused a careful investigation to be made to ascertain whether the above named defendant is in the military service of the United States Army, Navy, Air Force, Marine Corps, or Coast Guard; or a National Guard member called to active service for more than 30 consecutive days by the President or Secretary of Defense to respond to a national emergency; or a commissioned officer in active service of the Public Health Service or the National Oceanic and Atmospheric Administration.

4. As a result of this investigation, I hereby state as follows: (check box A, B, C, or D and complete as instructed)

   A. ☑ The defendant is not in any of the above named branches of the military service AND the defendant has not received notice of induction or notice to report for military service, AND, if this is an action for possession of real property, the premises are not occupied chiefly for dwelling purposes by the spouse, children, or other dependents of a person in military service. The facts supporting this conclusion are as follows (*check all that apply and attach additional pages and documentation as necessary*):

      ☐ I have proof of the defendant's military status from the Department of Defense Manpower Data Center, and the certificate of non-military status is attached.

      ☐ I have contacted each branch of the military and have received confirmation from each branch that the defendant is not in military service. The responses I received are attached.

      ☑ The defendant is not an individual. It is a __corporation__ and, therefore, no investigation of military service is required. (*Specify Type of Business Entity*)

      ☐ I asked the defendant personally on (*date*) _____.

      ☐ I spoke on (*date*) _____ with (*name and relationship with defendant*)_____ who has reason to know the defendant's military status because _____.

      _____

      ☐ For the following reasons (*explain*):_____

   B. ☐ After a careful investigation, I could not determine whether the defendant is in any of the above named branches of the military service, whether the defendant received notice of induction or notice to report for military service, or, if this is an action for possession of real property, whether an occupant of the property is the spouse, child, or other dependent of a person in military service. I have made the following efforts to investigate the defendant's military status (*attach additional pages and documentation as necessary*):_____

      _____

   C. ☐ The defendant is in one of the above named branches of the military service. The facts supporting this conclusion are as follows (*attach additional pages and documentation as necessary*): _____
      .

   D. ☐ The defendant executed a waiver of rights under Section 107 of the Servicemembers Civil Relief Act (2003) (50 U.S.C. App. § 517). A copy of the waiver, in at least 12 point type, signed by the defendant during or after his/her military service, is attached.

5. Pursuant to Section 201(b)(4) of the Servicemembers Civil Relief Act (2003) (50 U.S.C. App. § 521(b)(4), I certify and declare under penalty of perjury that the information contained above is true.

Date: __7/23/20__

Signature: _____
Michael R. Cogan, Esquire
12 S. Summit Ave., Suite 250
Gaithersburg, MD 20877
P (240) 386-0550 mcogan@randclegal.com

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

JACK I. BENDER & SONS

Case Number: **2020 CA 003261 B**

vs

Date: _____

THE GAP, INC. a/k/a GAP, INC.

☐ One of the defendants is being sued
in their official capacity.

| Name: *(Please Print)* Michael R. Cogan, Esquire | Relationship to Lawsuit |
|---|---|
| Firm Name: Michael R. Cogan, P.C. | ☒ Attorney for Plaintiff |
| Telephone No.: Six digit Unified Bar No.: (240) 386-0550     450916 | ☐ Self (Pro Se) ☐ Other: _____ |

TYPE OF CASE: ☒ Non-Jury    ☐ 6 Person Jury      ☐ 12 Person Jury

Demand: $ 288,603.88          Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: _____    Judge: _____    Calendar #: _____

Case No.: _____    Judge: _____    Calendar#: _____

---

**NATURE OF SUIT:**    *(Check One Box Only)*

**A. CONTRACTS**             **COLLECTION CASES**

| | | |
|---|---|---|
| ☒ 01 Breach of Contract | ☐ 14 Under $25,000 Pltf. Grants Consent | ☐ 16 Under $25,000 Consent Denied |
| ☐ 02 Breach of Warranty | ☐ 17 OVER $25,000 Pltf. Grants Consent | ☐ 18 OVER $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 27 Insurance/Subrogation | ☐ 26 Insurance/Subrogation |
| ☐ 07 Personal Property |     Over $25,000 Pltf. Grants Consent |     Over $25,000 Consent Denied |
| ☐ 13 Employment Discrimination | ☐ 07 Insurance/Subrogation | ☐ 34 Insurance/Subrogation |
| ☐ 15 Special Education Fees |     Under $25,000 Pltf. Grants Consent |     Under $25,000 Consent Denied |
| | ☐ 28 Motion to Confirm Arbitration | |
| |     Award (Collection Cases Only) | |

**B. PROPERTY TORTS**

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

**C. PERSONAL TORTS**

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 10 Invasion of Privacy | ☐ 17 Personal Injury- (Not Automobile, |
| ☐ 02 Alienation of Affection | ☐ 11 Libel and Slander |     Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 12 Malicious Interference | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 04 Automobile- Personal Injury | ☐ 13 Malicious Prosecution | ☐ 19 Wrongful Eviction |
| ☐ 05 Deceit (Misrepresentation) | ☐ 14 Malpractice Legal | ☐ 20 Friendly Suit |
| ☐ 06 False Accusation | ☐ 15 Malpractice Medical (Including Wrongful Death) | ☐ 21 Asbestos |
| ☐ 07 False Arrest | ☐ 16 Negligence- (Not Automobile, | ☐ 22 Toxic/Mass Torts |
| ☐ 08 Fraud |     Not Malpractice) | ☐ 23 Tobacco |
| | | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE      IF USED

ḍ

# Information Sheet, Continued

**C. OTHERS**

☐ 01 Accounting
☐ 02 Att. Before Judgment
☐ 05 Ejectment
☐ 09 Special Writ/Warrants
   (DC Code § 11-941)
☐ 10 Traffic Adjudication
☐ 11 Writ of Replevin
☐ 12 Enforce Mechanics Lien
☐ 16 Declaratory Judgment

☐ 17 Merit Personnel Act (OEA)
   (D.C. Code Title 1, Chapter 6)
☐ 18 Product Liability

☐ 24 Application to Confirm, Modify,
   Vacate Arbitration Award (DC Code § 16-4401)
☐ 29 Merit Personnel Act (OHR)
☐ 31 Housing Code Regulations
☐ 32 Qui Tam
☐ 33 Whistleblower

**II.**

☐ 03 Change of Name
☐ 06 Foreign Judgment/Domestic
☐ 08 Foreign Judgment/International
☐ 13 Correction of Birth Certificate
☐ 14 Correction of Marriage
   Certificate
☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
☐ 27 Petition for Civil Asset Forfeiture (Currency)
☐ 28 Petition for Civil Asset Forfeiture (Other)

☐ 15 Libel of Information
☐ 19 Enter Administrative Order as
   Judgment [ D.C. Code §
   2-1802.03 (h) or 32-151 9 (a)]
☐ 20 Master Meter (D.C. Code §
   42-3301, et seq.)

☐ 21 Petition for Subpoena
   [Rule 28-I (b)]
☐ 22 Release Mechanics Lien
☐ 23 Rule 27(a)(1)
   (Perpetuate Testimony)
☐ 24 Petition for Structured Settlement
☐ 25 Petition for Liquidation

**D. REAL PROPERTY**

☐ 09 Real Property-Real Estate
☐ 12 Specific Performance
☐ 04 Condemnation (Eminent Domain)
☐ 10 Mortgage Foreclosure/Judicial Sale
☐ 11 Petition for Civil Asset Forfeiture (RP)

☐ 08 Quiet Title
☐ 25 Liens: Tax / Water Consent Granted
☐ 30 Liens: Tax / Water Consent Denied
☐ 31 Tax Lien Bid Off Certificate Consent Granted

_Michael R. Cogan, Esq._
Attorney's Signature

7/27/20
Date



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

JACK I. BENDER & SONS
c/o Michael R. Cogan 12 South Summit Plaintiff
#250  Gaithersburg, MD 20877

Vs.

THE GAP, INC. a/k/a GAP, INC.

Case Number    **2020 CA 003261 B**

Serve: C.T. Corporation System          Defendant
1015 15th Street, NW Suite 1000
Washington, DC 20005                    **SUMMONS**
To the above named Defendant:

     You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

     You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michael R. Cogan #450916
Name of Plaintiff's Attorney
12 South Summit Avenue #250
Gaithersburg, MD 20877
Address
mcogan@randclegal.com

240 386 0550
Telephone

*Clerk of the Court*

By _____

Date _____ **07/24/2020**

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화하십시오.  ·  የትርጉም እርዳታ ከፈለጉ (202) 879-4828 ይደውሉ

     IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

     If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                   Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
Sección de Acciones Civiles
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____

_____  Demandante

contra

_____  Número de Caso: _____

_____

_____  Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

*SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

Por: _____

_____
Dirección

Subsecretario

_____

Fecha _____

_____
Teléfono

如需翻译, 请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

한국어로 번역을 원하시면 (202) 879-4828 로 전화주시기 바랍니다      የአማርኛ  ትርጉም  ለማግኘት  (202) 879-4828  ይደውሉ

**IMPORTANTE:** SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                                   Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
Telephone: (202) 879-1133 Website: www.dccourts.gov

JACK I. BENDER & SONS
c/o Michael R. Cogan 12 South Summit Ave   Plaintiff
#250  Gaithersburg, MD 20877

vs.

THE GAP, INC. a/k/a GAP, INC.

Case Number _____

Serve: C.T. Corporation System         Defendant
1015 15th Street, NW Suite 1000
Washington, DC 20005                **SUMMONS**
To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michael R. Cogan #450916

Name of Plaintiff's Attorney
12 South Summit Avenue #250
Gaithersburg, MD 20877
Address
mcogan@randclegal.com
240 386 0550
Telephone

*Clerk of the Court*

By _____
                    Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오.    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ


        **IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME_.**

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
Sección de Acciones Civiles
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____

Demandante

contra

Número de Caso: _____

_____

Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_SECRETARIO DEL TRIBUNAL_

Nombre del abogado del Demandante

_____

Por: _____

Dirección
                                              Subsecretario
_____

Fecha _____

Teléfono

如需翻译，请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

만약 번역이 필요하면 (202) 879-4828 로 연락하십시오      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

**IMPORTANTE:** SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                              Super. Ct. Civ. R. 4



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Telephone: (202) 879-1133 • Website: www.dccourts.gov

JACK I. BENDER & SONS
    Vs.                                 C.A. No.      2020 CA 003261 B
THE GAP, INC.

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference _once_, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                  Chief Judge Robert E. Morin

Case Assigned to: Judge JASON PARK
Date:  July 24, 2020
Initial Conference: 9:30 am, Friday, October 23, 2020
Location:  Courtroom 519
            500 Indiana Avenue N.W.
            WASHINGTON, DC 20001

CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief    Judge    Robert    E.    Morin

CAIO-60

Filed
D.C. Superior Court
08/20/2020 13:53PM
Clerk of the Court

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**(Civil Division-Civil Action Branch)**

| | | | |
|---|---|---|---|
| JACK I. BENDER & SONS, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | Case No.: | 2020 CA 003261 B |
| | ) | Judge: | The Hon. Jason Park |
| THE GAP, INC., a/k/a Gap, Inc., | ) | Next Event: | Initial Scheduling Conference |
| | ) | | October 23, 2020 |
| Defendant. | ) | | |
| | ) | | |

**CONSENT MOTION TO EXTEND TIME FOR DEFENDANT**
**THE GAP, INC., A/K/A GAP, INC. TO RESPOND TO COMPLAINT**

COMES NOW Defendant The Gap, Inc., a/k/a Gap, Inc. ("Gap"), by its undersigned counsel, and submits this CONSENT MOTION to extend the time up to and including **September 8, 2020,** for Defendant Gap to respond to the Complaint of Plaintiff Jack I. Bender & Sons ("Bender") pursuant to Super. Ct. Civ. R. 6 (b). In support of this motion, Defendant Gap states as follows:

1.      Plaintiff Bender filed the Complaint in the above-captioned action on July 23, 2020 and a Summons was issued on July 24, 2020.

2.      The Summons and Complaint were served on Defendant Gap on July 31, 2020 by a process server.

3.      Defendant Gap's response to the Complaint is due August 21, 2020.

4.      Defendant Gap's undersigned counsel was just recently engaged by Defendant Gap and additional days are needed to conduct a good faith inquiry into the allegations and prepare a response to the Complaint.

5.      This motion is made in good faith and not for the purpose of undue delay.

6.     PLAINTIFF BENDER CONSENTS TO THIS CONSENT MOTION TO EXTEND THE TIME UP TO AND INCLUDING SEPTEMBER 8, 2020 FOR DEFENDANT GAP TO RESPOND TO THE COMPLAINT.

7.     A proposed Order and Rule 12-I (a) Certificate accompany this Consent Motion.

Accordingly, Defendant The Gap, Inc., a/k/a Gap, Inc. respectfully moves this Court to extend the time, by consent, for Defendant to respond to the Complaint up to and including September 8, 2020.

Dated: August 20, 2020.

Respectfully submitted,

**THE GAP, INC., A/K/A GAP, INC.**


/s/ Patrick Hanes
Patrick Hanes (DC Bar # 1018551)
Williams Mullen
1666 K. St. NW, Suite 1200
Washington, DC 20006
(202) 293-8139 (telephone)
(202) 293.5939 (facsimile)
phanes@williamsmullen.com

*Counsel for Defendant*
*The Gap, Inc., a/k/a Gap, Inc.*

2

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**(Civil Division-Civil Action Branch)**

| | | | |
|---|---|---|---|
| JACK I. BENDER & SONS, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | **Case No.:** | 2020 CA 003261 B |
| | ) | **Judge:** | The Hon. Jason Park |
| THE GAP, INC., a/k/a Gap, Inc., | ) | **Next Event:** | Initial Scheduling Conference |
| | ) | | October 23, 2020 |
| Defendant. | ) | | |
| | ) | | |

## ORDER

This matter has come before the Court on Defendant's CONSENT MOTION TO

EXTEND TIME FOR DEFENDANT THE GAP, INC., a/k/a GAP, INC. LLC TO RESPOND

TO COMPLAINT. Upon review of the record, it is this _____ day of _____, 2020:

ORDERED: the Motion is GRANTED and the time for Defendant The Gap, Inc., a/k/a

Gap, Inc. to respond to the Complaint is extended up to and including September 8, 2020.


_____
JUDGE, Superior Court
of the District of Columbia


Send copies to:

Patrick Hanes (DC Bar # 1018551)
Williams Mullen
1666 K. St. NW, Suite 1200
Washington, DC 20006
202-293-8139 (telephone)
202-293-5939 (facsimile)
phanes@williamsmullen.com

Michael R. Cogan (DC Bar # 450916)
Michael R. Cogan, P.C.
12 S. Summit Avenue, Suite 250
Gaithersburg, MD 20877
(240) 912-0400 (telephone)
(240) 386-0555 (facsimile)
mcogan@randclegal.com

*Counsel for Plaintiff Jack I. Bender & Sons*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this August 20, 2020, a true copy of the Consent Motion to Extend Time

for Defendant The Gap, Inc., a/k/a Gap, Inc. to Respond to Complaint, proposed Order and Rule

12-I (a) Certification were served by email and first-class mail, postage prepaid, upon:

Michael R. Cogan (DC Bar # 450916)
Michael R. Cogan, P.C.
12 S. Summit Avenue, Suite 250
Gaithersburg, MD 20877
(240) 912-0400 (telephone)
(240) 386-0555 (facsimile)
mcogan@randclegal.com

*Counsel for Plaintiff Jack I. Bender & Sons*

/s/ Patrick Hanes_____
Patrick Hanes, Esq.

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**(Civil Division-Civil Action Branch)**

| | | | |
|---|---|---|---|
| **JACK I. BENDER & SONS**, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | **Case No.:** | 2020 CA 003261 B |
| | ) | **Judge:** | Jason Park |
| **THE GAP, INC., a/k/a Gap, Inc.,** | ) | **Next Event:** | Initial Scheduling Conference |
| | ) | | October 23, 2020 |
| Defendant. | ) | | |
| _____ | ) | | |

## <u>RULE 12-I(a) CERTIFICATION</u>

Before filing this Motion, counsel for Defendant The Gap, Inc., a/k/a Gap, Inc. obtained

the consent of the party affected by this Motion, Plaintiff Jack I. Bender & Sons.

Dated: August 20, 2020.

Respectfully submitted,

**THE GAP, INC., A/K/A GAP, INC.**

/s/ Patrick Hanes
Patrick Hanes (DC Bar #1018551)
Williams Mullen
1666 K. St. NW, Suite 1200
Washington, DC 20006
(202) 293-8139 (telephone)
(202) 293.5939 (facsimile)
phanes@williamsmullen.com

Filed
D.C. Superior Court
08/24/2020 18:40PM
Clerk of the Court

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

JACK I. BENDER & SONS,

        Plaintiff,

      v.

THE GAP, INC.,

        Defendant.

Case No.:  2020 CA 003261 B

Judge Jason Park

Initial Scheduling Conf.:  10/23/2020

## ORDER

Upon consideration of defendant The Gap, Inc.'s consent motion to extend the time to respond to the complaint, filed August 20, 2020, and for good cause shown, it is this 24th day of August, 2020, hereby

**ORDERED** that the consent motion is **GRANTED**; and it is further

**ORDERED** that the defendant shall file its response to the complaint on or before September 8, 2020.

**SO ORDERED**.

_____
Judge Jason Park
Superior Court of the District of Columbia

Copies to all parties via CaseFileXpress

**Instructions for Remote Hearings by Telephone or Video**
**Before Judge Jason Park**

Remote hearings by telephone or video conferences will be held in a virtual courtroom, which the parties and counsel may access in the following ways:

(1) calling 1-844-992-4726 or 202-860-2110 and entering meeting ID number 129 705 0412;

(2) going to the WebEx website at https://dccourts.webex.com/meet/ctb519 or going to https://dccourts.webex.com and entering meeting ID number 129 705 0412; or

(3) downloading the WebEx Meetings app, opening the app, select Join Meeting, and enter https://dccourts.webex.com/meet/ctb519.

The WebEx platform has video capability, which can be utilized through the website or the app. If you have trouble gaining access to the virtual courtroom, please call the judge's chambers at (202) 879-1885.

Please note the following guidelines for appearing in the virtual courtroom:

(1) When you enter the virtual courtroom (by dialing in on a phone, or signing in through the website or app), you should not attempt to speak because another hearing may be underway. You should be automatically muted by the courtroom clerk when you first arrive. If you are using the WebEx website or the app, you may check in with the courtroom clerk using the "chat" function.  If you are on a telephone, you should wait for your case to be called.

(2) At the check-in time (which is specified in the Order setting the hearing), the courtroom clerk will perform a roll call to determine which parties and counsel are present.  The courtroom clerk will then call the matters that are ready.

(3) If a party or counsel does not respond when the matter is called, the judge's staff will attempt to call and/or email the missing party or counsel (if the Court has that information), and will instruct the party or counsel to dial in or sign in to the courtroom. If parties or counsel "arrive" in the virtual courtroom after roll call, they should not attempt to speak because another hearing may be underway. If they are using the WebEx website or the app, they may check in with the courtroom clerk using the "chat" function.  If they are calling in by telephone, they should wait for their case to be called.

If a party or counsel intends to rely on exhibits or other documents during the hearing, the party or counsel shall e-mail the exhibits to the Court at judgeparkchambers@dcsc.gov, copying all sides, no later than 5:00 p.m. the day before the hearing. The party or counsel must also file the exhibits on the docket using the CaseFileXpress system and provide a copy of the exhibit to any witness before the hearing. The exhibits must be separately labeled so that they can be easily identified by all parties and the Court during the remote hearing.

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**(Civil Division-Civil Action Branch)**

| | | |
|---|---|---|
| **JACK I. BENDER & SONS**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.:** 2020 CA 003261 B |
| | ) | **Judge:** The Hon. Jason Park |
| **THE GAP, INC., a/k/a Gap, Inc.,** | ) | **Next Event:** Initial Scheduling Conference |
| | ) | October 23, 2020 |
| Defendant. | ) | |
| _____ | ) | |

<u>**NOTICE OF FILING OF NOTICE OF REMOVAL**</u>

TO THE CLERK:

Attached please find a copy of a Notice of Removal that is contemporaneously being filed

with the United States District Court for the District of Columbia.  Pursuant to 28 U.S.C. § 1446

(d), this Court shall proceed no further with this case unless and until the case is remanded.

Dated: August 28, 2020.

Respectfully submitted,

**THE GAP, INC., A/K/A GAP, INC.**

/s/ Patrick Hanes
Patrick Hanes (DC Bar # 1018551)
Williams Mullen
1666 K St. NW, Suite 1200
Washington, DC 20006
(202) 293-8139 (telephone)
(202) 293.5939 (facsimile)
phanes@williamsmullen.com

*Counsel for Defendant*
*The Gap, Inc., a/k/a Gap, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2020, the foregoing document was electronically filed with the Court in this case for distribution to the following:

Michael R. Cogan (DC Bar # 450916)
Michael R. Cogan, P.C.
12 S. Summit Avenue, Suite 250
Gaithersburg, MD 20877
(240) 912-0400 (telephone)
(240) 386-0555 (facsimile)
mcogan@randclegal.com

*Counsel for Plaintiff Jack I. Bender & Sons*

s/ Patrick Hanes
Patrick Hanes (DC Bar # 1018551)